UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, MARY DOE, and JAMES DOE, <br><br> Plaintiffs, <br><br> v. <br><br> TRUSTEES OF BOSTON COLLEGE, PAUL J. CHEBATOR, CAROLE HUGHES, CATHERINE-MARY RIVERA, PATRICK J. KEATING, and BARBARA JONES, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. _____ |

## COMPLAINT AND JURY DEMAND

Plaintiffs John Doe, Mary Doe, and James Doe,[1] for their complaint against defendants Trustees of Boston College, Paul J. Chebator, Carole Hughes, Catherine-Mary Rivera, Patrick J. Keating, and Barbara Jones, allege as follows:

### NATURE OF ACTION

1. This is an action for declaratory and injunctive relief and for damages arising out of the unlawful conduct of the defendant university and its agents that resulted in the wrongful suspension of plaintiff John Doe, then a first-semester senior.  The suspension was the result of a rigged disciplinary process that branded John a sexual predator for the rest of his life. Defendants' actions, which were in violation of both federal and state law, were taken to achieve a predetermined result and with deliberate disregard of the consequences to plaintiffs and the grievous harm that they would suffer and have suffered.

---

[1]  Plaintiffs have filed, contemporaneously with this complaint, a motion to proceed pseudonymously.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343. This Court has subject matter jurisdiction over plaintiffs' state claims under 28 U.S.C. §§ 1332 because this action is one between citizens of different states. There is jurisdiction over the state claims under 28 U.S.C. § 1367 as well. The amount in controversy exceeds $75,000, exclusive of interest and costs. In addition, an actual controversy exists between plaintiff John Doe and defendant Trustees of Boston College, justiciable in character, in respect to which John Doe seeks a declaration of his rights and appropriate further relief under the provisions of 28 U.S.C. §§ 2201, 2202, and 1651.

3. This Court has personal jurisdiction over defendant Trustees of Boston College because it regularly does business and engages in other persistent courses of conduct in this district. This Court has jurisdiction over the individual defendants because each either resides in this district or, in connection with his or her employment in this district, has committed tortious and other acts giving rise to the claims stated herein.

4. Venue is proper in this court under 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to plaintiffs' claims occurred in this district.

## PARTIES

5. Plaintiffs John Doe, Mary Doe, and James Doe are citizens and residents of a state other than Massachusetts and Vermont.

6. Defendant Trustees of Boston College is the legal name of the educational institution formed under the laws of the Commonwealth of Massachusetts and located in Chestnut Hill, Massachusetts. The school is generally known as Boston College.

7. Defendant Paul J. Chebator was, at all material times, the Dean of Students at Boston College. He is sued in his individual capacity and as an agent of Boston College during times material to the complaint. Upon information and belief, he is a citizen and resident of Vermont.

8. Defendant Carole Hughes was, at all material times, the Senior Associate Dean of Students at Boston College. She is sued in her individual capacity and as an agent of Boston College during times material to the complaint. Upon information and belief, she is a citizen and resident of Massachusetts.

9. Defendant Catherine-Mary Rivera was the Chairperson of the Boston College Administrative Hearing Board that rendered the decision at issue. She is sued in her individual capacity and as an agent of Boston College during times material to the complaint. Upon information and belief, she is a citizen and resident of Massachusetts.

10. Patrick J. Keating was, at all material times, Executive Vice President of Boston College and the Interim Vice President for Student Affairs. He is sued in his individual capacity and as an agent of Boston College during times material to the complaint. Upon information and belief, he is a citizen and resident of Massachusetts.

11. Barbara Jones is Vice President for Student Affairs at Boston College. She is sued in her individual capacity and as an agent of Boston College during times material to the complaint. Upon information and belief, she is a citizen and resident of Massachusetts.

## FACTS

### A. Boston College and the Doe Family

12. Boston College ("BC" or "the University") is a Catholic university founded and operated by the Society of Jesus. According to its mission statement, the University "is rooted in a world view that encounters God in all creation and through all human activity, especially in the search for truth in every discipline, in the desire to learn, and in the call to live justly together."

13. Mary Doe and James Doe are BC alumni who have been active on behalf of their alma mater and in Jesuit causes.  Approximately 20 members of their extended family have attended BC.  They were thrilled when their son John was accepted by and decided to attend BC. In the fall of 2012, John was a senior pursuing a double major in History and Hispanic Studies; he was scheduled to graduate the following spring.  He was on the reporting staff of the school newspaper, *The Heights*, and hoped to attend law school after graduation.

### B.   The Events of October 20-21, 2012

14. On the evening of Saturday, October 20, 2012, John was on assignment for *The Heights*, covering a social function for BC students sponsored by AHANA, the University's organization for minority students.  The event was held on the *Spirit of Boston* cruise ship in Boston Harbor.  Approximately 600 students attended the event, and the ship was at capacity. The ship had three decks:  there were casino tables on the bottom deck, a dance floor on the middle deck, and soft drinks and snacks on the top deck.

15. As a reporter for *The Heights*, John had been provided a complimentary pass to the event.  When he boarded the ship, he was introduced to several AHANA student leaders whom he planned to interview later in the evening.

16. Several of John's friends attended the event as well.  Shortly after the ship left the pier at approximately 11:30 p.m., John – 6'4" tall and wearing a purple shirt – was moving and dancing his way through the packed dance floor, trying to reach some of his friends.  They were watching him cross the dance floor and were waiting for him to arrive where they were standing. The music was very loud, it was dark, and a strobe light was flashing.

17. Also moving across the dance floor, but in front of John, was another male BC senior, J.K.[2] J.K., an acquaintance of John, was considerably shorter at 5'8" and was wearing a light colored shirt with designs on the front. J.K. was headed across the dance floor to the same destination as John.

18. As John continued slowly making his way through the crowd, a woman, out of the blue, turned around with an angry expression and began screaming at him. Startled, John had no idea why. He could not make out her words because of the noise. After shrugging in response, John continued to move forward. At that point, J.K. turned back to face John, said "Sorry, dude, that was my bad," and then laughed. John did not understand or respond to J.K.'s comment.

19. John eventually reached his friends. After a few minutes, the ship's security guards appeared and took John away. John was stunned and had no idea what was happening. John's friends, who had just watched him cross the dance floor, were equally stunned. One of them, "Tom," called John's cell phone to find out what was happening. Tom heard John say, "J.K. must have . . . ," before a security guard made John end the call.

20. The security guards took John to a bar area on the middle deck that was not in use and held him there until the ship returned to the pier. While he was detained, the security guards told him that he was not free to leave. He was not allowed to use the bathroom or communicate with anyone.

21. When the ship arrived at the pier, the Massachusetts State Police took John into custody, gave him *Miranda* warnings, handcuffed him, and placed him under arrest. They put plastic bags on his hands to preserve evidence and took him to the State Police barracks at Logan Airport. On the way, one of the state troopers, holding a computer thumb drive, yelled at him

---

2   Pseudonyms are used for each of the students referenced.

that they had video of the entire incident and that he had better confess. John told the trooper that the video would show that he did not do anything wrong.

22. At the barracks, John was shackled to the wall. The state troopers repeated the threat that he should confess because the video would prove him guilty. John refused to say anything further and asked to contact an attorney.

23. Forensic evidence specialists took several swab samples from his hands, fingers, and fingernails, and took his clothes. The police booked him and took his mug shot and fingerprints. John spent the night in a cell at the barracks before being released on bail early Sunday morning.

24. On Monday, October 22, a criminal complaint was issued, charging John with indecent assault and battery on a person age 14 or over. The charge carried a maximum penalty of five years in state prison, lifetime parole supervision, and permanent registration as a sex offender. John was arraigned on this charge the same day in South Boston District Court and pled "not guilty."

### C. The Criminal Case

#### 1. Factual Investigation

25. With the financial assistance of his parents, John was able to hire an experienced criminal defense attorney, Hugh Curran of the Bletzer & Bletzer law firm. Attorney Curran, through the criminal discovery procedure, was able to learn the following: the victim of the assault, a BC sophomore named A.B., through several interviews with the Boston College Police, the State Police, the emergency room doctor, and BC officials, consistently gave a specific, detailed description of what happened.

26. A.B. had been dancing with her friend and fellow student "Betsy." A.B. felt a hand go up her dress from the back and "two fingers were forcibly inserted up into [her] anus." She "knew it was two fingers" because when her assailant "pulled his fingers out of her anus she

could feel his thumb and other two fingers on either side run up along her 'butt crack' and to the lower portion of her back." The assailant's "entire two fingers" penetrated her anus "all the way," it was "painful," and "it really hurt when he did it." When A.B. turned around, she "saw a tall, lone Caucasian male . . . [who] was wearing a purple shirt." "While turning, [she] yelled, 'what the hell are you doing?' The male did not respond or move." Rather, "the guy was just staring at [her] with a weird look."

27. Although A.B.'s dancing partner, Betsy, was facing A.B., she did not see the assault. Rather, Betsy stated to the authorities that A.B. "suddenly . . . made an odd facial expression. . . .[,] turned around and looked at the tall guy behind her and yelled something along the lines of 'What the hell is wrong with you?' He seemed non-responsive & looked at her with ambivalence." A.B. and Betsy left the dance floor. According to Betsy, A.B. later said that "the tall male with brunette hair & purple button down shirt stuck his fingers between her legs."

28. After John had been removed from the ship, J.K. showed unusual interest in what happened to John, whom he barely knew. At 1:49 a.m. on October 21, J.K. texted "Bob," one of John's friends who had been on the ship: "Is [John] ok?" Bob replied that he had "[n]o idea." J.K. then tried to call John at 3:16 a.m. while John was in custody.

29. The next day, J.K. exchanged texts with John's friend, Tom, as follows:

> J.K.: "Did u ever figure out how/why [John] got in trouble[?]"
>
> Tom: "Not yet[,] but I'll let you know when I find out."
>
> J.K.: "Ha[.] I'm just so confused what he coulda done. We were so fucked."

30. J.K. also texted John the day after the cruise at 1:46 p.m. John responded at 5:26 p.m.:

> J.K.: "What happened last night?"

John:  "Hey man just got my phone back, what happened sat night?"

J.K.:  "Dude I literally have 0 recollection of the boat cruise.  Not even one minute.  I blacked in late that night in a golden vest and dr sues[s] hat.  What did they say they took u in for?"

31.  John telephoned J.K. the following day, October 22, and they spoke for 13 minutes. A private investigator hired by Attorney Curran listened to the conversation.  The investigator, Kevin Mullen, is a former Sergeant Detective with the Boston Police Department.  The conversation went as follows:

- J.K. stated again that he had no recollection of the cruise.

- When John told J.K. about his statement – "Sorry, dude, that was my bad" – J.K. did not respond, except to say, "Oh, that's weird."

- When John told J.K. about the woman's allegation, J.K. stated: "What a bitch.  What kind of girl goes to a dance floor like that and doesn't expect to get touched or grabbed?"

32.  Mullen interviewed J.K. in person on October 29 and heard a much different version of events.  J.K. now claimed to have a good memory of most of the evening on the ship.  He also denied making any phone calls or texting after the cruise about John's situation.  He claimed not to recall crossing the dance floor with John or saying anything to John along the lines of "Sorry, dude, that was my bad."

**2.  Dealings with the District Attorney's Office**

33.  The prosecutor assigned to John Doe's case was Jennifer O'Keefe of the Suffolk County District Attorney's Office.  Attorney Curran interacted frequently with ADA O'Keefe – herself a BC alumna – in an effort to convince her  that the police had arrested the wrong man. Initially, Attorney Curran focused on: (a) the improbability of a reporter for the school newspaper committing a heinous assault at an event that he was assigned to cover; (b) the fact

that no one saw John touch, much less assault, A.B.; (c) the proximity of J.K. to A.B., his admittedly intoxicated state, and his statement to John at the time ("Sorry, dude . . . ."); (d) J.K.'s lack of memory due to "blacking out"; (e) his consciousness of guilt demonstrated after the event by his phone calls and texts; (f) his inculpatory statements to John about the woman ("What a bitch"; should have expected to be "touched or grabbed"); and (g) his convenient regaining of selective memory when speaking with Investigator Mullen.

34. The results of the forensic tests on John's hands became available in February 2013. They were negative:  no blood or DNA was detected.  As Attorney Curran emphasized to ADA O'Keefe, if A.B.'s consistent, specific description of her assault was correct, it would have been all but impossible for her attacker not to have her DNA on his hand.  ADA O'Keefe agreed that the forensic results tended to be exculpatory, but was not prepared to say that they entirely ruled out John as the perpetrator.

35. Through the discovery process, Attorney Curran had obtained a copy of the cruise ship's surveillance video.  The video, which had been taken on equipment that was probably decades old, was of poor quality and extremely "compressed," *i.e.*, the video did not reflect the depth of the sizable dance floor and also distorted distances between people and objects.

36. Attorney Curran retained a forensic videographic company to analyze the video and, if possible, to improve the quality and eliminate the distortion of the raw video footage.

37. The forensic videographers, after a great deal of work, were able to do so.  The forensically-analyzed video showed the following:

- John Doe is visible on the video of the dance floor for approximately three and one half minutes, and can be seen slowly making his way through the crowd.

- The moment after A.B. was assaulted can be pinpointed; she turns around and her face is visible.

9

- If it is assumed that she turned around 1-2 seconds after her assailant withdrew his hand, the time of the assault can be fixed.

- Fifteen seconds before the assault, John has his back to A.B.

- Ten seconds before the assault, John turns around.

- Two seconds before the assault, John is standing straight and has his right arm above his head.

- At the instant of the assault, John is still standing straight with his right arm above his head.

- At the instant of the assault, John is 4-6 feet away from A.B.

- At the instant of the assault, there are at least 2-3, and perhaps as many as 5, people between John and A.B.

38. ADA O'Keefe viewed this version of the video at the office of the forensic videographic company in July 2013. One of the videographers explained the entire process to her, described what the video showed, and answered all her questions. ADA O'Keefe ultimately agreed that the prosecution of John Doe should not go forward.

39. The remaining issue concerned the appropriate mechanism to dispose of the case. Under Massachusetts criminal procedure, there are a number of forms of disposition. For example, "continuation without a finding" requires that a defendant admit responsibility for the crime charged, but the court will not enter – and the defendant's record will not reflect – a finding of guilty. Another such mechanism is "probation before trial," which does not require an admission of guilt. Instead, the case is kept open for a period of time, usually 6-12 months, and then dismissed if the defendant has complied with any conditions set by the court.

40. Attorney Curran told ADA O'Keefe that the only acceptable disposition was an unequivocal dismissal of all charges. O'Keefe responded that such a dismissal would require the approval of a senior official in the Suffolk County District Attorney's Office.

41. Prior to seeking such approval, and to remove any possible doubt of John's innocence, Attorney Curran had John take a polygraph examination, which he passed with no evidence of deception.

42. In December 2013, Attorney Curran met with a senior official in the Suffolk County District Attorney's Office, and presented the argument for outright dismissal. Attorney Curran pointed to: (1) the evidence surrounding the assault, including J.K.'s behavior indicating a consciousness of guilt; (2) the negative results of the forensics tests on John's hands and fingers; (3) the video that ADA O'Keefe considered exculpatory; and (4) the favorable results of the polygraph test. The senior official agreed that dismissal of the charges was appropriate, but stated his preference that the case be dismissed at the end of the school year in the spring.

43. In May 2014, an ADA appeared in the South Boston District Court and moved for an outright dismissal of the charges against John Doe, stating that both ADA O'Keefe and the senior prosecutor recommended this course of action. The court granted the motion. Attorney Curran's hard work and the prosecutors' willingness to listen averted a miscarriage of justice, and the criminal portion of John's nightmare was over. The same cannot be said, however, of the ordeal that John and his parents have suffered at the hands of Boston College, the school that they once loved.

44. That ordeal began when the University learned of John's arrest in the early morning of October 21, 2012 and decided that handcuffs equated to guilt. The University immediately

embarked on a counterfeit disciplinary process with a predetermined result, all of which was contrary to law, as more fully described below.

**D.   Federal Statutory and Regulatory Requirements Concerning Allegations of Sexual Assault**

45.   The issue of sexual assaults on college and university campuses is primarily addressed by an act of Congress known as Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.   Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.   The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.   20 U.S.C. §§ 1681(a), 1687.   A school specifically agrees, as a condition for receiving federal funds, to operate all of its programs and activities in accordance with Title IX and the Department of Education's Title IX regulations.   This agreement is known as an "assurance of compliance."   34 C.F.R. § 106.4(a)-(c).   In this respect, Title IX is no different from other federal legislation that conditions the entitlement to federal funds on adherence to a federal regulatory scheme.

46.   The University is a recipient of federal funds, is bound by Title IX and its regulations, and, upon information and belief, has executed an assurance of compliance.

47.   Since regulations were first promulgated under Title IX in 1975,[3] there has been a requirement that a school "adopt and publish *grievance procedures providing for the prompt and equitable resolution of student . . . complaints* alleging any action which would be prohibited by" Title IX or its regulations.   34 C.F.R. § 106.8(b) (emphasis added).   Both the Department of

---

[3]   U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 36 n.98 (notice of publication at 66 Fed. Reg. 5512 (January 19, 2001)) ("2001 Guidance"), available at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

Education and the Department of Justice have set forth this requirement by way of regulation.[4]  It has also long been recognized by "[t]he Supreme Court, Congress, and Federal executive departments and agencies . . . that sexual harassment of students can constitute discrimination prohibited by Title IX."[5]  "Sexual Harassment" is broadly defined as "unwelcome conduct of a sexual nature" that includes sexual intercourse, sexual assault, and rape.  Student-on-student sexual harassment is prohibited by Title IX, as are other forms of sexual harassment.[6]

48.  The Office for Civil Rights ("OCR") of the Department of Education investigates and administratively enforces Title IX as it relates to sexual harassment.  In 2001, OCR promulgated regulations pursuant to notice-and-comment rulemaking[7] in a document entitled "Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").[8]  OCR issued these regulations to "continue[ ] to provide the principles that a school should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance."[9]

49.  Title IX's regulations, including the 2001 Guidance, have the force and effect of law, for they affect individual rights and obligations, and were the product of notice-and-comment rulemaking.

50.  In the 2001 Guidance, OCR recognizes that "procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past

---

[4]   34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice).

[5]   2001 Guidance at 2 & n.3.

[6]   *Id.* at 2-3 & nn.2, 3, 6, 8, 20.

[7]   *Id.* at ii.

[8]   *See* note 3 *supra.*

[9]   2001 Guidance at i.

experience." 2001 Guidance at 20.  Nevertheless, OCR has identified a number of factors to be

used in determining whether a school's procedures satisfy the "prompt and equitable"

requirement of the regulations.

51.  First, in a section entitled "Due Process Rights of the Accused," OCR states that the

procedures must not only "ensure the Title IX rights of the complainant," but must also

"accord[ ] due process to both parties involved."  *Id.* at 22.  This Title IX "due process"

requirement applies to both state and private colleges and universities.  *Id.* at 2, 22.

52.  The "prompt and equitable" procedures that a school is required to implement to

"accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment . . .";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint . . . ."

*Id.* at 20.

53.  A school also has an obligation under Title IX to make sure that all employees

involved in the conduct of the procedures have "adequate training as to what conduct constitutes

sexual harassment," which includes "alleged sexual assaults."  *Id.* at 21.

54. In April 2011, OCR issued a "significant guidance document" commonly referred to as the "Dear Colleague Letter."[10]  The Letter reaffirms the vitality of the 2001 Guidance and is OCR's latest interpretation of Title IX as it relates to sexual assault proceedings on campus.  As set forth in the Letter, OCR states that compliance with Title IX requires the following:

- A school's "Title IX coordinator [the official charged with compliance] should review the [school's] disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX."[11]

- **"Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence,** once notified that the police department has completed its gathering of evidence . . . , the school must promptly resume and complete its fact-finding for the Title IX investigation."[12]

- The complainant and the accused student "**must have an equal opportunity to present relevant witnesses and other evidence.**"[13]

- The complainant and the accused student "must be afforded similar and timely access to any information that will be used at the hearing.  For example, a school should not conduct a pre-hearing meeting during which only the [complainant] is present and **given an opportunity to present his or her side of the story,** unless a similar meeting takes place with the [accused student]."[14]

- **"Schools must maintain documentation of all proceedings,** which may include written findings of fact, **transcripts, or audio recordings.**"[15]

---

[10] "Dear Colleague" Letter from Russlynn Ali, Assistant Secretary for Civil Rights, U.S. Department of Education (Apr. 4, 2011), available at http://www2.ed.gov/about/offices/list/ocr/letters/colleagues-201104.pdf.

[11] *Id.* at 8.

[12] *Id.* at 10 (emphasis added) (footnote omitted).

[13] *Id.* at 11 (emphasis added).

[14] *Id.* (emphasis added).

[15] *Id.* at 12 (emphasis added).

- "[S]chools [should] provide an appeals process."[16]

- "In sexual violence cases, the fact-finder and decision-maker also should have **adequate training or knowledge regarding sexual violence**."[17]

- "If an investigation or hearing involves forensic evidence, that evidence should be reviewed by a **trained forensic examiner**."[18]

**E.    The University's 2012 Procedures Concerning Allegations of Sexual Assault**

55.   For the 2012-2013 school year, the University had three sources of written policies and procedures relating to sexual assault:

- Section 4 of the 2012-2013 Student Guide,[19] entitled "Community Standards and Policies," which included general provisions as well as provisions relating specifically to "Sexual Harassment, Sexual Assault & Sexual Misconduct";

- Section 5 of the 2012-2013 Student Guide, entitled "Student Conduct System," which described the disciplinary process, including the operation of the Administrative Hearing Board, the body that considered the most serious violations; and

- A two-page document entitled "Conduct Board Procedure" that was provided to both the complaining student and the accused student.

The University represented in the Student Guide that all its policies and procedures concerning sexual assault (collectively "Sexual Assault Policies and Procedures"[20]) complied with the requirements of Title IX.

---

[16]   *Id.*

[17]   *Id.* (emphasis added).

[18]   *Id.* (emphasis added).

[19]   The 2012-2013 Student Guide was published on the University's website, www.bc.edu.

[20]   All quotations concerning the Sexual Assault Policies and Procedures are from (1) the University website as it existed just prior to October 20, 2012 or (2) the "Conduct Board Procedure" document from the same period.

56. The University also made four specific, overarching guarantees to every student involved in the disciplinary process, including those accused of sexual assault: (1) the accused student had the right to "due process"; (2) the accused student had "the right to a fair procedure which is appropriate to the circumstances"; (3) the accused student had "[t]he right to have access to a process through which to resolve deprivations of rights"; and (4) "deviations from prescribed procedures" would "invalidate a decision or proceeding" if "significant prejudice to a student . . . may result."

57. Under the 2012-2013 Sexual Assault Policies and Procedures, a BC student who wished to assert a sexual assault complaint against another student was to initiate the process by contacting the Dean of Students and/or the Boston College Police Department. The University was to respond by providing the student with advice on (a) submitting a complaint to the University; (b) initiating a criminal proceeding with local law enforcement; or (c) pursuing both options at the same time. The complaint submitted to the University was required to contain a "clear statement explaining the nature and circumstances" of the charge.

58. Once a student submitted a charge of sexual assault to the University, the Sexual Assault Policies and Procedures mandated that the following steps be taken by the Dean of Students[21] and his or her staff:

**a. Threshold Evaluation.** The "Dean of Students or designee" was required to perform a threshold evaluation of the charge by having a face-to-face meeting with the accused student and "discuss[ing] the complaint." After hearing what the accused student had to say, the Dean/designee was to "promptly [initiate] an investigation of the alleged incident." There was one exception to the "prompt investigation" requirement:  if the complainant had pursued

---

[21]   In 2012-2013, the Student Conduct System was "administered by the Vice President for Student Affairs through the Dean of Students and his/her staff."

criminal charges and the criminal proceeding was ongoing, the Dean's Office "may elect to stay the disciplinary process if the student is summarily suspended . . . ." A "summary suspension" prohibited a student from entering University housing or any University property. "In the case of summary suspensions imposed as a result of criminal charges, the suspension may remain in effect until the matter is resolved both off and on campus."

   **b. Investigation of the Complaint.** Unless the Dean's Office stayed the disciplinary process, the investigation was to go forward and be conducted by the Dean's Office in conjunction with the Boston College Police: "The Boston College Police work cooperatively with the Office of the Dean of Students to investigate charges of sexual assault." The Boston College Police had officers "specially trained" to investigate charges of sexual assault. The investigation was to include four components: (1) "a review of statements obtained from either party"; (2) "interviews with the complainant and the accused (if identified)"; (3) "interviews with appropriate witnesses"; and (4) "a review of other relevant information." "Once the investigation is complete, the University will take appropriate action . . . ."

   **c. Referral to a Conduct Board.** If the Dean's Office determined that the investigation warranted further proceedings, the matter was referred to one of the University's "Conduct Boards." The Dean of Students "determine[s] which board will hear the case." Serious allegations, such as charges of sexual assault, were heard by the Administrative Hearing Board, which consisted of three administrators, one faculty member or academic administrator, and one student. "All board members are trained by the Office of the Dean of Students." "Chairpersons for the Administrative Hearing Board are designated by the Dean of Students and receive additional training."

**d. Timing of the Hearing and Resolution.** The procedures did not set forth deadlines for holding a hearing or for resolution of a charge, but "[t]he University will make every reasonable effort to resolve the complaint within 60 days." In addition, the accused student had "the right to adequate time to prepare a response to the charges" in addition to the due process and other guarantees set forth above.

**e. Notice of the Referral and the Hearing.** "When a matter is referred to a board, the accused student will be sent a copy of the [board] conduct procedures [*i.e.*, the two-page document]." The Dean's Office would also send the accused student a notice, at least 72 hours in advance of the hearing, that was required to include (1) the name of the board hearing the case; (2) the time and location of the hearing; (3) the names of all parties charged and the name(s) of the complainant(s); and (4) the "**alleged violations.**" (emphasis added)  The procedures make clear that the notice must be meaningful and complete with regard to the "alleged violations": the student has the fundamental "right to be informed of **any charges of misconduct.**" (emphasis added)

**f. Procedural Rules for the Hearing.** In 2012-2013, the procedural rules for hearings included:

- Each Board member was required "to be impartial in the hearing of the case."

- The complainant and the accused student each had the right to be accompanied by an advisor, who could be a lawyer if there were open criminal charges against the accused student.  The advisor and the student could confer, but the advisor [could] not formulate specific questions, responses, or statements for the student."  Nor could the advisor "address the Board or act in any adversary capacity."

- "The University reserves the right to have legal counsel at a hearing to serve as an advisor to the Chairperson of the hearing board.  The chairperson and legal counsel may consult any time during the hearing."

- The parents of the complainant and those of the accused student were permitted to attend the hearing.

- The complainant and the accused student each had the right to request the placement of a partition so that neither would be visible to the other. The Dean of Students had the final decision as to whether a partition would be used.

- No stenographic or audio recording of the hearing was made. The use of any electronic device at the hearing required advance written permission of the Dean of Students.

- Both the complainant and the accused student were entitled to present witnesses and "other related evidence."

- The witnesses were required to be fact witnesses, *i.e.*, "able to speak to the facts of the incident which they have witnessed." Character witnesses were generally not allowed to testify; rather, written statements were to be provided.

- The Dean of Students did not ensure the attendance of witnesses for either the complainant or the accused student: "The Dean's Office **does not** notify witnesses and **does not** have subpoena power over them." (emphasis in original)

- "The hearing board has the authority to require individuals to appear as witnesses in cases where it is determined that their testimony is important and necessary for a full and fair hearing of a case."

- "The standard used to determine responsibility is a preponderance of the evidence, that is, whether it is 'more likely than not' that the accused has violated the policy."

    **g. Conduct of the Hearing**. The accused student was guaranteed "the right to hear evidence in support of the charges" and "the right to present evidence against the charges." The chairperson of the Board was to conduct the hearing in the following manner:

- "The chairperson will introduce the complaint by reading the formal charges as determined by the Office of the Dean of Students."

- "The complainant will then have an opportunity to read his/her incident report [*i.e.*, his/her version of events] to the board and to elaborate on it.  The accused will then have an opportunity" to respond.

- The Board members could question the complainant and the accused student at any time during the hearing.

- The complainant and the accused could only question each other through the chairperson.

- Witnesses could make a statement, which would then be followed by questions from the Board.  Questions from the complainant and the accused student were required to be asked through the chairperson.

- The complainant and the accused student each had the right to make a final statement.

**h. Decisionmaking Process**.  After the hearing, the Board was to "meet in private" and render one of four decisions by a simple majority vote:  (1) "responsible"; (2) "not responsible"; (3) "no finding"; or (4) "responsible for a lesser inclusive charge."  If the finding was "responsible," or "responsible for a lesser inclusive charge," the Board was to recommend punishment to the Dean of Students, which could include suspension or dismissal from the University.  The accused student had "the right to be informed of the outcome of [the] proceeding."

**i. Appeal**.  The accused student had the fundamental "right to have access to a process through which to resolve deprivations of rights."  The appeal process after the hearing was as follows:

- The appeal mechanism was not an appeal as of right, but a "request for an appeal."

- There were only two grounds on which to base a request for an appeal:  (1) a denial of "due process"; or (2) the existence of new evidence not available at the time of the hearing.

- The request for an appeal was directed to the Dean of Students and the Vice President for Student Affairs.

- "If the Dean [of Students] and the Vice President [for Student Affairs] decide that the [request for an] appeal has merit, . . . they will [1] refer the appeal to the Appeals Board to be reheard in its entirety or [2] refer it back to the original hearing board for further adjudication."

- The "Appeals Board" was a body composed of the Dean of Students or designee, the Director of Residential Life or designee, and an administrator appointed by the Vice President for Student Affairs.  The decision of the Appeals Board was final.

## F.   The University's Disciplinary Proceeding Against John Doe

### 1.  The Sexual Assault Notification Form

59.  In the early morning hours of October 21, 2012, a Boston College Police officer completed a standard University document entitled "Sexual Assault Notification Form."  The form's description of the incident the night before was false and misleading in that it attributed knowledge to A.B. that she did not have nor ever claim to have had.  The form stated that (1) John Doe "approached [A.B.,] began to dance with her," and "then placed his hand up her skirt and inserted a finger inside her anus"; and (2) A.B. witnessed the act and, therefore, knew who had done it.  This false narrative was immediately and widely distributed within several University administrative departments and led to an immediate summary suspension that prohibited John Doe from setting foot on campus, a suspension that, except for a brief period of time, remained in place.  The false narrative, together with John Doe's arrest, led the Office of the Dean of Students to assume from the outset that John Doe was guilty, an assumption that carried through the entire disciplinary process.

## 2. The Dean's Initial Refusal to Meet with John Doe and Resulting Procedural Decisions

60. John Doe's parents, Mary and James Doe, learned of John's arrest the morning after the cruise. James was immediately in contact with the Dean's Office and was told that he and John could meet with the Dean the next day, Monday, October 22. James flew to Boston on Sunday. That same day, Dean of Students Paul Chebator was in contact with A.B.'s father, who "was quite angry and upset" and "wanted the male student to be expelled immediately." In reporting this conversation to his staff, Chebator stated that both A.B. and John Doe "will be met by someone in the dean's office in the next day or two and a determination will be made how to proceed." But the Dean's Office inexplicably refused to meet with John and his father on October 22 and 23.

61. During the evening of October 23, Chebator spoke with Senior Associate Dean of Students Carole Hughes, to whom he had delegated day-to-day responsibility for the matter. Chebator agreed with the following conclusions reached by Hughes, who had never spoken with John:

- The summary suspension barring John from campus should remain in place.

- The University's policies and Title IX required that the matter be resolved quickly, preferably "in the next two weeks."

- An Administrative Hearing Board should be convened to hear the charges against John.

- Because the Boston College Police had no jurisdiction at the scene of the incident, they were entirely prohibited from investigating the matter.

- Hughes would interview both A.B. and John in order to obtain their respective accounts of the incident and would also interview other witnesses.

- "[T]hat inquiry along with a hearing board would constitute an investigation." Hughes confirmed this conclusion with Nora Field, the University's Deputy General Counsel.

### 3. The Dean's Refusal to Listen to John Doe's Account

62. Hughes finally met with John and his father on October 24, having already decided to bar John from campus, refer the matter to an Administrative Hearing Board for a quick resolution, and conduct an "investigation" without the assistance of the Boston College Police. When John attempted to explain what happened and how A.B. had identified the wrong person, Hughes refused to allow John to explain what happened – contrary to her previously-stated intent to interview John. Instead, she told John that he could save his explanation for the hearing. But as Hughes stated in an email reporting on the meeting, John, despite Hughes' refusal to allow it, was able to get out "that he did not do this" and that "this is a case of mistaken identity."

63. At the same meeting, James – who is an attorney[22] – requested that the hearing be delayed until the District Attorney's Office and State Police concluded their investigation. Hughes responded that Title IX required the school to move forward without delay, even without evidence that may be developed by law enforcement. She later stated something quite different in that same email reporting on the meeting: "Certainly we could wait [to hold the hearing] until after the [criminal] court dates . . . ."

64. John met with Hughes on two more occasions, accompanied both times by his mother, Mary. On October 26, Hughes allowed John to review – but not have a copy of – a statement that A.B. had written with Hughes' assistance. Hughes also provided John with (a) the notice of the charges against him: "Sexual Assault"; and (b) the two-page document entitled

---

[22] Upon hearing of the incident, James began providing John with legal assistance and remains part of his legal team today.

"Conduct Board Procedure." The term "Sexual Assault" was not defined, nor was it defined in the Sexual Assault Policies and Procedures. At the second meeting, on October 30, John was allowed to review his school records and any other documents that were to be used at the hearing. Although Hughes had in her possession at least one other statement by a witness, she did not provide it, or even reveal its existence. She also told John that the Dean's Office had no authority to require witnesses to appear at the hearing on John's behalf.

65. At both the October 26 and 30 meetings with Hughes, John once again attempted to tell Hughes what happened the night of the cruise, but she again refused to allow him to explain. Moreover, she was overtly hostile to him and his mother. In Mary's words, Hughes "treated him as a contemptible criminal."

66. After a postponement at the request of A.B., the hearing was rescheduled for November 8. On November 7, the failure of the Dean's Office to conduct any sort of meaningful investigation – as required by the University's own procedures – surfaced once more. On that day, John's attorney-advisor for the disciplinary process – Conrad Bletzer, Jr. – called the University's General Counsel, Joseph Herlihy, and told him what John had repeatedly and unsuccessfully tried to tell Hughes: both the police and the school had charged the wrong person, and it was another student who should be investigated, based on his statement to John at the time and his statements and conduct after-the-fact.

67. Attorney Bletzer's call to Herlihy led, on information and belief, to Herlihy instructing Hughes to demand that John meet with her without his lawyer being present. Hughes emailed John that "[i]t is imperative that you meet with me tomorrow morning," i.e., the day of the hearing, to discuss the assertion "that there was someone else responsible for this." When John told her that his lawyer was not available in the morning, she responded that she "did not

need to speak to his attorney, [but] needed to speak to him." John asked her to call his attorney, but Hughes refused to do so, and no meeting occurred.

### 4. The Hearing

68. The hearing began on November 8. The Administrative Hearing Board consisted of the chairperson, Catherine-Mary Rivera, the Assistant Director of Residential Life; two other administrators; a visiting professor at the law school; and an undergraduate student. Rivera was appointed Chairperson by the Dean of Students, Chebator, and received "additional training" from the Dean's Office. Although the Sexual Assault Policies and Procedures required each Board member "to be impartial in the hearing of the case," Rivera acted as the *de facto* prosecutor at the hearing. In both words and attitude, she was openly hostile to John. She entirely abandoned her designated role as a neutral arbiter of the facts.

69. Others in attendance were A.B., her parents, and her lawyer-advisor; John, his parents, and his lawyer-advisor; and University General Counsel Herlihy. A partition divided the room.

70. There is no transcript of the hearing, owing to the University's policy prohibiting stenographic or audio recording. In sum and substance, the November 8 proceeding was as follows:

- A.B. testified consistently with her prior statements, including the highly-specific details of the assault, how she did not see the assault, and how she knew that John Doe had done it because he had a "weird look" on his face.

- A.B.'s friend, Betsy, refused to come to the hearing. A.B. testified that Betsy did not see the assault.

- John denied having touched A.B. in any way and testified as to what J.K. said to him. He also testified concerning J.K.'s texts and the October 22 telephone conversation with J.K. John emphasized that the forensic testing of his hands and the forensically-analyzed video, when available, would

prove that he was innocent.  He showed a small portion of the raw video footage to the Board.

- John's friends – Tom and two others – testified that they were watching John cross the dance floor and saw nothing. They corroborated John's testimony that he was sober because he had to write an article for the school paper. They also testified that J.K. was obviously drunk and had previously blacked out from drinking.  Tom testified about the aborted phone call in which John said, "J.K. must have . . ."   Finally, John's friends testified as to J.K.'s unusual interest in what happened to John and the texts that J.K. sent.

71. The Board refused to allow Kevin Mullen, the private investigator and former Boston Police Department Sergeant Detective, to testify even though he was on John's witness list and had first-hand knowledge of relevant evidence.  In addition, John wanted J.K. to testify and had asked Dean Hughes to compel his attendance.  She claimed to lack the authority to do so.

72. The Board adjourned the hearing in order to schedule a second day to hear testimony from Betsy and J.K.

73. The day after the hearing, Hughes sent Betsy an email in which she threatened Betsy with punishment if she failed to (1) meet with Hughes and (2) appear at the second day of the hearing.  Betsy did not respond.  Hughes had a subordinate, Christine Davis, call Betsy, who agreed to meet with Davis that day, November 12.  Davis then sent Hughes an email: "[Betsy] is coming to meet with me as I type. ☺"  Hughes replied by email: "Yay."

74. The hearing reconvened on November 16.  Betsy testified that she did not see John do anything and that the dance floor was so "tightly packed," including "behind [A.B.]," that "people were banging into each other."  There were a "lot of people," but John "stood out because he was tall."

75. J.K., accompanied by a prominent Boston criminal defense lawyer with a history of representing BC athletes, also testified.  He denied being drunk on the cruise, denied blacking out, denied being on the dance floor with John, and denied assaulting A.B.  Upon information and belief, the Dean's Office threatened J.K. with punishment if he did not appear to testify.

76. The Board once more refused to hear the testimony of Investigator Mullen, who would not only have corroborated John Doe's testimony concerning the October 22 telephone call with J.K., but would also have testified about the interview with J.K. on October 29 in which J.K. drastically changed his story.  The rationale for excluding the investigator's testimony was that Mullen did not witness the assault itself, so his testimony was of no value.

77. In A.B.'s final comments, she shouted:  "No person is safe with [John Doe] on campus, and my family will never rest until [John Doe] is expelled!"

78. In his final comments, John reasserted his innocence and begged the Board to keep the process open until results of the forensic tests on his hands were available and the forensic analysis of the surveillance video was complete.

### 5. The Decision

79. Although John was charged only with "Sexual Assault," and no mention was made in the charging document of a "lesser inclusive charge," the Board issued a finding of "Responsible" for "Indecent Assault and Battery," an offense lacking any definition in the University's Sexual Assault Policies and Procedures.  Upon information and belief, the Board simply parroted the name of the pending criminal charges of which John was later exonerated. In its decision, the Board credited all of A.B.'s testimony except her very specific claim and description of two fingers being inserted all the way into her anus.  That evidence, the Board found, was not credible and, therefore, "it seem[s] less likely than not that the perpetrator achieve[d] penetration," and, as a result, there was only "unwanted touching in a sexual nature."

28

80. The Board entirely ignored or discounted John's testimony and that of his witnesses.

81. The punishment recommended by the Board and imposed by the Dean was (a) a three-semester suspension – the current semester (for which John received no credit), the spring 2013 semester, and the fall 2014 semester; (b) a permanent ban from residing in or even entering University housing; and (c) "loss of senior week privileges at any point."

### 6. The Appeal

82. John appealed the decision or, more accurately, submitted a "request" for an appeal that, if successful, would lead to a hearing before the Appeals Board or a rehearing before the Board that originally decided his case. The grounds for his request for appeal were a denial of due process and the refusal to wait for the evidence that, when available, would exonerate him.

83. The request for appeal was to be directed to the Dean of Students, Paul Chebator, and the Vice President for Student Affairs. The latter had recently resigned, so his place was taken by Patrick Keating, the University's Executive Vice President, who was also serving as the Interim Vice President for Student Affairs.

84. Chebator and Keating denied the request for appeal by letter of December 7, 2012. Despite the letter's date, it was hand-delivered to the Does' home on Christmas Eve.

85. Prior to finalizing the letter, Chebator sent a draft to Board Chairperson Rivera for her comments and approval before sending it to General Counsel Herlihy "for his review."

### G. Aftermath

86. John served his suspension and returned to the BC campus in January 2014 under exceedingly difficult circumstances. He did receive one piece of good news. It was discovered that he could apply for credit for certain advanced placement courses taken in high school. With those credits, he was able to graduate in May 2014. Despite the horrific treatment that John

suffered at the University's hands, he, his parents, and other family members decided to attend the graduation ceremonies.

87. During the weekend of graduation, James Doe approached the President of the University, William Leahy, S.J. James told Father Leahy about what had happened to John, and that James would be in further contact. James and Mary each wrote long letters that described, in detail, the University's unreasonable and unlawful actions; the many flaws in the disciplinary process; the University's failure to follow its own procedures; the assumption from the get-go that John was guilty; the corresponding attitude and hostility of the Dean's Office and the Administrative Hearing Board; the unrelenting pain suffered by the Doe family as a result of the University's wrongful conduct; and John's exoneration by the Suffolk County District Attorney's Office.

88. Both letters begged Father Leahy to remedy the wrong that had been done. James' letter also stated that the family had no "desire to file a lawsuit against Boston College, as well as the individuals responsible," but that such a suit would be necessary if "this injustice [is not] corrected." Finally, James asked for a meeting with Father Leahy to discuss the matter.

89. Father Leahy responded to the letters by a September 24, 2014 email: "I have read your letter and also the one from your wife. Both communicate powerfully what you have been through and continue to experience." Father Leahy suggested that Barbara Jones, the new Vice President for Student Affairs, would be the proper person to conduct a "review of the decision."

90. In a September 28 email to James, Father Leahy stated:

> Dr. Jones has the letters that your wife and you sent me, and I have also told her that I believe that she is the right person at BC to review the case and make a recommendation, which she would send to the Executive Vice President. I do not know how long it would take to **complete re-examining the facts and make a**

**determination**, but I am confident that Dr. Jones would do everything she could to expedite the matter. (emphasis added)

## H.   The Sham Review of the Case

91.   James Doe traveled to Boston to discuss the investigation with Jones.   Despite assurances to James that she took the matter very seriously and intended to conduct an independent, thorough review of John's disciplinary process, Jones' "investigation" was a sham that in no way resembled the "re-examination of the facts" promised by Father Leahy.   Instead, the "investigation" turned out to be a warmed-over justification for the many procedural and other flaws in the disciplinary process, using precisely the same excuses employed by Deans Chebator and Hughes, and Chairperson Rivera.

92.   In particular, Jones disregarded entirely the scientific evidence that convinced the Commonwealth of Massachusetts to dismiss the criminal charges without qualification.   In Jones' view, set forth in a December 17, 2014 letter to James:

- The negative results of the forensic tests of John's hands were irrelevant because the Hearing Board concluded that there was no "digital penetration."

- The forensically-analyzed video – found to be exculpatory by the Suffolk County District Attorney's Office – "was, at best, inconclusive." Jones viewed the video with explanation by the videographer, just as ADA O'Keefe did.

- The results of the polygraph examination, also relied on by the District Attorney's Office, was not worthy of any consideration because "there is no consensus in either the scientific or legal community that polygraph evidence is reliable."

93.   Finally, Jones stated in her letter that there was no basis that would "justify a reconsideration of this case."

## COUNT I
### Breach of Contract – Disciplinary Proceeding
### (John Doe/University)

94.  Plaintiffs incorporate paragraphs 1 through 93 as if fully pleaded.

95.  John Doe applied to and enrolled in the University and, with the assistance of his parents, paid tuition and other fees and expenses.  John did so in reliance on the understanding and with the reasonable expectations, among others, that (a) the University would implement and enforce the provisions and policies set forth in its official publications, including the 2012-2013 Student Guide, the "Conduct Board Procedure," its Sexual Assault Policies and Procedures, and other relevant documents, including those not mentioned in this complaint; and (b) those provisions and policies would comply with the requirements of applicable law, including Title IX.

96.  An express contract or, alternatively, a contract implied in law or in fact was formed between the University and John.

97.  The contract contained an implied covenant of good faith and fair dealing.  It also contained the following provisions that guaranteed certain rights to every student involved in the disciplinary process, including those accused of sexual assault:  (1) the accused student had the right to "due process"; (2) the accused student had "the right to a fair procedure which is appropriate to the circumstances"; (3) the accused student had "[t]he right to have access to a process through which to resolve deprivation of rights"; and (4) "deviations from prescribed procedures" would "invalidate a decision or proceeding" if "significant prejudice to a student . . . may result" (collectively "guarantees of due process and fundamental fairness").  As set forth below, the University repeatedly and materially breached these guarantees of due process and fundamental fairness as well as the implied covenant of good faith and fair dealing and other contractual provisions.  These breaches include, but are not limited to, the following:

### A.   Breach of Obligation to Perform a Threshold Evaluation

98. The Sexual Assault Policies and Procedures specifically required the Dean of Students or a designee to perform a threshold evaluation of the charge by having a face-to-face meeting with the accused student and "discuss[ing] the complaint." The University breached this obligation repeatedly. Senior Associate Dean of Students Hughes met with John Doe and one of his parents on three separate occasions, but refused each time to allow him to explain what happened the night of the cruise.

99. Hughes' refusal to listen led to John being deprived of a key procedural protection: the Dean's ability to stay the disciplinary process if a criminal proceeding was ongoing and the accused student had been summarily suspended, as John had been. Had Hughes listened to John's account, instead of assuming his guilt and referring the matter to an Administrative Hearing Board without ever hearing his side of the story, the only fair and equitable response under the circumstances would have been to stay the school's process until the Suffolk County District Attorney's Office completed its investigation, which ultimately exonerated John.

100. The University's failure and refusal to perform a threshold evaluation breached its own procedures requiring the same, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### B.   Breach of Obligation to Conduct an Appropriate Investigation

101. Unless the Dean's Office stayed the disciplinary process after the threshold evaluation, it was required, together with the Boston College Police, to "promptly" conduct an investigation of the sexual assault charge that included (1) "a review of statements obtained from either party"; (2) "interviews with the complainant and the accused (if identified)"; (3) "interviews with appropriate witnesses"; and (4) "a review of other relevant information."

102. The University's breach of its obligations under the Sexual Assault Policies and Procedures to conduct the required investigation began when Hughes concluded, without any proper basis, that because the Boston College Police had no jurisdiction at the scene of the incident, they were entirely precluded from investigating the matter. Instead of involving the University's own professional law enforcement officers – some of them "specifically trained" to investigate allegations of sexual assault – Hughes decided that (a) she would interview A.B., John, and other witnesses; and (b) "that inquiry along with a hearing board would constitute an investigation." First, her proposal breached the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing. Second, Hughes did not carry through on her plan, as she never interviewed John. Third, to the extent that she performed any sort of investigation, Hughes, upon information and belief, was not an experienced or trained investigator.

103. In addition, the Sexual Assault Policies and Procedures drew a clear line of demarcation between investigation and adjudication. After an investigation, a charge of sexual assault was referred, if appropriate, to a Hearing Board. The Sexual Assault Policies and Procedures made no provision whatsoever for a Hearing Board to conduct any part of the required investigation. Moreover, upon information and belief, none of the members of the Hearing Board in this case were experienced or trained investigators.

104. These breaches were made all the more egregious in that Hughes' plan was approved by both Dean of Students Chebator and Nora Field, the University's Deputy General Counsel.

105. The incomplete and haphazard investigation breached the University's own requirements, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### C.   Breach of Obligation to Set an Appropriate, Fair Hearing Date

106. Another of Hughes' conclusions – also concurred in by Chebator and Field – was that the University's procedures and Title IX required a quick hearing of the charge, preferably "in the next two weeks."

107. But the procedures said no such thing and set no deadline for a hearing.  Rather, "[t]he University will make every reasonable effort to resolve the complaint within 60 days."  In other words, even without a stay, the University's obligation was to act reasonably in the scheduling of a hearing.

108. In addition, the accused student had "the right to adequate time to prepare a response to the charges."  Under the circumstances of John's case, that meant adequate time for the criminal investigation to be completed.  In fact, Title IX contemplates that very eventuality: a school may delay its investigation until the criminal investigation is complete.  Hughes, Chebator, and Field got that wrong as well.

109. The decision to hold a hearing shortly after the date of the incident was a breach of the provision requiring a hearing date reasonable under the circumstances, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### D.   Breach of Obligation to Provide Fair and Meaningful Notice of the Charges

110. The Sexual Assault Policies and Procedures required that the written notice to the accused student of a referral to a Hearing Board include the "alleged violations."  They also guaranteed the fundamental "right to be informed of any charges of misconduct."

111. The notice to John stated only that he was charged with "Sexual Assault," an undefined term. Even though the possible results of a hearing included "responsible for a lesser inclusive charge," the notice contained no mention of a "lesser inclusive charge" or what such a "lesser inclusive charge" might be.

112. The notice was defective in that it did not fairly apprise John of the charges that he was facing. A.B.'s statements to the State Police and to the University, and as well as her hearing testimony, were thoroughly consistent (two fingers inserted all the way in the anus, etc.). There was no notice to John that he could be found responsible for some lesser offense called "Indecent Assault and Battery," nowhere defined in the Sexual Assault Policies and Procedures.

113. Complete and meaningful notice of the charges faced by an accused is among the most basic procedural protections, and the notice must state and define the charged offenses with sufficient particularity to enable the accused party to meet the charges.

114. The notice of the charges was a breach of the provision requiring notice of all "alleged violations," the fundamental "right to be informed of any charges of misconduct," the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### E.   Denial of Right to Effective Counsel at the Hearing

115. The Sexual Assault Policies and Procedures permitted an attorney to serve as the accused student's advisor if there were criminal charges pending. But the attorney could not question witnesses, address the Hearing Board, or otherwise speak, except to confer with his client. These restrictions were in direct contravention of the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

116. Although the Sexual Assault Policies and Procedures recognized that an accused student facing criminal charges should have an attorney with him at the hearing, the University

then inexplicably tied the attorney's hands.  Any such accused student is faced with a difficult choice:  (a) defend himself at the campus hearing with the potential for self-incrimination or, at least, discovery for the state prosecutor; or (b) guard against criminal exposure by not contesting the University's charges and virtually ensuring expulsion.  The stakes are enormous.

117.  Self-incrimination issues aside, the notion of a young man being able to defend himself competently in this intensely-emotional situation is absurd.  An accused student in this situation is bound to be intimidated – as John was – and cannot be expected to prepare and deliver his version of the facts in a coherent and logical manner.  John should not have been forced to go it alone without effective counsel, and a mute lawyer is no substitute.  The University violated its guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### F.   Breach of Promise that Fact Witnesses Will Be Permitted to Testify

118.  The Sexual Assault Policies and Procedures promised that an accused had the right to present witnesses who were "able to speak to the facts of the incident which they have witnessed."  Unlike these fact witnesses, character witnesses, in general, were required to submit written statements in lieu of live testimony.

119.  The Hearing Board prohibited John Doe from calling a critical fact witness:  Kevin Mullen, the private investigator.  He would have testified, based on his personal knowledge, as to two important matters:  (1) the October 22 telephone call between John and J.K.; and (2) his October 29 interview with J.K.  The Board's evidentiary ruling was based on an illogical and unfair reading of the witnesses provision:  to be allowed to testify, a person was required to have witnessed the sexual assault, and no other type of fact witness could testify.

120. The Board's exclusion of Investigator Mullen's testimony was a breach of the promise that the accused had the right to present witnesses, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### G.   Breach of Obligation to Provide an Unbiased Disciplinary Process and Tribunal

121. The Sexual Assault Policies and Procedures' guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing obligated the University to provide an unbiased disciplinary process and tribunal, and to guarantee that the outcome of the hearing was not predetermined. The University breached these obligations.

122. Although the Sexual Assault Policies and Procedures did not designate a person to serve as a prosecutor in the disciplinary process or even state that someone should fill that role, Chebator and Hughes served as the prosecutor prior to the hearing. Their conduct tainted the entire process, beginning with Hughes' refusal to allow John to tell his side of the story; Hughes' hostility toward John, treating him like a "contemptible criminal" in front of his mother; the refusal to investigate; the prejudicial scheduling of the hearing; the refusal to wait for potentially exculpatory evidence; and Hughes' effort – on General Counsel Herlihy's instructions – to breach the attorney-client privilege by attempting to interrogate John outside the presence of his lawyer. In short, prior to the hearing, the Dean's Office presumed John to be guilty and was determined that the hearing's result would be consistent with this presumption.

123. This view held by the Dean's Office carried over into the hearing. Hearing Board Chairperson Rivera – designated by and the recipient of "additional training" from the Dean – acted as the Dean's prosecutor-by-proxy, was overtly hostile to John, refused to let a critical defense witness testify, and improperly continued the hearing so that the Dean's Office could force the attendance of other witnesses that Rivera and the Dean's Office hoped would make the

case against John. Rivera was not, as required by the Sexual Assault Policies and Procedures, "impartial in the hearing of the case."

124. Between the two hearing days, Hughes – despite the false assertion of the Dean's Office that they had no power over witnesses – threatened Betsy with discipline if she did not appear at the second day of the hearing. Hughes and a subordinate exchanged highly-inappropriate emails when it became clear that Betsy had been intimidated into participating.

125. Similarly, J.K. – also apparently threatened with discipline by the Dean's Office – appeared as a witness on the second day of the hearing, accompanied by a prominent criminal defense lawyer with connections to the University. Upon information and belief, the Dean's Office, assisted by General Counsel Herlihy, arranged for that representation.

126. The bias of the Dean's Office was so pervasive throughout the pre-hearing and hearing processes that it destroyed any possibility of fairness and ensured that John would be found guilty. This conclusion is fully supported by the Board's contortions and manipulation of the evidence to find John guilty of a "lesser inclusive charge." The finding was plainly a product of the presumption of guilt, as well as the atmosphere of bias and hysteria that permeated the entire disciplinary process, which began with A.B.'s father demanding that John be expelled immediately. The hearing ended with A.B. shouting the same and impliedly threatening suit if the University did not comply.

## H. Breach of Obligation to Provide a Trained, Competent Tribunal

127. The Sexual Assault Policies and Procedures' guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing obligated the University to provide a competent disciplinary tribunal whose members had been appropriately trained. Upon information and belief, none of the Board members who heard John's case had

any training in adjudication; in the law of sexual assault; in the weighing of evidence; in the significance of forensic evidence; in what type of conduct constitutes sexual assault; or in the relevance or irrelevance of particular types of evidence in the alleged sexual assault setting. Thus, the University breached its guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

128. The Board's lack of training had an additional harmful and prejudicial effect in that they failed to recognize the significance of the forensic evidence that was forthcoming and that ultimately exonerated John of all criminal charges.

129. The University's breach of its obligation to provide a trained, competent disciplinary tribunal deprived John of a fair hearing and seriously prejudiced him.

I. **Breach of Obligations that the Accused Be Presumed Innocent and that the University Has the Burden of Proof**

130. The Sexual Assault Policies and Procedures had no specific provision addressing either the presumption of innocence or the assignment of the burden of proof.  Both the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing required that John be presumed innocent and that the University have the burden of proof at the hearing.

131. As discussed above, (a) the Dean's Office, prior to the hearing, operated on the presumption that John was guilty, and (b) Chairperson Rivera conducted the hearing based on the same presumption.  This presumption breached the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

132. In addition, the Dean's Office and Chairperson Rivera impermissibly assigned John the burden of proving his innocence at the hearing.  This misallocation of the burden of proof

breached the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

**J.     Breach of Obligation that There Be Sufficient Evidence to Support the Board's Finding**

133. The University's breaches as to the presumption of innocence and the burden of proof had an additional harmful and prejudicial effect, as they led to another breach, that of the obligation that there be sufficient evidence to support the Board's finding.

134. The written "comments" to the Board's "Finding Sheet" grossly mischaracterizes much of the hearing evidence.    But this mischaracterization is largely insulated by the University's unlawful refusal to make an audio or stenographic record of the proceedings.

135. Nevertheless, the Board's finding of "Responsible" for the "lesser inclusive charge" of "Indecent Assault and Battery" rests on two "comments":

- "The Administrative Hearing Board does not doubt that an unwanted touching in a sexual nature occurred to [A.B.] on the boat cruise during the timeframe indicated."

- "However, given that this happened in a matter of seconds (the time it took [Betsy] to look away) and given that [A.B.'s] reaction was not one of sudden pain, it seem[s] less likely than not that the perpetrator achieved penetration."

136. In other words, all other evidence aside, the Board did not believe it was possible for John Doe – all 6'4" of him – to do what A.B., time and again, said happened to her.  So the Board, determined to find John guilty of something, engaged in a contorted, cynical manipulation of the evidence that is bogus on its face, even on the scant administrative record. In addition, the critical factual finding that A.B. did not suffer "sudden pain" is entirely contrary to what she repeatedly told the police.

137. Had the Board given John the presumption of innocence that he was due and properly applied the burden of proof, it would have recognized that the University did not adduce sufficient evidence to find John responsible for any offense.

138. The Board's failures to do so are breaches of the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

### K.   Breach of Obligation that a Record Be Made of the Hearing

139. The University's failure to require that an audio or stenographic record be made of sexual assault hearings is a breach of the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.  There is no reason, cost or otherwise, why a record could not be made of every sexual assault hearing other than a desire on the part of the University to make the process as opaque and as immune from scrutiny as possible, to the prejudice of the accused student who seeks review.

140. The Sexual Assault Policies and Procedures provided an appeal process.  It was flawed and unlawful, but any appeal process is rendered entirely useless without a verbatim record of the hearing.

### L.   Breach of Obligation to Provide a Meaningful Right of Appeal

141. The Sexual Assault Policies and Procedures guaranteed an accused student "the fundamental right to have access to a process through which to resolve deprivations of rights."

142. But the appeal process was not as of right; rather, it was only a "request for an appeal" directed to Dean Chebator and the Vice President for Student Affairs.  As an initial matter, given Chebator's involvement throughout the disciplinary process, his role as an appellate officer destroyed any semblance of credibility, impartiality, or fairness that the appeal process was required to have.  Moreover, Patrick Keating, the Interim Vice President for Student

Affairs, upon information and belief, had little or no knowledge of the process or his role in it, and followed Chebator's lead without question, either affirmatively or tacitly.

143. The appeal mechanism was deficient in that it was not an appeal as of right, but only a request for an appeal. Furthermore, the grounds for appeal were unfairly limited and prejudicial: only (a) a denial of due process or (b) the existence of new evidence not available at the time of the hearing. Given that the request-for-appeal deadline was five business days from date of the Hearing Board's decision, the "new evidence" ground was illusory. And without a record of the hearing, the denial-of-due-process ground was illusory as well.

144. Moreover, upon information and belief, neither Chebator nor Keating had training in adjudication; in appellate procedure; in the law of sexual assault; in the weighing of evidence; in the significance of forensic evidence; in what types of conduct constitutes sexual assault; or in the relevance or irrelevance of particular types of evidence in the alleged sexual assault setting.

145. At the end of the day, neither the lack of qualifications nor the structure of the appeal mechanism mattered, for the whole exercise was a farce. Before issuing the decision, Chebator actually submitted it to Hearing Board Chairperson Rivera for her review, comment, and approval. This violation of due process and fundamental fairness – and the implied covenant of good faith and fair dealing – removed any remaining legitimacy or impartiality that the appeal process was required to have. Chebator and Keating denied the request for appeal.

146. The processing and denial of John's request for appeal breached the fundamental "right to have access to a process through which to resolve deprivations of rights"; the guarantees of due process and fundamental fairness; and the implied covenant of good faith and fair dealing.

## M.  Summary

147.  All of the foregoing breaches of contract were wrongful, without lawful justification or excuse, prejudicial, and were part of an effort to achieve a predetermined result in John's case:  a finding that he had committed sexual assault or a related offense.  As a direct and foreseeable result of these breaches of contract, John has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to:  mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**COUNT II**
**Promissory Estoppel – Disciplinary Proceeding**
**(John Doe/University)**

148.  Plaintiffs incorporate paragraphs 1 through 147 as if fully pleaded.

149.  As described above, the Sexual Assault Policies and Procedures and the other official University publications constitute promises and representations that the University intended to induce reliance on the part of John Doe.  In reasonable reliance, John accepted the University's offer of admission and incurred the cost of tuition and related expenses based on the University's representations that it would honor its express and implied promises, including the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

150.  John relied to his detriment on these express and implied promises and representations made by the University.

151.  Injustice can only be avoided by enforcement of the University's promises and representations.

152.  As a direct and foreseeable result of the University's failure to honor its promises and representations, John has sustained, and will continue to sustain, substantial injury, damage,

and loss, including, but not limited to:  mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

### COUNT III
### Breach of Contract – 2014 Review
### (All Plaintiffs/University)

153.  Plaintiffs incorporate paragraphs 1 through 152 as if fully pleaded.

154.  In 2014, James Doe and Mary Doe, on behalf of themselves and John, wrote letters to University President Leahy that detailed the wrongs done to the family by the University. James' letter stated that the family was prepared to file suit against the University unless the injustice done to John was corrected.  Father Leahy responded by making an offer: Barbara Jones, the new Vice President for Student Affairs, would conduct an independent review of the matter, "re-examining the facts and mak[ing] a determination." The Does accepted the offer and, in return, agreed to forbear from filing suit pending completion of the independent review.  With this offer, acceptance, and the passage of consideration, a contract – whether express, or implied in law or in fact – was formed between the Does and the University.

155.  As stated above, the "independent review" was anything but, and the University breached the contract, including its implied covenant of good faith and fair dealing.

156.  The University's breaches were wrongful, without lawful justification or excuse, and prejudicial.  As a direct and foreseeable result of these breaches of contract, each plaintiff has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to, mental anguish and severe emotional distress.

### COUNT IV
### Breach of Common Law Duty of Basic Fairness
### (John Doe/University)

157.  Plaintiffs incorporate paragraphs 1 through 156 as if fully pleaded.

158. The University had a common law duty to ensure that John Doe's disciplinary process was conducted with basic fairness.

159. The University breached this duty of basic fairness with regard to the 2012 disciplinary process and the 2014 review of the process.

160. The University's breach of its duty to ensure basic fairness proximately caused John to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**COUNT V**
**Declaratory Judgment – Title IX**
**(John Doe/University)**

161. Plaintiffs incorporate paragraphs 1 through 160 as if fully pleaded.

162. As set forth above, Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and the regulations promulgated thereunder require a school receiving federal funds to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints" alleging any form of sexual harassment, including sexual assault.[23] These procedures must "accord[ ] due process to both parties involved."[24]

163. The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum, those listed in paragraph 52 *supra*.  Among those minimal requirements are (a) "[n]otice . . . of the procedure"; (b) "[a]dequate, reliable, and impartial investigation of complaints"; (c) "the opportunity to present witnesses and other evidence"; and (d) "[d]esignated and reasonably prompt timeframes for the major stages of the complaint process."  A school must also ensure that all employees

---

[23]   *See supra* ¶ 47.
[24]   *See supra* ¶ 51.

involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment," which includes "alleged sexual assaults."[25]

164. As written, the University's student disciplinary process in effect in the 2012-2013 school year, including the Sexual Assault Policies and Procedures, violated Title IX and the regulations thereunder, which have the force of law, including the requirements that the procedures comport with due process and be "prompt and equitable." Those violations, which are described above, include, but are not limited to, the following: (a) no requirement that an accurate audio or stenographic record be made of the hearing; and (b) the lack of a meaningful right to appeal because no record of the hearing was required and because the appeal was not as of right, but rather a request for appeal.

165. As implemented, the University's student disciplinary process in effect during the 2012-2013 school year, including the Sexual Assault Policies and Procedures, violated Title IX and the regulations thereunder, which have the force of law, including the requirements that the procedures comport with due process and be "prompt and equitable." Those violations, which are described above, include, but are not limited to, the following: (a) the failure to provide an unbiased disciplinary tribunal; (b) the failure to provide appropriate training for the members of the Administrative Hearing Board; and (c) the failure to provide appropriate training for the appellate officers.

166. As applied to John Doe, the University's student disciplinary process in effect during the 2012-2013 school year, including the Sexual Assault Policies and Procedures, violated Title IX and the regulations thereunder, which have the force of law, including the requirements that the procedures comport with due process and be "prompt and equitable." Those violations

---

[25] *See supra* ¶ 53.

which are described above, include, but are not limited to, the following:  (a) the failure to perform a threshold evaluation of the charge, including denying John the right to tell his side of the story; (b) the failure to conduct an appropriate investigation with a trained investigator; (c) the failure to set an appropriate, fair hearing date that would have allowed John to rely on exculpatory evidence; (d) the failure to provide fair and meaningful notice of the charges; (e) the refusal to allow a fact witness with relevant evidence to testify; (f) the failure to provide an unbiased disciplinary process and tribunal; (g) the failure to ensure that John be presumed innocent and that the University had the burden of proof; (h) the failure to recognize the critical nature of, and to wait for, the forensic evidence that ultimately exonerated John of all criminal charges; (i) the failure to ensure that there be sufficient evidence to support the Hearing Board's finding; (j) the affirmance of the Board's finding on appeal even though the appellate officers had no record of the hearing and could not conclude legitimately, impartially, or in good faith that the Board's decision was valid; and (k) otherwise acting to achieve a predetermined result, *i.e.*, a finding that John committed sexual assault or some related offense.

167. Pursuant to the provisions of 28 U.S.C. §§ 2201, 2202, and 1651, John Doe is entitled to (a) a declaratory judgment that the University's 2012-2013 student disciplinary process, including the Sexual Assault Policies and Procedures, as written, violated Title IX (including its due process requirements); (b) a declaratory judgment that the University's student disciplinary process, including the Sexual Assault Policies and Procedures, as implemented, violated Title IX (including its due process requirements); (c) a declaratory judgment that the University's student disciplinary process, including the Sexual Assault Policies and Procedures, as applied to John, violated Title IX (including its due process requirements); and (d) further necessary or proper relief.

## COUNT VI
### Violation of Title IX – Erroneous Outcome
### (John Doe/University)

168. Plaintiffs incorporate paragraphs 1 through 167 as if fully pleaded.

169. Title IX, as set forth above, prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.  20 U.S.C. §§ 1681(a), 1687.  The University receives federal funds and must comply with Title IX.

170. A victim of discrimination based on his or her gender has, under Title IX, a private right of action against the offending school for monetary damages and equitable relief.

171. As set forth above, the University engaged in a series of actions that ultimately resulted in the Hearing Board's erroneous finding that John Doe committed a sex offense, *i.e.*, "Indecent Assault and Battery."  This conduct was the product of disparate treatment of John on the basis of his gender.

172. As set forth above, there were significant evidentiary weaknesses underlying the Board's finding, including an absence of any evidence that John touched A.B., much less assaulted her; an alternative theory of the case supported by J.K.'s admissions and his motive to lie at the hearing; and the near certainty that A.B. picked John out of the crowd on the dance floor because he was 6'4" and was wearing a purple shirt.

173. In addition to the lack of evidence against John, there were, as set forth above, numerous procedural flaws that affected the proof, including the lack of an appropriate investigation by a trained investigator; the refusal to wait for the forensic evidence that ultimately exonerated John in the eyes of the law; the disallowance of Investigator Mullen's testimony; the presumption of guilt applied to John; and the impermissible shifting of the burden of proof to John.

174. The erroneous outcome of the hearing, as confirmed by the phony appeal process, was exacerbated by the 2014 review of the matter authorized by Father Leahy, the University President.  Apart from the deficiencies of that review, set forth above, the conclusion reached ignored the exculpatory evidence that led the Suffolk County District Attorney's Office to dismiss the charges without condition.

175. The erroneous outcome of the hearing, appeal, and 2014 review can only be explained by gender bias against males in cases involving allegations of sexual assault.  This bias is reflected in the patterns of decisionmaking by the University throughout the entire process.

176. Moreover, upon information and belief, in all, or in virtually all, cases of campus sexual misconduct at BC, the accused student is male and the accusing student is female.  The University has created an environment in which it is impossible for a male accused of sexual assault to receive the due process guaranteed by Title IX.  This significant gender-based statistical disparity demonstrates the existence of discrimination.  In fact, the University impermissibly presumes male students "guilty until proven innocent" based on invidious gender stereotypes.

177. There are at least four causes for this discriminatory environment at the University. First, acquittal of an accused male student carries the threat that the Department of Education's Office for Civil Rights could institute an investigation that would result in the University's loss of federal funding.  There could also be a civil suit filed by the female complainant, a type of suit that garners much more publicity than a suit by the accused and convicted male student.

178. Second, the University officials in charge of or involved in the disciplinary process are not thinking about justice, individual rights, or their obligations to provide a fair and

equitable procedure in accordance with due process guarantees; rather, they are thinking what would be most expedient for them in their professional roles.

179. Third, these officials also focus on what would be most expedient for the University and, in particular, avoiding publicity that could harm the University's image and brand, and hinder its efforts to attract tuition-paying students. The safer course for these officials is to convict all accused male students.

180. Fourth, the University officials are susceptible to internal and external pressures, including efforts by those who wish to change the so-called "campus rape culture" at the expense of the individual rights of the accused male students. The University and its officials have plainly embraced this view, and the misandry it embodies. The resulting bias is obvious in the Sexual Assault Policies and Procedures. The presumption of guilt of an accused male student is reflected in the terms used to describe the accusers, who are invariably female: "victims"; "survivors"; "victims/survivors"; and "female victims/survivors." Similar language also appears on the University's "Sexual Assault Notification Form," which is distributed throughout the University administration after an accusation is made: "victim information"; "victim/survivor"; "assault survivor"; and "survivor." Again, the University's concern is not a fair and equitable procedure in accordance with due process guarantees, but how the school will look to the outside world and the tuition-paying students that it hopes to attract.

181. The unusual facts of John's case led him to experience this invidious gender bias and discriminatory environment more acutely than the typical accused male student in a "he said/she said" situation. John was accused of a cold-blooded, violent sexual assault and immediately arrested by the State Police. The University officials in charge of and involved in the disciplinary process could not even entertain the possibility that John, a male, might be

innocent. Indeed, in the words of John's mother, Dean Hughes treated him like a "contemptible criminal."

182. Moreover, the conclusion of the 2014 review ordered by Father Leahy can only be explained by gender bias. The Commonwealth of Massachusetts exonerated John, but the University did not, even with the identical exculpatory evidence.

183. John, based solely on his gender, suffered an erroneous outcome of the disciplinary process and the 2014 review. This unlawful discrimination by the University in violation of Title IX proximately caused John to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**COUNT VII**
**Violation of Title IX – Deliberate Indifference**
**(John Doe/University)**

184. Plaintiff incorporate paragraphs 1 through 183 as if fully pleaded.

185. In 2012, Paul Chebator, the Dean of Students and appellate officer; Carole Hughes, the Senior Associate Dean of Students; Catherine-Mary Rivera, the Chairperson of the Hearing Board; Patrick J. Keating, the Executor Vice President, Interim Vice President for Student Affairs, and appellate officer; and Joseph Herlihy, the General Counsel, all had actual notice of (a) the University's misconduct relating to John Doe's disciplinary proceeding; (b) the Hearing Board's unlawful finding that John committed "Indecent Assault and Battery"; (c) the phony appeal process; and (d) John's punishment of a three-semester suspension.

186. Despite this actual notice of the University's misconduct and the resulting harm to John, each of these officials named in the preceding paragraph failed and refused to take any

steps to correct the misconduct and resulting harm to John even though they had the authority and obligation to institute corrective measures.

187.  This failure and refusal can only be explained by gender bias against males, as set forth above.

188.  In 2014, Father Leahy, the University President; Barbara Jones, the Vice President for Student Affairs; and, upon information and belief, Jones' immediate superior, Patrick Keating, the Executive Vice President, all had actual notice of (a) the University's misconduct relating to John Doe's disciplinary proceeding; (b) the Hearing Board's unlawful finding that John committed "Indecent Assault and Battery"; (c) the phony appeal process; and (d) John's punishment of a three-semester suspension.

189.  Despite this actual notice of the University's misconduct and the resulting harm to John, each of these officials named in the preceding paragraph failed and refused to take any steps to correct the misconduct and the resulting harm to John even though they had the authority and obligation to institute corrective measures.

190.  This failure and refusal can only be explained by gender bias against males, as set forth above.

191.  John, based solely on his gender, has suffered and continues to suffer the effects of the University officials' deliberate indifference, both in 2012 and in 2014.  This unlawful discrimination by the University in violation of Title IX proximately caused John to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT VIII
### Negligence – Disciplinary Proceeding
### (John Doe/University, Chebator, Hughes, Rivera, Keating)

192. Plaintiffs incorporate paragraphs 1 through 191 as if fully pleaded.

193. Having put in place a student disciplinary process, including the Sexual Assault Policies and Procedures, the University owed a duty of care to John Doe and others to conduct that process in a non-negligent manner and with due care. The University officials who directed and implemented that process – defendants Chebator, Hughes, Rivera, and Keating – owed John the same duty of care.

194. The conduct of the University and the individual defendants named in this count, as described above, fell below the applicable standard of care and amounted to breaches of the duty of due care.

195. These breaches of the duty of due care caused John, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT IX
### Negligence – 2014 Review
### (All Plaintiffs/University, Keating, Jones)

196. Plaintiffs incorporate paragraphs 1 through 195 as if fully pleaded.

197. The University, through its President, Father Leahy, voluntarily assumed the duty of conducting the 2014 review. The University owed a duty of care to John Doe, Mary Doe, and James Doe to conduct that process in a non-negligent manner and with due care. The official in charge of that review, defendant Jones, and her immediate superior, defendant Keating, owed the same duty of care to the plaintiffs.

198. The conduct of the University and the individual defendants named in this count, as described above, fell below the applicable standard of care and amounted to a breach of the University's duty of due care.

199. These breaches of the duty of due care caused (a) John, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects; and (b) Mary and James, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to, mental anguish and severe emotional distress.

### COUNT X
### Negligent Infliction of Emotional Distress
### (All Plaintiffs/All Defendants)

200. Plaintiffs incorporate paragraphs 1 through 199 as if fully pleaded.

201. The conduct of all defendants, as described above, was negligent and involved numerous breaches of the standard of care.

202. Defendants' negligent conduct caused John Doe, Mary Doe, and James Doe to suffer emotional and mental distress as well as symptoms of physical harm caused by the emotional and mental distress.

203. A reasonable person would have suffered emotional and mental distress under the same circumstances.

204. The University's negligence did actually and proximately cause each plaintiff emotional and mental distress, as well as other substantial injury, damage, and loss.

### COUNT XI
### Negligent Infliction of Emotional Distress – Witnessing Injury to Family Member
### (All Plaintiffs/All Defendants)

205. Plaintiffs incorporate paragraphs 1 through 204 as if fully pleaded.

206. The conduct of all defendants, as described above, was negligent and involved numerous breaches of the standard of care.

207. This conduct caused John Doe, Mary Doe, and James Doe substantial injury, damage, and loss.

208. Each of the plaintiffs witnessed the others suffer this substantial injury, damage, and loss, and, as a direct and proximate result of so witnessing, suffered emotional and mental distress, as well as symptoms of physical harm caused by the emotional and mental distress.

209. A reasonable person would have suffered emotional and mental distress under the same circumstances.

210. Defendants' negligence did actually and proximately cause each plaintiff to witness the others' substantial injury, damage, and loss.  As direct and proximate result, each plaintiff suffered emotional and mental distress, as well as other substantial injury, damage, and loss.

## COUNT XII
### Intentional Infliction of Emotional Distress
### (All Plaintiffs/All Defendants)

211. Plaintiffs incorporate paragraphs 1 through 210 as if fully pleaded.

212. The conduct of all defendants, as described above, was an effort to achieve or confirm a predetermined result in John Doe's disciplinary proceeding: a finding that he had committed Sexual Assault or a related offense that would brand him a sexual predator.  The 2014 review was a sham and was intended to confirm the finding of the University disciplinary process.  Defendants' conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized society.

213. Each defendant either intended to inflict emotional distress on John Doe, Mary Doe, and James Doe, or knew or should have known that emotional distress was likely to result from such conduct.

214. The conduct of each defendant, whether intentional or reckless, did actually and proximately cause emotional distress to each of the plaintiffs.

215. The emotional distress suffered by each plaintiff was severe and of a nature that no reasonable person could be expected to endure it.  In particular, the Doe family's relationship with the University made the betrayal all the more bitter and overwhelming.  As a result, plaintiffs were particularly susceptible to emotional distress as a result of each defendant's intentional or reckless conduct.

216. As a direct and proximate result of each defendant's intentional or reckless conduct, each plaintiff suffered emotional and mental distress, as well as other substantial injury, damage, and loss.

**COUNT XIII**
**Intentional Infliction of Emotional Distress –**
**Conduct Directed at an Immediate Family Member**
**(All Plaintiffs/All Defendants)**

217. Plaintiffs incorporate paragraphs 1 through 216 as if fully pleaded.

218. The conduct of all defendants, as described above, was an effort to achieve or confirm a predetermined result in John Doe's disciplinary proceeding: a finding that he had committed Sexual Assault or a related offense that would brand him a sexual predator.  The 2014 review was a sham and was intended to confirm the finding of the University disciplinary process.  Defendants' conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized society.

219. Each defendant either intended to inflict emotional distress on John Doe, Mary Doe, and James Doe, or knew or should have known that emotional distress was likely to result from such conduct.

220. Each plaintiff was present at some or all of defendants' extreme and outrageous conduct and knew of such conduct at substantially the same time that it was occurring.

221. Each plaintiff is an immediate family member of the other two plaintiffs and witnessed the said conduct directed at his/her family members.

222. The conduct of each defendant, whether intentional or reckless, did actually and proximately cause emotional distress to each of the plaintiffs.

223. The emotional distress suffered by each plaintiff was severe and of a nature that no reasonable person could be expected to endure it.  In particular, the Doe family's relationship with the University made the betrayal all the more bitter and overwhelming.  As a result, plaintiffs were particularly susceptible to emotional distress as a result of each defendant's intentional or reckless conduct.

224. As a direct and proximate result of each defendant's intentional or reckless conduct, each plaintiff suffered emotional and mental distress, as well as other substantial injury, damage, and loss.

### COUNT XIV
### Unjust Enrichment
### (All Plaintiffs/University)

225. Plaintiffs incorporate paragraphs 1 through 224 as if fully pleaded.

226. As set forth above, John Doe, with the assistance of his parents, paid the University, for the fall 2012 semester, approximately $30,000 in tuition, fees, and other expenses, and  for room and board as well.

227. In paying these sums, John and his parents conferred a benefit on the University, of which the University was aware.  Under the circumstances set forth above, it would be inequitable for the University to retain (a) any portion of the tuition, fees, and other expenses; or (b) the unused pro rata portion of the sum paid for room and board.

228. In order to avoid the University's unjust enrichment at plaintiffs' expense, plaintiffs are entitled to an award of damages in the amount that the University has been unjustly enriched.

## RELIEF REQUESTED

WHEREFORE, plaintiffs pray for judgment against defendants, jointly and severally, and ask this Court to:

1. issue a judgment that (a) declares the University's investigation, prosecution, and adjudication of the charge against John Doe to be contrary to the University's contractual and other obligations, its own rules and regulations, and contrary to law; (b) declares the University's student disciplinary process, including the Sexual Assault Policies and Procedures, as written, as implemented, and as applied to John Doe, to be in violation of Title IX, including its due process requirements; (c) requires the University to expunge the entire disciplinary proceeding and the 2014 review from the University's records; (d) declares the University's conduct to be wrongful, willful, intentional, and reckless; (e) prohibits the University from referencing John Doe's disciplinary proceeding in the event of any third-party inquiry; and (f) declares that upon any third-party inquiry, John Doe may reply in the negative as to any question as to whether he has been accused of sexual misconduct or as to any similar question.

2. issue a permanent injunction that directs the University to comply with Title IX, including its due process requirements;

3. award plaintiffs compensatory damages in an amount to be determined at trial, but not less than $3,000,000, for mental anguish, severe emotional distress, serious mental injury, injury to reputation, past and future economic loss, deprivations of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by the wrongful conduct of defendants;

4. award plaintiffs compensatory damages in the amount that the University has been unjustly enriched by its wrongful conduct;

5. award plaintiffs their attorney's fees, disbursements, and costs pursuant to the provisions of 42 U.S.C. § 1988(b) (relating to Title IX); or pursuant to any other statute or common law doctrine providing for the award of attorney's fees, disbursements, and/or costs;

6. award prejudgment interest; and

7. grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims so triable.

Respectfully submitted,

John Doe, Mary Doe, and James Doe

By their attorneys,

DLA PIPER LLP (US)

/s/ Matthew J. Iverson
Matthew J. Iverson (BBO # 653880)
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000
(617) 406-6100 (fax)
matthew.iverson@dlapiper.com

Charles B. Wayne
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com