UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>TRUSTEES OF BOSTON COLLEGE, *et al.*, )<br><br>Defendants. ) | Civil Action No. 15-10790-DJC |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A. Boston College and the Doe Family

1. Defendant Trustees of Boston College ("BC" or "the University") is a Catholic university founded and operated by the Society of Jesus.  According to its mission statement, the University "is rooted in a world view that encounters God in all creation and through all human activity, especially in the search for truth in every discipline, in the desire to learn, and in the call to live justly together."   Complaint and Jury Demand ("Complaint") ¶ 12; Answer and Jury Demand ("Answer") ¶ 12.

2. Mary Doe and James Doe are BC alumni.  In the fall of 2012, their son John was a BC senior pursuing a double major in History and Hispanic Studies; he was scheduled to graduate the following spring.  He was on the reporting staff of the school newspaper, *The Heights*. Answer ¶ 13.

### B. The Events of October 20-21, 2012

3. On the evening of Saturday, October 20, 2012, John was on assignment for *The Heights*, covering a social function for BC students sponsored by AHANA, the University's organization for minority students.  The event was held on the *Spirit of Boston* cruise ship in

Boston Harbor.  Approximately 600 students attended the event, and the ship was at capacity. The ship had three decks, one of them with a dance floor.  John Doe Dep. at 22, 32 (excerpts attached as Ex. 1).

4.  As a reporter for *The Heights*, John had been provided a complimentary pass to the event.  When he boarded the ship, he was introduced to two of the AHANA student leaders whom he planned to interview later in the evening.  *Id.* at 23-25.

5.  Several of John's friends attended the event as well.  Shortly after the ship left the pier at approximately 11:30 p.m., John  –  6'4" tall and wearing a purple shirt – was moving and dancing his way through the packed dance floor, trying to reach some of his friends.  They were watching him cross the dance floor and were waiting for him to arrive where they were standing. The music was very loud, it was dark, and a strobe light was flashing.  *Id.* at 34-35; Ex. 2 at 2.

6.  John testified to the following before the University Administrative Hearing Board and at his deposition:  Also moving across the dance floor, but in front of John, was another male BC senior, J.K.[1]  J.K., an acquaintance of John, was headed across the dance floor to the same destination as John.  John Doe Dep. at 35.  As John continued slowly making his way through the crowd, a woman turned around with an angry expression and began screaming at him.  He could not make out her words because of the noise.  John continued to move forward.  At that point, J.K. turned back to face John, and said "Sorry, dude, that was my bad."  John did not understand or respond to J.K.'s comment.  John Doe Dep. at 35-36, 38; Complaint ¶¶ 17-18, 70; Answer ¶ 70.

7.  John eventually reached his friends.  After a few minutes, the ship's security guards appeared and took John away.  John was stunned and had no idea what was happening.  One of

---

[1]  Pseudonyms are used for each of the students referenced.  The attached exhibits have been redacted as necessary.

his friends, "Tom," called John's cell phone to find out what was happening.  John told Tom that "[J.K.] may have done something" before a security guard made John end the call.  John Doe Dep. at 38-39.

8.  The security guards took John to a different part of the ship and held him there until the ship returned to the pier.  *Id.* at 39-40.  When the ship arrived at the pier, the Massachusetts State Police took John into custody, gave him *Miranda* warnings, handcuffed him, and placed him under arrest.  They put plastic bags on his hands to preserve evidence and took him to the State Police barracks at Logan Airport.  Ex. 3 at 3.  One of the state troopers told John that they had video of the entire incident and that he had better confess.  John told the trooper that the video would show that he did not do anything wrong.  John Doe Dep. at 44.  It was clear to John that the troopers were trying to goad him into confessing, and he refused to say anything further and asked to contact an attorney.  *Id.* at 42.

9.  Forensic evidence specialists took several swab samples from John's hands, fingers, and fingernails, and took his clothes.  Ex. 2 at 2.  The police booked him and took his mug shot and fingerprints.  Ex. 3.  John spent the night in a cell at the barracks before being released on bail early Sunday morning.

10.  The State Police arrested John because of allegations made by the woman who had yelled at John on the dance floor, a BC sophomore named "A.B."  Complaint ¶ 25; Answer ¶ 25. A.B., through several interviews with the Boston College Police, the State Police, the emergency room doctor, and BC officials, consistently gave a specific, detailed description of what happened:  A.B. had been dancing with her friend and fellow student "Betsy."  A.B. felt a hand go up her dress from the back and "two fingers were forcibly inserted up into [her] anus."  Ex. 4. She "knew it was two fingers" because when her assailant "pulled his fingers out of her anus she

could feel his thumb and other two fingers on either side run up along her 'butt crack' and to the lower portion of her back." . Ex. 5 at 2. The assailant's "entire two fingers" penetrated her anus "all the way," it was "painful," and "it really hurt when he did it." *Id.* at 2, 3. When A.B. turned around, she "saw a tall, lone Caucasian male . . . [who] was wearing a purple shirt." Ex. 4. "While turning, [she] yelled, 'what the hell are you doing?' The male did not respond or move." *Id.* Rather, "the guy was just staring at [her] with a weird look." Ex. 3 at 2. *See also* Ex. 6 at 3; Ex. 7 (emergency room record excerpt); Complaint ¶ 26; Answer ¶ 26 ("The defendants admit that A.B. claimed that John Doe sexually assaulted her generally in the manner alleged.").

11.  Although A.B.'s dancing partner, Betsy, was facing A.B., she did not see the assault. Rather, Betsy stated to the authorities that A.B. "suddenly . . . made an odd facial expression. . . .[,] turned around and looked at the tall guy behind her and yelled something along the lines of 'What the hell is wrong with you?' He seemed non-responsive & looked at her with ambivalence." Ex. 8 at 1. A.B. and Betsy left the dance floor. According to Betsy, A.B. later said that "the tall male with brunette hair & purple button down shirt stuck his fingers in between her legs." *Id.*

12.  After John had been removed from the ship, J.K. showed interest in what happened to John, whom he barely knew. At 1:49 a.m. on October 21, J.K. texted "Bob," one of John's friends who had been on the ship: "Is [John] ok?" Bob replied that he had "[n]o idea." Ex. 9 at 1. J.K. then tried to call John at 3:16 a.m. while John was in custody.

13.  The next day, J.K. exchanged texts with John's friend, Tom, as follows:

J.K.:  "Did u ever figure out how/why [John] got in trouble[?]"

Tom:  "Not yet[,] but I'll let you know when I find out."

J.K.:  "Ha[.] I'm just so confused what he coulda done. We were so fucked."

*Id.* at 2.

14. J.K. also texted John the day after the cruise at 1:46 p.m.  John responded at 5:26

p.m.:

> J.K.:  "What happened last night?"
>
> John:  "Hey man just got my phone back, what happened sat night?"
>
> J.K.:  "Dude I literally have 0 recollection of the boat cruise.  Not even one minute.  I blacked in late that night in a golden vest and dr sues[s] hat.  What did they say they took u in for?"

*Id.* at 3.

## C. The Criminal Case

### 1. Arraignment

15. On Monday, October 22, a criminal complaint was issued, charging John with

indecent assault and battery on a person age 14 or over.  The charge carried a maximum penalty

of five years in state prison, lifetime parole supervision, and permanent registration as a sex

offender.  Ex. 10.  John was arraigned on this charge the same day in South Boston District

Court and pled "not guilty."  Affidavit of Hugh R. Curran ¶ 2 (attached as Ex. 11).  John was

represented in the criminal case by Hugh Curran of the Bletzer & Bletzer law firm.  *Id.*

### 2. Factual Investigation

16. Attorney Curran hired a private investigator, Kevin Mullen, to assist in John's

defense.  Mullen is a former Sergeant Detective with the Boston Police Department.  Affidavit of

Kevin Mullen ¶¶ 1-2 (attached as Ex. 12).

17. On October 22, John telephoned J.K., and they spoke for 13 minutes.  Mullen

listened to the conversation, which went as follows:

- J.K. stated again that he had no recollection of the cruise.

- When John told J.K. about his statement – "Sorry, dude, that was my bad" – J.K. did not respond, except to say, "Oh, that's weird."

- When John told J.K. about the woman's allegation, J.K. stated: "What a bitch.  What kind of girl goes to a dance floor like that and doesn't expect to get touched or grabbed?"

*Id.* ¶ 3.

18.  Mullen interviewed J.K. in person on October 29 and heard a much different version of events.  J.K. now claimed to have a good memory of most of the evening on the ship.  He also denied making any phone calls or texting after the cruise about John's situation.  He claimed not to recall crossing the dance floor with John or saying anything to John along the lines of "Sorry, dude, that was my bad." *Id.* ¶ 4.

### 3.  Dealings with the District Attorney's Office

19.  The prosecutor assigned to John's case was Jennifer OKeeffe of the Suffolk County District Attorney's Office.  Attorney Curran interacted frequently with ADA OKeeffe – herself a BC alumna – in an effort to convince her  that the police had arrested the wrong man.  Initially, Attorney Curran focused on: (a) the improbability of a reporter for the school newspaper committing a heinous assault at an event that he was assigned to cover; (b) the fact that no one saw John touch, much less assault, A.B.; (c) the proximity of J.K. to A.B., his admittedly intoxicated state, and his statement to John at the time ("Sorry, dude . . . ."); (d) J.K.'s lack of memory due to "blacking out"; (e) his consciousness of guilt demonstrated after the event by his phone calls and texts; (f) his inculpatory statements to John about the woman ("What a bitch"; should have expected to be "touched or grabbed"); and (g) his convenient regaining of selective memory when speaking with Investigator Mullen.  Curran Aff. ¶ 3.

20.  The results of the forensic tests on John's hands became available in February 2013. They were negative:  no blood or DNA was detected.  Ex. 13.  As Attorney Curran emphasized to ADA OKeeffe, if A.B.'s consistent, specific description of her assault was correct, it would have been all but impossible for her attacker not to have her DNA on his hand.  ADA OKeeffe

agreed that the forensic results tended to be exculpatory, but was not prepared to say that they entirely ruled out John as the perpetrator.  Curran Aff. ¶ 4.

21.  Through the discovery process, Attorney Curran had obtained a copy of the cruise ship's surveillance video.  The video, which had been taken on equipment that was probably decades old, was of poor quality and extremely "compressed," *i.e.*, the video did not reflect the depth of the sizable dance floor and also distorted distances between people and objects.  *Id.* ¶ 5.

22.  Attorney Curran retained a forensic videographic company to analyze the video and, if possible, to improve the quality and eliminate the distortion of the raw video footage.  The forensic videographers, after a great deal of work, were able to do so.  *Id.* ¶ 6.

23.  In July 2013, one of the forensic videographers, Michael Garneau, gave a presentation of the forensically-analyzed video to ADA OKeeffe at his company's office.  He explained the entire process to her and described what the video showed in the following manner:

- John Doe is visible on the video of the dance floor for approximately three and one half minutes, and can be seen slowly making his way through the crowd.

- The moment after A.B. was assaulted can be pinpointed; she turns around and her face is visible.

- If it is assumed that she turned around 1-2 seconds after her assailant withdrew his hand, the time of the assault can be fixed.

- Fifteen seconds before the assault, John has his back to A.B.

- Ten seconds before the assault, John turns around.

- Two seconds before the assault, John is standing straight and has his right arm above his head.

- At the instant of the assault, John is still standing straight with his right arm above his head.

- At the instant of the assault, John is 4-6 feet away from A.B.

- At the instant of the assault, there are at least 2-3, and perhaps as many as 5, people between John and A.B.

Mr. Garneau answered whatever questions that ADA OKeeffe had.  Curran Aff. ¶ 7.

24. ADA OKeeffe ultimately agreed that the prosecution of John Doe should not go forward.  Attorney Curran told ADA OKeeffe that the only acceptable disposition of the case was an unequivocal dismissal of all charges.  ADA OKeeffe responded that such a dismissal would require the approval of a senior official in the Suffolk County District Attorney's Office. *Id.* ¶ 8.

25. Prior to seeking such approval, and to remove any possible doubt of John's innocence, Attorney Curran had John take a polygraph examination, which he passed with no evidence of deception.  *Id.* ¶ 9; Ex. 14.

26. In December 2013, Attorney Curran met with Patrick Haggan, the First Assistant District Attorney for Suffolk County, and presented the argument for outright dismissal. Attorney Curran pointed to: (1) the evidence surrounding the assault, including J.K.'s behavior indicating a consciousness of guilt; (2) the negative results of the forensics tests on John's hands and fingers; (3) the video that ADA OKeeffe considered exculpatory; and (4) the favorable results of the polygraph test.  First ADA Haggan agreed that dismissal of the charges was appropriate, but stated his preference that the case be dismissed at the end of the school year in the spring.  Curran Aff. ¶ 10.

27. In May 2014, an ADA appeared in South Boston District Court and moved for an outright dismissal of the charges against John Doe, stating that both ADA OKeeffe and First ADA Haggan recommended this course of action.  The court granted the motion.  Ex. 15 at 2.

**D. The University's 2012 Procedures Concerning Allegations of Sexual Assault**

28. "[A] Jesuit education is about the integration of intellectual excellence and religious commitment, and that includes, certainly, living righteously, so that touches clearly upon justice and right action." Leahy Dep. at 39 (excerpts attached as Ex. 16). "[T]he student disciplinary system at Boston College [is] intended to seek justice in the Jesuit tradition." *Id.* at 39-40.

29. For the 2012-2013 school year, the University had three sources of written policies and procedures relating to sexual assault: Section 4 of the 2012-2013 Student Guide, entitled "Community Standards and Policies" (Ex. 17); Section 5 of the 2012-2013 Student Guide, entitled "Student Conduct System" (Ex. 18); and a two-page document entitled "Conduct Board Procedure," which was provided to both the complaining student and the accused student (Ex. 19). Answer ¶ 55.

30. The Student Guide stated that the University's policies and procedures concerning sexual assault (collectively "Sexual Assault Policies and Procedures") were "[i]n accordance with Title IX."[2] Ex. 17 at 11. The Student Guide also stated that "[t]he Student Affairs Title IX Coordinator oversees the University's response to complaints of sexual harassment, sexual misconduct, and sexual assault in cases where a Boston College student is the complainant." *Id.* at 13.

31. The Sexual Assault Policies and Procedures stated:

- the accused student had the right to "due process" (Ex. 19 at 2);

- the accused student had "the right to a fair procedure which is appropriate to the circumstances" (Ex. 17 at 2);

- the accused student had "[t]he right to have access to a process through which to resolve deprivations of rights" (*Id.*); and

---

[2]   Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

- "deviations from prescribed procedures" would "invalidate a decision or proceeding" if "significant prejudice to a student . . . may result" (Ex. 18 at 1).

32.  A University student who wished to assert a sexual assault complaint against another student had three options:  (1) "filing a complaint within the University"; (2) "filing a criminal complaint"; and (3) "pursuing both options at the same time."  Ex. 17 at 15.

33.  In 2012-2013, "[t]he Student Conduct System [was] administered by the Vice President for Student Affairs through the Dean of Students and his/her staff."  Ex. 18 at 1.

34.  Once a student submitted a charge of sexual assault to the University, the Sexual Assault Policies and Procedures set forth the following steps:

**a. Initial Meeting**.  "A student who has had a complaint lodged against him or her will be called by the Dean of Students or designee to discuss the complaint."  Ex. 18 at 2.

**b. Investigation**.  After hearing what the accused student has to say, the Dean/designee "promptly [initiates] an investigation of the alleged incident."  Ex. 17 at 15.  If, however, the complainant was pursuing criminal charges, the Dean's Office "may elect to stay the disciplinary process if a student is summarily suspended and the criminal matter remains open."  *Id.* at 16. Absent a stay, the investigation would proceed:  "The Boston College Police work cooperatively with the Office of the Dean of Students to investigate and resolve cases under this policy."  *Id.* "The Boston College Police have specially trained officers to respond to sexual assault and domestic violence complaints."  *Id.*  The investigation "will include [1] a review of statements obtained from either party, [2] interviews with the complainant and the accused (if identified), [3] interviews with appropriate witnesses, and [4] a review of other relevant information."  *Id.* at 15.  "Once the investigation is complete, the University will take appropriate action . . . ."  *Id.*

**c. Referral to a Conduct Board**.  If the Dean's Office determined that the investigation warranted further proceedings, the matter was referred to one of the University's "Conduct

Boards." The Dean of Students "determine[s] which board will hear the case." Ex. 18 at 3. Serious allegations, such as charges of sexual assault, were heard by the Administrative Hearing Board, which consisted of "three administrators, one faculty member or academic administrator, and one student." *Id.* at 4. "All board members are trained by the Office of the Dean of Students." *Id.* "Chairpersons for the Administrative Hearing Board are designated by the Dean of Students and receive additional training." *Id.*

**d. Timing of the Hearing and Resolution**. The procedures did not set forth deadlines for holding a hearing or for resolution of a charge, but "[t]he University will make every reasonable effort to resolve the complaint within 60 days." Ex. 17 at 15. The accused student also had "the right to adequate time to prepare a response to the charges." *Id.* at 2.

**e. Notice of the Referral and the Hearing**. "When a matter is referred to a board, the accused student will be sent a copy of the [board] conduct procedures [*i.e.*, Ex. 19]." Ex. 18 at 3. The Dean's Office would also send the accused student a notice, at least 72 hours in advance of the hearing, that was required to include (1) the name of the board hearing the case; (2) the time and location of the hearing; (3) the names of all parties charged and the name(s) of the complainant(s); and (4) the "**alleged violations.**" Ex. 19 at 1 (emphasis added). The procedures state that the student has "the right to be informed of **any charges of misconduct**." Ex. 17 at 2 (emphasis added).

**f. Procedural Rules for the Hearing**. In 2012-2013, the procedural rules for hearings included:

- "Board members **must** disclose any real or perceived conflict of interest between themselves and any party and may not hear a case if they are not able to be impartial in the hearing of the case." Ex. 18 at 4 (emphasis added).

- The complainant and the accused student each had the right to be accompanied by an advisor, who could be a lawyer if there were open criminal charges against the accused student.  Ex. 19 at 1.  The advisor and the student could confer, "but the advisor [could] not formulate specific questions, responses, or statements for the student."  Ex. 18 at 5.  Nor could the advisor "address the Board or act in any advocacy capacity."  *Id.*

- "The University reserves the right to have legal counsel at a hearing to serve as an advisor to the chairperson of the hearing board.  The chairperson and legal counsel may consult any time during the hearing."  *Id.*

- The complainant and the accused student each had the right to request the placement of a partition so that neither would be visible to the other.  The Dean of Students had the final decision as to whether a partition would be used.  *Id.*

- No stenographic or audio recording of the hearing was made. The use of any electronic device at the hearing required advance written permission of the Dean of Students.  *Id.*

- Both the complainant and the accused student were entitled to present witnesses and "other related evidence."  *Id.* at 6.

- The witnesses were required to be fact witnesses:  "Witnesses should be able to speak to the facts of the incident which they have witnessed."  *Id.*  Character witnesses were generally not allowed to testify; rather, written statements were to be provided.  *Id.*

- The procedures also provided that "[w]itnesses, upon request of either complainant or accused, will make a presentation concerning those facts that they are witness to, relevant to the complaint, and will then answer questions posted by the board and by the adversarial parties."  *Id.*

- "It is the responsibility [of] each party to notify their own witnesses of the date, time, and location of the hearing.  The Dean's Office **does not** notify witnesses and **does not** have subpoena power over them."  Ex. 19 at 1 (emphasis in original).

- "The hearing board has the authority to require individuals to appear as witnesses in cases where it is determined that their testimony is important and necessary for a full and fair hearing of a case."  Ex. 18 at 6.

- "The standard used to determine responsibility is a preponderance of the evidence, that is, whether it is 'more likely than not' that the accused has violated the policy." Ex. 17 at 12.

**g. Conduct of the Hearing**.  The accused student was guaranteed "the right to hear evidence in support of the charges" and "the right to present evidence against the charges."  *Id.* at 2.  The chairperson of the Board was to conduct the hearing in the following manner:

- "The chairperson will introduce the complaint by reading the formal charges as determined by the Office of the Dean of Students." Ex. 18 at 6.

- "The complainant will then have an opportunity to read his/her incident report [*i.e.*, his/her version of events] to the board and to elaborate on it.  The accused will then have an opportunity" to respond.  *Id.*

- The Board members could question the complainant and the accused student at any time during the hearing.  *Id.*

- "The accused and the complainant will be given an opportunity to ask questions.  All questions, however, must be directed to and through the chairperson."  *Id.*

- The complainant and the accused student each had the right to make a final statement.  *Id.*

**h. Decisionmaking Process**.  After the hearing, the Board was to "meet in private" and render one of four decisions by a simple majority vote: (1) "responsible"; (2) "not responsible"; (3) "no finding"; or (4) "responsible for a lesser inclusive charge."  *Id.* at 4, 5, 6.  If the finding was "responsible," or "responsible for a lesser inclusive charge," the Board was to recommend punishment to the Dean of Students, which could include suspension or dismissal from the University.  *Id.* at 4.  The accused student had "the right to be informed of the outcome of [the] proceeding."  Ex. 17 at 2.

**i. Appeal**.  The accused student had the "right to have access to a process through which to resolve deprivations of rights."  *Id.*  The appeal process after the hearing was as follows:

- The appeal mechanism was not an appeal as of right, but a "request for an appeal." Ex. 18 at 7.

- There were two grounds on which to base a request for an appeal: (1) a "lack of due process," also referred to as a "demonstrated lack of fairness" and "procedural unfairness"; and (2) the existence of "evidence not previously available that would be likely to change the result of the prior hearing." *Id.*; Ex. 19 at 2.

- The deadline for the request for appeal was five business days from the date of the Board's decision. Ex. 19 at 2.

- The request for an appeal was directed to the Dean of Students and the Vice President for Student Affairs. Ex. 18 at 7.

- "If the Dean [of Students] and the Vice President [for Student Affairs] decide that the [request for an] appeal has merit, . . . they will [1] refer the appeal to the Appeals Board to be reheard in its entirety or [2] refer it back to the original hearing board for further adjudication." *Id.*

- The "Appeals Board" was a body composed of the Dean of Students or designee, the Director of Residential Life or designee, and an administrator appointed by the Vice President for Student Affairs. The decision of the Appeals Board was final. *Id.* at 5.

35. In April 2011, the University's Vice President for Student Affairs convened a committee to study the prevention of and response to sexual violence on campus. Ex. 20 at 5 (excerpt). Dean of Students Paul Chebator was a member of the committee, and Associate General Counsel Nora Field was counsel to the committee. *Id.* at 33. The committee issued a report on April 23, 2012 that contained the following finding:

> Adjudicating sexual violence cases is often difficult for hearing board members. The Office for the Dean of Student Development currently offers a 3-hour training for board members. **Based on best practices, the training of a hearing board such as ours is insufficient.** A comprehensive training for all hearing board members is recommended to last two days and cover a wide array of topics to assure a fair process as outlined in Title IX.

*Id.* at 29 (citations omitted) (emphasis added).

36.  The Boston College Police officers who are "specially trained" to "respond to sexual assault and domestic violence complaints," Ex. 17 at 16, receive the following training:  In addition to 40 hours of training that includes "basic investigation" and "interview techniques," these officers receive an additional 40 hours of training "that provides them with the skills and techniques to work with a victim and properly investigate sexual assault [allegations]." Deposition of Thomas E. Atkinson, Jr., Deputy Chief of Boston College Police Department and Associate Director of Public Safety, at 17, 33-34 (excerpts attached as Ex. 21).  "[I]investigative techniques are part of the [sexual assault] course."  *Id.* at 34.  Both of the above training courses are taken at a municipal police training academy or a special State Police officer training academy.  *Id.* at 33.

### E.  The University's Disciplinary Proceeding Against John Doe

#### 1.  The Sexual Assault Notification Form

37.  In the early morning hours of October 21, 2012, a Boston College Police officer completed a standard University document entitled "Sexual Assault Notification Form."  The form's description of the incident the night before was false and misleading in that it attributed knowledge to A.B. that she did not have nor ever claim to have had.  The form stated:  "The victim [A.B.] was dancing with a female friend [Betsy] on the boat's dance floor.  The suspect [John Doe] approached the victim and began to dance with her; he then placed his hand up her skirt and inserted a finger inside her anus.  The victim told her friend and the two women reported the rape to a member of the boat's security staff."  Ex. 22 at 3.  This form was sent to University administrative personnel, including the Dean of Students.  *Id.*; Answer ¶ 59.  The University imposed an immediate summary suspension that prohibited John from setting foot on campus.  Answer ¶ 59.

**2. Pre-Hearing Conduct of the Dean's Office**

38. John's parents, Mary and James Doe, learned of John's arrest on Sunday, the day after the cruise. M. Doe Dep. at 7-8 (excerpts attached as Ex. 23); James Doe Dep. at 17-18 (excerpts attached as Ex. 24). James flew to Boston that evening. James Doe Dep. at 25. That same day, Dean of Students Paul Chebator was in contact with A.B.'s father, who "was quite angry and upset" and "wanted the male student to be expelled immediately." Ex. 25. In reporting this conversation to his staff, Chebator stated that both A.B. and John "will be met by someone in the dean's office in the next day or two and a determination will be made how to proceed." *Id.* But the Dean's Office would not meet with John and his father until Wednesday, October 24. James Doe Dep. at 32-33.

39. Senior Associate Dean of Students Carole Hughes was responsible for John's matter. Answer ¶ 61. It was the first sexual assault case for which she was in charge. Hughes Dep. I at 60-61 (excerpts attached as Ex. 26); Hughes Dep. II at 52-53 (excerpts attached as Ex. 27).

40. During the evening of October 23, Chebator spoke with Hughes, Answer ¶ 61, and agreed with the following conclusions (in Ex. 28) reached by Hughes:

- The summary suspension barring John from campus should remain in place because (1) A.B. "was able to identify [John] at the scene"; (2) "At least one other student, and possibly two were also able to identify him"; (3) John "was arrested," "was arraigned," and "was given a pre-trial hearing date"; and (4) "these two students do not know each other."

- The University's "policies" and Title IX required that the matter be resolved quickly, preferably "in the next two weeks."

- An Administrative Hearing Board should be convened to hear the charges against John.

- "Given that [Boston College Police Department] had no jurisdiction on the scene, they cannot conduct any further investigation."

- Hughes would obtain written statements from A.B. and John in order to obtain their respective accounts of the incident and would also interview other witnesses.

- "[T]hat inquiry along with a hearing board would constitute an investigation."  Hughes confirmed this conclusion with Nora Field, the University's Associate General Counsel.  Hughes Dep. I at 41-43; Field Dep. at 41-42 (excerpts attached as Ex. 29).

41.  The Administrative Hearing Board was the investigating body in John's case.  Hughes Dep. I at 24.  Field Dep. at 42.

42.  Hughes met with John and his father on October 24, having already decided that the summary suspension should remain in place and that an Administrative Hearing Board would be convened sometime in the next two weeks.  Answer ¶ 62.  Hughes did not ask John "to tell [her] his side of the story."  Hughes Dep. I at 155.  When John attempted to explain what happened and how A.B. had identified the wrong person, Hughes refused to allow John to explain what happened.  James Doe Dep. at 36-37.  Instead, she told John that he "would have an opportunity at the hearing to tell the board his side of the story."  Hughes Dep. I at 77.  But, as Hughes stated in an email reporting on the meeting, John was able to get out "that he did not do this" and that "this is a case of mistaken identity."  Ex. 30 at 1.

43.  At the same meeting, James – who is an attorney – requested that the hearing be delayed until the District Attorney's Office and State Police concluded their investigation.  Hughes told him "no."  Hughes Dep. I at 80.  She later stated in the same email reporting on the meeting:  "Certainly we could wait [to hold the hearing] until after the [criminal] court dates . . . ."  Ex. 30 at 1.

44.  John met with Hughes on two more occasions, October 26 and 30, accompanied both times by his mother, Mary.  On October 26, Hughes allowed John to review – but not have a copy of – a statement that A.B. had written.  Hughes also provided John with (a) the notice of the

charges against him:  "Sexual Assault" (Ex. 31 at 3); and (b) the two-page document entitled "Conduct Board Procedure" (Ex. 19).  Answer ¶ 64.

45.  Hughes and Chebator had decided that the charge would be "Sexual Assault." Hughes Dep. I at 24-25.  The term "Sexual Assault" was not defined in the charging document, nor was it defined in the Sexual Assault Policies and Procedures.  Hughes believed that the term was defined in the Sexual Assault Policies and Procedures.  *Id.* at 25.

46.  At the second meeting, on October 30, John was allowed to review his conduct records, the report written by the Boston College Police on the scene, and A.B.'s statement. Answer ¶ 64.  John told Hughes that he wanted J.K. to testify and asked Hughes to compel his attendance.  Answer ¶ 71.  Hughes told John that the Dean's Office had no authority to require witnesses to appear at the hearing on John's behalf.  M. Doe Dep. at 11-12.  Hughes, however, knew that "there was a clause in the student guide that allowed us to compel the students [to testify] if we felt it was necessary."  Hughes Dep. I at 27.  In addition, two days before the hearing, University General Counsel Joseph Herlihy told Hughes that "the Dean of Students office would need to be the party to require [J.K.] to appear."  Herlihy Dep. at 68-69 (excerpts attached as Ex. 32).

47.  At both the October 26 and 30 meetings with Hughes, John once again attempted to tell Hughes what happened the night of the cruise, but she again refused to allow him to explain. M. Doe Dep. at 11, 13.  Hughes never "ask[ed] [John] to tell [her] his side of the story."  Hughes Dep. I at 155.

48.  Chebator has testified that during these "preliminary conversations," John, "[a]t some point, he should be given, would have been given an opportunity to tell his side of the story."  Chebator Dep. at 37-38 (excerpts attached as Ex. 33).

49. After a postponement at the request of A.B., the hearing was rescheduled for November 8.  On November 7, John's attorney-advisor for the disciplinary process – Conrad Bletzer, Jr. – called Herlihy, and told him that both the police and the school had charged the wrong person, and it was another student who should be investigated.  Answer ¶ 66.

50. After Attorney Bletzer's call to Herlihy, Hughes emailed John that "[i]t is imperative that you meet with me tomorrow morning," *i.e.*, the day of the hearing, to discuss the assertion "that there is another student who told you that he was responsible for the assault."  Ex. 34. When John called and told her that his lawyer was not available in the morning, she responded that she "did not need to speak to his attorney, [but] needed to speak to him."  Ex. 35.  John asked her to call his attorney, but Hughes refused to do so, telling him "that was unnecessary." *Id.*  No meeting occurred.

### 3. The Hearing

51. The hearing began on November 8.  The Administrative Hearing Board consisted of the chairperson, Catherine-Mary Rivera, the Associate Director of Residential Life; two other administrators; a professor at the law school; and an undergraduate student.   Answer ¶ 68. Hughes was Rivera's professional mentor.  Rivera Dep. at 179 (excerpts attached as Ex. 36); Hughes Dep. II at 62-63.

52. The law professor on the Board was Norah Wylie.  At the time of the hearing, Wylie was seven months into a four-year term as Co-Chair of the Board of Directors of Emerge, an organization that describes its "mission" as "to eliminate violence against women."  Wylie Dep. at 80 (excerpts attached as Ex. 37); Ex. 38 at 2, 15 (excerpt).  Wylie did not disclose her leadership position or affiliation with this advocacy group to Hughes or anyone else involved with the hearing.  Wylie Dep. at 81-82.

53. Hughes was unaware of Wylie's position or affiliation with the advocacy group. Hughes Dep. II at 67.  Hughes did not ask "candidates for the hearing board . . . if any of them held views that would make them inappropriate for that particular hearing board." *Id.* at 68.  It was Hughes' "job to ensure that the . . . members on any particular hearing board were to be impartial." *Id.* at 67.

54. Others in attendance at the hearing were A.B., her parents, and her lawyer-advisor; John, his parents, and his lawyer-advisor; and University General Counsel Herlihy.  A partition divided the room.  Complaint ¶ 69; Answer ¶ 69.

55. There is no transcript of the hearing, consistent with the University's policy prohibiting stenographic or audio recording.  Answer ¶ 70.  The evidence at the November 8 hearing included the following:

- A.B. testified consistently with her prior statements, *i.e.*, that her assailant approached her from behind and inserted two fingers in her anus.  Answer ¶ 70.

- A.B. testified that she did not see the assault.  Answer ¶ 70.

- A.B.'s friend, Betsy, did not appear at the hearing.  Answer ¶ 70.

- A.B. testified that Betsy did not see the assault.  Answer ¶ 70.

- A.B. testified that she knew that John had done it in part because he had a weird look on his face.  Answer ¶ 70.

- A.B. testified that she knew that John was the assailant because when she turned around, "he made eye contact with her"; "he was tall and wearing a bright purple shirt"; and he "was a lone, white male standing behind her."  Rivera Dep. at 109-10.

- John denied having touched A.B. in any way and testified as to what J.K. said to him on the dance floor.  John also testified concerning J.K.'s texts and the October 22 telephone conversation with J.K.  Answer ¶ 70.

- John showed the Board a portion of the ship's video surveillance footage. Answer ¶ 70. Although the video was of poor quality, Answer ¶ 35, it showed that "the dance floor was packed with people." Rivera Dep. at 110-11.

- Three of John's friends who were with him that night testified on his behalf. "Each of them had a different vantage point." *Id*. at 111-12. "[E]ach of them testified that they didn't see [John] bend down or do anything unusual." *Id*. at 112.

- John argued to the Board that the forensic testing of his hands and an enhanced version of the video, when available, would prove that he was innocent. Answer ¶ 70.

56. The Board adjourned the hearing in order to schedule a second day to hear testimony from Betsy and J.K. Complaint ¶ 72; Answer ¶ 72.

57. The day after the hearing, Hughes sent Betsy an email that directed her to appear as a witness when the hearing resumed or to "be subject to sanction by the Dean of Students." Ex. 39. Betsy did not respond. Hughes had a subordinate, Christine Davis, call Betsy, who agreed to meet with Davis that day, November 12. Answer ¶ 73. Davis then sent Hughes an email: "[Betsy] is coming to meet with me as I type. ☺" Hughes replied by email: "Yay." Ex. 40 at 1.

58. Also on the day after the hearing, Hughes met with J.K. and his father, and "was very clear with [J.K.] that he was coming [to the resumed hearing] as a witness and was not being charged with anything." Ex. 41. Hughes had previously discussed how to treat J.K. with Chebator. Hughes Dep. II at 64. As for the possibility that J.K. may have been responsible for the assault on A.B., Hughes "ha[d] [no] thoughts along those lines at all." Hughes Dep. I at 157-58. Hughes also instructed her subordinate, Davis, "to talk to [Rivera] about how the board might also put [J.K.] at ease." Ex. 41.

59. At the same meeting, J.K.'s father "expressed concern about the need for a lawyer." Hughes "consulted with Joe [Herlihy] and we provided two names of local attorneys." Ex. 42 at

3; Hughes Dep. II at 9.  J.K. was represented at the hearing by one of those attorneys, Phil Tracy.

Hughes Dep. II at 9.

60.  The hearing reconvened on November 16.  Answer ¶ 74.

61.  Betsy testified as follows:

- She did not see the assault while it was taking place.  Rivera Dep. at 117-18.

- "[T]he dance floor was tightly packed," including "behind [A.B.]," and "there were a lot of people around [Betsy] and [A.B.] as they were dancing." *Id.* at 118.

- John "stood out because he was tall." *Id.*

62.  J.K. attended the hearing accompanied by Attorney Tracy.  Answer ¶ 75.  J.K.

testified as follows:

- He denied being drunk the night of the cruise.  Rivera Dep. at 118.

- He denied assaulting A.B. *Id.* at 119.

- He denied saying anything to John along the lines of "Sorry, dude, my bad." *Id.*

63.  In his final statement, John "pleaded for the Board to wait for evidence that would

show that he was innocent."  Rivera Dep. at 123.  He asked the Board to wait for the results of

the forensic testing being performed by the State Police because if A.B. was correct that

someone had inserted two fingers in her anus, a negative test result would show that he did not

assault her. *Id.* at 123-24; Answer ¶ 78.  He asked the Board to wait for the forensically-

analyzed video.  Rivera Dep. at 124; Answer ¶ 78.

64.  In her final statement, A.B. said, "[N]o person is safe with [John Doe] on campus

and my family will never rest until [John Doe] is expelled."  Rivera Dep. at 124-25.

65. On both hearing days, the Board refused John's request to allow Kevin Mullen, the private investigator, to testify. Answer ¶ 119. John told the Board that (a) Mullen would testify about his personal knowledge of the October 22 phone call between John and J.K.; and (b) his October 29 interview with J.K. *Id.* Rivera, after consultation with Hughes and Herlihy, gave three reasons for excluding Mullen as a witness. Rivera first said that Mullen's designation as a witness for the first day of the hearing was untimely. Rivera Dep. at 77-78. Rivera has testified that the timing of Mullen's designation did not "preclude [the Board] from allowing Mr. Mullen to testify on the second day of the hearing." *Id.* at 86-87. Rivera also stated that Mullen's testimony would be "hearsay." *Id.* at 83. Finally, Rivera stated that Mullen could not testify because he did not witness the events at issue, *i.e.*, the alleged assault. Rivera Dep. at 79, 86. Herlihy advised Rivera that the University's procedures "could support a decision not to hear [Mullen's] testimony" on that basis. Herlihy Dep. at 94-95.

66. Had Mullen been permitted to testify, his testimony would have included (a) the October 22 telephone conversation between John and J.K. that Mullen heard (as set forth in ¶ 17 *supra*); and (b) Mullen's interview with J.K. (as set forth in ¶ 18 *supra*). Mullen Aff. ¶¶ 3, 4.

### 4. The Board's Deliberations and Decision

67. The Board began deliberations after the conclusion of the second session of the hearing on November 16. The Board was considering the result called a "no finding" based on insufficient evidence. Hughes Dep. I at 184-85. The Board did not reach a decision on November 16, which was a Friday, and suspended their deliberations until the following week. On the evening of November 16, Rivera informed Hughes by email that the "no finding" result was under consideration. Ex. 43. Rivera also told Hughes that the Board was "[s]truggling with needing to see the other evidence," *i.e.*, the forensic testing results and the forensically-analyzed video. *Id.*

68. In a telephone conversation over the weekend, Rivera told Hughes that the Board was "struggling with the decision, so they were [considering] the possibility of a no finding" and wanted to know if such a result was available to the Board. Hughes Dep. I at 184-85. Hughes called Chebator, who told her that "[w]e have had them in the past, but I discourage them." *Id.* at 185. Hughes relayed Chebator's view to Rivera prior to the second deliberation session, which was held on Monday, November 19. *Id.* at 186.

69. The Board reached a decision of "Responsible" for "Indecent Assault and Battery." Ex. 44 at 1. The offense was changed to "Sexual Assault: Indecent Assault and Battery" after discussions among Chebator, Hughes, Herlihy, and Rivera. Exs. 45, 46, 47.

70. Neither "Indecent Assault and Battery" nor "Sexual Assault: Indecent Assault and Battery" was mentioned in the charging document or defined in the Sexual Assault Policies and Procedures. Exs. 31 at 3 (original notice), 48 at 2 (revised due to change of hearing date). The charging document did not mention a "lesser inclusive offense." *Id.*

71. The rationale for the Board's decision is set forth in the "Comments" section of the Administrative Hearing Board Finding Sheet. Ex. 49 at 3. After the Board reached the finding, they called Herlihy while they were still in the deliberation room. They and Herlihy "discuss[ed] the various terminologies to describe what behavior they found [John] responsible for." Herlihy Dep. at 110-11. Herlihy also suggested changes to the rationale for the decision. *Id.* at 110, 111. The second bullet point in the "Comments" section states: "However, given that this happened in a matter of seconds (the time it took [Betsy] to look away) and given that [A.B.'s] reaction was not one of sudden pain, it seem[s] less likely than not that the perpetrator achieve[d] penetration." Ex. 49 at 3. Herlihy supplied the "less likely than not" language. Herlihy Dep. at 114.

72. The sanction recommended by the Board and imposed by Chebator was "(a)  a University Suspension beginning immediately [and continuing] until January 6, 2014; (b) a dismissal from Housing beginning immediately [and continuing] until graduation; and (c) 'loss of senior week privileges at any point.'"  Answer ¶ 81.

73. At the time of John's disciplinary process in October-November 2012, Hughes was "not completely" familiar with Title IX's requirements.  Hughes Dep. I at 203.  It is "fair to say that [Hughes] cannot [say] one way or the other whether [she] compiled with Title IX."  *Id.* at 203-04.

### 5. The Appeal

74. John Doe submitted a request for an appeal that, if successful, would lead to a hearing before the Appeals Board or a rehearing before the Board that originally decided his case.  Answer ¶ 82.  The grounds for his request for appeal were a denial of due process and the refusal to wait for the evidence that, when available, would exonerate him.  Ex. 50 at 1.

75. The request for appeal was to be directed to the Dean of Students, Chebator, and the Vice President for Student Affairs.  The latter had recently resigned, so his place was taken by Patrick Keating, the University's Executive Vice President, who was also serving as the Interim Vice President for Student Affairs.  Complaint ¶ 83; Answer ¶ 83.

76. Keating had no experience or training in the area of student discipline or in the area of allegations of sexual assault in the student discipline context.  Keating Dep. at 9-11, 28 (excerpts attached as Ex. 51); Answer ¶ 144.

77. Herlihy told Keating the following:

- The appeal "was essentially procedural, [and Keating should] follow the recommendations of Paul [Chebator]."  Keating Dep. at 24.

- It was "not necessary" for Keating to "be involved in all the details of the case and understand the background." *Id.*

78.  Keating "undertook no evaluation of the merits of the appeal." *Id.* at 25.  Keating "waited for [Chebator's] review of the case." *Id.*  Chebator met with Keating after "he [Chebator] had put the letter [decision] together." *Id.*  The letter decision was final. *Id.* at 26.  Chebator "walked [Keating] through the letter," *id.* at 25, and Keating signed it. *Id.* at 26.

79.  Prior to finalizing the letter decision, Chebator sent a draft to Rivera for her comments, which she supplied.  Ex. 52; Answer ¶¶ 85, 145.  Chebator also consulted Herlihy on the drafting of the letter decision, and Herlihy supplied comments and suggestions to Chebator. Exs. 53, 54; Answer ¶ 85.

80.  The request for appeal was denied by a letter decision dated December 7, 2012 and signed by Chebator and Keating.  Ex. 55.

**F.   Aftermath**

81.  John served his suspension and returned to the BC campus in January 2014.  He applied for credit for certain advanced placement courses taken in high school, and he was able to graduate in May 2014.  Answer ¶ 86.

82.  During the weekend of graduation, James Doe approached the President of the University, William Leahy, S.J.  James told Father Leahy about what he believed had happened to John and said that he would be in further contact.  Answer ¶ 87.

83.  In September 2014, James and Mary, on behalf of themselves and John, each wrote long letters to Father Leahy.  Answer ¶¶ 87, 154; Exs. 56, 57.  Each letter details the wrongs that each believed had been done by the University to John.  Exs. 56, 57.  Each letter asked Father Leahy to remedy the wrongs that had been done by the University.  Ex. 56 at 10; Ex. 57 at 6.

84. James' letter stated that the family had no "desire to file a lawsuit against Boston College as well as the individuals particularly responsible for this injustice; but this injustice must be corrected." Ex. 56 at 10.

85. From James' letter, Father Leahy "understood that the family was prepared to file a lawsuit against the university unless the injustice, as they put it, done to [John] was corrected." Leahy Dep. at 42. Father Leahy "responded with the offer of an independent review" to be conducted by the current Vice President for Student Affairs, Barbara Jones. *Id.* at 42-43.

86. Father Leahy told James that he "believes that [Jones] is the right person at BC to review the case." Ex. 58 at 4. Father Leahy contemplated that Jones would "re-examin[e] the facts and make a determination." *Id.* Father Leahy intended that the review would be "thorough and fair" as well as "independent." Leahy Dep. at 23, 42. Father Leahy saw Jones' task as follows: "The whole process of the two letters was her area, and that was hers to respond to, that's what I wanted her to do." *Id.* at 32.

**G. The 2014 Review**

87. Jones understood that Father Leahy wanted her, with regard to the review of John's matter, to "reexamine[e] the facts and make a determination." Jones Dep. at 30 (excerpts attached as Ex. 59).

88. Jones "met with James and told him that she took the matter very seriously and would conduct an unbiased and careful review of John's disciplinary process." Answer ¶ 91.

89. Jones saw her task as "looking at whether or not we followed our procedures and whether or not there was new evidence." *Id.* at 35. In her view, "[i]t was not [my] role . . . to rehear the case." *Id.* at 72.

90. In Jones' view, it was not her "responsibility" to "evaluate the claim made by [A.B.] that [John] was a lone male dancing behind her." *Id.* at 65-66.

91. Jones did not "investigate the role that [J.K.] played in this matter" because "[t]he administrative hearing board investigated that." *Id.* at 72.

92. Jones did investigate whether the Office of the Dean of Students or Herlihy had "personal involvement" in "the hearing board's deliberations." *Id.* at 80-81. She concluded that "[t]here was no involvement by the Dean of Students Office or by Joe Herlihy." *Id.*

93. Jones "asked [Keating] in one of [their] regular meetings how the appeal was handled." *Id.* at 82. Keating told her "that the appeal [decision] was prepared by Paul Chebator and that he signed off on it." *Id.* Jones did not "ask [Keating] any questions." *Id.* at 82-83.

94. Jones never spoke to Chebator "in the course of [her] review." *Id.* at 83. "[B]ased on what [Jones] understood had happened, [Chebator] was not involved in the case. He was involved in handling some of the phone calls, but was not involved directly in the case." *Id.*

95. In James' letter to Father Leahy, he asserted that the individuals involved in the disciplinary process were not properly trained. Ex. 56 at 4. Jones did not believe it "necessary to evaluate the quantity and quality of that training." *Id.* at 67-68.

96. Jones involved Herlihy in her review because "Joe is legal counsel for the university." *Id.* at 51. Herlihy provided information to Jones. *Id.* at 52-53, 60, 68-70, 75-76. Jones "talked with Joe periodically when [she] had questions about what was being alleged." *Id.* at 81.

97. Herlihy told Jones that the criminal charges against John had been "dismissed for lack of evidence, but the district attorney's standard of evidence are very different than our standard of evidence." *Id.* at 52-53.

98. Herlihy told Jones "that the university discipline process does not hinge necessarily on the evidence that would be gathered from the police . . . ." *Id.* at 60.

99.  Jones, together with Herlihy, wrote a November 14, 2014 letter to James.  Ex. 60.

Neither Jones nor Herlihy can recall who wrote the first draft.  Jones Dep. at 94; Herlihy Dep. at

135.  The letter was signed by Jones; there is no indication on the letter of Herlihy's

involvement.  Ex. 60.  The letter rejected some of the allegations made in the letters sent by

James and Mary.  *Id.*

100.  In response to the assertion that "the Board was not properly trained," the letter

states that "[t]he practices and standards of the Board were consistent with best practices in

higher education and the understanding of the Dear Colleague guidelines at the time."  *Id.* at 2.

101.  Jones and Herlihy, in "collaboration," wrote a December 17, 2014 letter to James.

Jones Dep. at 99; Ex. 61.  Neither Jones nor Herlihy can recall who wrote the first draft.  Jones

Dep. at 99; Herlihy Dep. at 135.  This letter was written after Jones (a) was provided the results

of the forensic testing done by the police on John's hands; (b) viewed the same forensically-

analyzed video seen by ADA OKeeffe; and (c) was provided the successful results of the

polygraph given to John.  Ex. 61.

102.  The December 17, 2014 letter states that the forensic testing results are not relevant

because the appellate decision states that "[w]e have consulted with the Board concerning this

matter and they feel strongly that a negative result of the swab test would not change their

finding in this matter."  *Id.*  The letter states that the forensically-analyzed video is, "at best,

inconclusive and, thus, insufficient to justify a reconsideration of this case."  *Id.*  As to the

polygraph, the letter states that "there is no consensus in either the scientific or legal community

the polygraph evidence is reliable and, accordingly, we do not believe that the results of such a

test would justify a reconsideration of this case."  *Id.*  The letter was signed by Jones; there is no

indication on the letter of Herlihy's involvement.  *Id.*

Respectfully submitted,

John Doe, Mary Doe, and James Doe

By their attorneys,

DLA PIPER LLP (US)

/s/ Matthew J. Iverson
Matthew J. Iverson (BBO # 653880)
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000
(617) 406-6100 (fax)
matthew.iverson@dlapiper.com


/s/ Charles B. Wayne
Charles B. Wayne (*pro hac vice*)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of May, 2016, a copy of the foregoing was served by electronic mail using the CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/ Charles B. Wayne
Charles B. Wayne