## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| )<br>)<br>**JOHN DOE, et al.,** )<br>)<br>**Plaintiffs,** )<br>)<br>**v.** )<br>)<br>)<br>**TRUSTEES OF BOSTON COLLEGE, et al.,** )<br>)<br>**Defendants.** )<br>)<br>)<br>) | **Civil Action No. 15-cv-10790** |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                     **October 4, 2016**

### I.      Introduction

Plaintiffs John Doe ("Doe"), Mary Doe ("Mary") and James Doe ("James") (collectively,

"Doe")[1] have filed this lawsuit against Defendants Trustees of Boston College ("BC") and various

BC administrators Paul Chebator ("Chebator"), Carole Hughes ("Hughes"), Catherine-Mary

Rivera ("Rivera"), Patrick J. Keating ("Keating") and Barbara Jones ("Jones") (collectively,

"Individual Defendants"), for the disciplinary action that BC took against Doe for a sexual assault,

denied by Doe, of a fellow student.  Plaintiffs allege that the process that led to Doe's suspension

violated BC's express and implied contract with its students, failed to provide a fair process for

Doe, violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title

IX"), amounted to negligence and both negligent and intentional infliction of emotional distress.

---

[1]  Because John Doe, Mary Doe and James Doe assert the same claims collectively, the
Court refers to these individuals collectively as "Doe" unless otherwise indicated.

D. 1.  Doe has moved to amend the complaint and add Joseph Herlihy ("Herlihy"), BC's General Counsel, as a defendant.  D. 51.  Doe has moved for partial summary judgment on Count I (breach of contract) and Count IV (breach of the duty of fairness).  D. 64.  BC has moved for summary judgment on all counts.  D. 67.  Individual Defendants have moved for summary judgment on all counts related to them.  D. 69.  For the reasons stated below, the Court **DENIES** Doe's motion to amend its complaint, **DENIES** Doe's partial motion for summary judgment, **ALLOWS** BC's motion for summary judgment and **ALLOWS** Individual Defendants' motion for summary judgment.

## II.  Standard of Review

### A.  <u>Motion to Amend</u>

Under Fed. R. Civ. P. 15(a), leave to amend will be freely given when justice so requires. Once the Court enters a scheduling order, however, "case law clearly establishes that Rule 16(b)'s 'good cause' standard, rather than Rule 15(a)'s 'freely give[n]' standard governs motions to amend filed after scheduling order deadlines" have expired.  <u>Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.</u>, 714 F.3d 62, 64 (1st Cir. 2013) (quoting <u>Flores-Silva v. McClintock-Hernández</u>, 710 F.3d 1, 3 (1st Cir. 2013)); <u>United States ex rel. D'Agostino v. EV3, Inc.</u>, 802 F.3d 188, 194 (1st Cir. 2015).  When evaluating motions under the "good cause" standard, the Court focuses predominantly on the diligence (or lack thereof) of the moving party, in addition to assessing the prejudice to the party-opponent.  <u>Flores-Silva</u>, 710 F.3d at 3 (citing <u>Steir v. Girl Scouts of the USA</u>, 383 F.3d 7, 12 (1st Cir. 2004)); <u>O'Connell v. Hyatt Hotels of Puerto Rico</u>, 357 F.3d 152, 155 (1st Cir. 2004) (citing <u>Johnson v. Mammoth Recreations, Inc.</u>, 975 F.2d 604, 609 (9th Cir. 1992)).

### B.  <u>Summary Judgment</u>

The Court grants summary judgment when no genuine dispute of material fact exists and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  Facts are material if they carry the potential to affect the outcome of the suit

under applicable law.  <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st

Cir. 2000) (quoting <u>Sanchez v. Alvarado</u>, 101 F.3d 223, 227 (1st Cir. 1996)).  The movant must

show the absence of a genuine issue of material fact.  <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st

Cir. 2000).  If the movant meets that burden, the non-moving party must "with respect to each

issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could

reasonably resolve that issue in her favor," <u>Borges ex rel. S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1,

5 (1st Cir. 2010), instead of merely resting upon allegations or denials in the pleadings.  <u>Anderson

v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  In deciding a summary judgment motion, the

Court views the record in the light most favorable to the non-moving party, drawing all reasonable

inferences in his favor.  <u>Noonan v. Staples, Inc.</u>, 556 F.3d 20, 25 (1st Cir. 2009).

### III.   Factual Background

Unless otherwise noted, the following undisputed material facts are drawn from the parties'

statements of material facts and their responses.[2]

#### A.    <u>The Alleged Sexual Assault</u>

In Fall 2012, Doe[3] was a senior at BC.  D. 65 ¶ 2; D. 74 ¶ 2; D. 10 ¶ 13.  On October 20,

2012, Doe attended a BC event on the *Spirit of Boston* cruise ship to cover the event for BC's

school newspaper.  D. 65 ¶¶ 2, 3; D. 74 ¶¶ 2, 3.  Doe is 6'4" tall and, at the time, was wearing a

purple shirt.  D. 65 ¶ 5; D. 74 ¶ 5.  Around 11:30 p.m., Doe moved across the dance floor.  D. 65

---

[2]  If a party has provided no response to a statement of fact by an opposing party, those statements of fact are deemed admitted.  <u>Stonkus v. City of Brockton Sch. Dep't</u>, 322 F.3d 97, 102 (1st Cir. 2003) (quoting D. Mass. L.R. 56.1); <u>see</u> <u>Rodio v. R.J. Reynolds Tobacco Co.</u>, 416 F. Supp. 2d 224, 227 (D. Mass. 2006) (deeming defendant's facts admitted where plaintiff disputed facts but failed to present supported facts that controverted defendant's assertions).

[3]  For purposes of the Factual Background, the Court refers to John Doe as "Doe," Mary Doe as "Mary" and James Doe as "James."

¶ 5; D. 74 ¶ 5.  He was moving and dancing his way across the packed dance floor to reach some of his friends.    D. 65 ¶ 5; D. 74 ¶ 5.  Doe later testified that, as he was crossing the dance floor, a woman turned and screamed at him.  D. 65 ¶ 6; D. 74 ¶ 6.  A few minutes later, security guards escorted Doe away, and when the ship docked, Massachusetts State Police arrested Doe who was not released on bail until early the following morning.  D. 65 ¶¶ 7-9; D. 74 ¶¶ 7-9; D. 71 ¶ 19.  Forensic evidence specialists took several swab samples from Doe's hands, fingers and fingernails and took his clothes.  D. 65 ¶ 9; D. 74 ¶ 9; D. 65-2 at 3.

Police arrested Doe because "AB," a BC sophomore who was on the dance floor, stated that she felt a hand go up her clothing and two fingers were inserted into her anus.  D. 65 ¶ 10; D. 74 ¶ 10.  When AB turned around, she stated she saw a lone white male wearing a purple shirt.  D. 65 ¶ 10; D. 74 ¶ 10; D. 71 ¶ 17.  AB's friend, Betsy, who was her dancing partner at the time, but who did not see the assault, stated that AB told her that a tall male with brown hair and a purple shirt stuck his fingers between her legs.  D. 65 ¶ 11; D. 74 ¶ 11.

Doe testified that another male individual, "JK," was crossing the dance floor at the same time as he did.  D. 65 ¶ 6; D. 74 ¶ 6.  Doe further testified that when AB screamed at Doe, JK said, "Sorry, dude, that was my bad."  D. 65 ¶ 6; D. 74 ¶ 6.  After Doe was taken away by security guards, Doe told his friend that "JK must have done something."  D. 65 ¶ 7; D. 74 ¶ 7.  After Doe was removed from the ship, JK texted Doe's friend to see if Doe was alright.  D. 65 ¶ 12; D. 74 ¶ 12.  The following day, JK texted another one of Doe's friends, asking why and how Doe got in trouble.  D. 65 ¶ 13; D. 74 ¶ 13.  JK also texted Doe the following day, asking what had happened the night before and stating he had no recollection of the boat cruise.  D. 65 ¶ 14; D. 74 ¶ 14.

In the immediate aftermath of the criminal charges, Doe hired legal counsel who in turn hired Kevin Mullen, a former Boston Police Department Sergeant Detective, as a private

investigator.  D. 65 ¶¶ 15-16; D. 74 ¶¶ 15-16.  Given Doe's observations of JK on the dance floor and JK's apparent interest in Doe's arrest, Doe phoned JK on October 22, 2012 and Mullen listened to their conversation.  D. 65 ¶ 17; D. 74 ¶ 17.  In the conversation, JK reiterated that he had no recollection of the cruise and did not confirm his "Sorry, dude, that was my bad" statement to Doe, but merely responded that such a statement was "weird."  Id.  A week later, Mullen interviewed JK in person.  D. 65 ¶ 18; D. 74 ¶ 18.  JK indicated that he now had a good memory of the evening, denied calling or texting after the cruise about Doe and failed to recall if he crossed the dance floor with Doe or made the "Sorry, dude" statement that Doe claimed that he had.  Id.

### B.      The Criminal Case Against Doe

The day after the incident, on October 22, 2012, the Suffolk District Attorney's Office charged Doe in state district court with indecent assault and battery on a person age 14 or older and he was arraigned that same day.  D. 65 ¶¶ 15, 19; D. 74 ¶¶ 15, 19; D. 71 ¶ 22.  In discovery for the criminal case, forensic testing of Doe's hands were negative for blood traces.  D. 65 ¶ 20; D. 74 ¶ 20.  The results of this forensic testing, however, was not available until February 2013, some four months after the incident.  D. 65 ¶ 20; D. 74 ¶ 20.  The testing was negative for the presence of blood, id., but the record does not indicate DNA testing, but rather the preservation of the swaps for possible later "possible recovery of DNA."  Id.; D. 65-13 at 3.  Doe's defense attorney also obtained a copy of the surveillance video recorded on the cruise and later had that video forensically enhanced and analyzed.  D. 65 ¶¶ 21-22; D. 74 ¶¶ 21-22.  In May 2014, the Commonwealth moved for a dismissal of the charges against Doe.  D. 65 ¶ 27; D. 74 ¶ 27.  The state court granted this motion and the criminal charges against Doe were dismissed.  D. 65 ¶ 27; D. 74 ¶ 27.

C.     **University Disciplinary Proceedings Against Doe**

1.     *BC's 2012-2013 Procedures Concerning Sexual Assault Allegations*

For the 2012-2013 academic calendar, BC had three written procedures related to sexual assault accusations:  (1) Section 4 of the 2012-2013 Student Guide ("Student Guide"); (2) Section 5 of the Student Guide; and (3) the Conduct Board Procedure.  D. 65 ¶ 29; D. 74 ¶ 29; D. 71 ¶ 24. These procedures were administered by the Vice President for Student Affairs through the Dean of Students and the Dean's staff.  D. 65 ¶ 33-34, D. 74 ¶ 33-34.  Read together, these procedures provided the investigatory and adjudicatory procedures for students charged with sexual assault.

These documents provide that students have "the right to a fair procedure which is appropriate to the circumstances" as well as "[t]he right to have access to a process through which to resolve deprivations of rights."  D. 65-17 at 3; D. 65 ¶ 31, D. 74 ¶ 31.  The procedures also explain that "deviations from prescribed procedures will not necessarily invalidate a decision or proceeding unless significant prejudice to a student or the University may result."  D. 65-18 at 1; D. 71 ¶ 25.

The policies and procedures explain the disciplinary hearing process for sexual assault accusations.  First, the rules provide that an investigation includes "a review of statements obtained from either party, interviews with the complainant and the accused (if identified), interviews with appropriate witnesses, and a review of other relevant information."  D. 65-17 at 16; D. 65 ¶ 34(b); D. 74 ¶ 34(b).  After the investigation is complete, BC "will take appropriate action."  D. 65-17 at 16; D. 65 ¶ 34(b); D. 74 ¶ 34(b).

The rules also explain the pre-hearing process.  These rules provide "[i]f the complainant proceeds with both a disciplinary complaint and a criminal complaint, the University conduct process will normally proceed while the criminal action is in process," but "the Office of the Dean

of Students may elect to stay the disciplinary process if a student is summarily suspended and the criminal matter remains open." D. 65-17 at 17; D. 65 ¶ 34(b); D. 74 ¶ 34(b). Next, the Student Guide states that allegations of sexual assault may lead to immediate suspension and must be "followed within a reasonable period of time . . . by a conduct hearing to resolve the incident." D. 71 ¶ 26; D. 75 ¶ 26. When a student has been accused of sexual assault, he/she "will be called by the Dean of Students or designee to discuss the complaint." D. 65-18 at 3; D. 65 ¶ 34(a); D. 74 ¶ 34(a); D. 71 ¶ 28. In addition, "[w]hen a matter is referred to a board, the accused student will be sent a copy of the conduct procedures," D. 65-18 at 4; D. 65 ¶ 34(e); D. 74 ¶ 34(e), and "the accused student will be sent written notification . . . indicating . . . alleged violations," D. 65-19 at 2; D. 65 ¶ 34(e); D. 74 ¶ 34(e), as the student has a "right to be informed of any charges of misconduct." D. 65-17 at 3; D. 65 ¶ 34(e); D. 74 ¶ 34(e).

The procedures also provide rules related to the disciplinary hearing. For example, members of the hearing board "must disclose any real or perceived conflicts of interest between themselves and any party . . . ." D. 65-18 at 5; D. 65 ¶ 34(f); D. 74 ¶ 34(f). In addition, both "[t]he complainant and the accused student may be accompanied by an advisor of their choosing," but that advisor "is not entitled to address the Board or act in any advocacy capacity at the hearing." D. 65-18 at 6; D. 65 ¶ 34(f); D. 74 ¶ 34(f). Moreover, the hearing cannot be recorded unless advance written permission is requested from the Dean of Students. D. 65 ¶ 34(f); D. 74 ¶ 34(f). Both students "are entitled to bring witnesses to the hearing or to present other related evidence," but the witnesses present must "speak to the facts of the incident they have witnessed." D. 65-18 at 7; D. 65 ¶ 34(f); D. 74 ¶ 34(f). Finally, BC applies a preponderance of the evidence standard to assess whether a violation has occurred. D. 65 ¶ 34(f); D. 74 ¶ 34(f).

The policies also outline how the hearing should proceed.  It details that "[t]he chairperson will introduce the complaint by reading the formal charges as determined by the Office of the Dean of Students."  D. 65-18 at 7; D. 65 ¶ 34(g); D. 74 ¶ 34(g).  The complainant "will then have an opportunity to read his/her incident report to the board and to elaborate on it," after which "the accused will then have an opportunity to make a full and accountable response to the complainant." D. 65-18 at 7; D. 65 ¶ 34(g); D. 74 ¶ 34(g).  Then, "[t]he board members may question both the complainant and the accused on all matters relevant" and each party is "given an opportunity to ask questions . . . through the chairperson."  D. 65-18 at 7; D. 65 ¶ 34(g); D. 74 ¶ 34(g).  Finally, both parties are "given the opportunity to make a final statement to the hearing board."  D. 65-18 at 7; D. 65 ¶ 34(g); D. 74 ¶ 34(g).  Following the hearing the board meets "in private to determine whether the accused is responsible or not for the charge(s)" and renders one of the following decisions with respect to the accused:  (1) responsible; (2) not responsible; (3) no finding; or (4) "responsible for a lesser inclusive charge."  D. 65-18 at 5, 7; D. 65 ¶ 34(h); D. 74 ¶ 34(h).  "If the decision is 'responsible,' the board may recommend sanctions up to and including suspension or dismissal from the University."  D. 65-18 at 5; D. 65 ¶ 34(h); D. 74 ¶ 34(h).

After a decision, the accused student has "the right to be informed of the outcome of any proceeding."  D. 65-17 at 3; D. 65 ¶ 34(h); D. 74 ¶ 34(h).  If the accused student wants to appeal the decision, he or she may do so.  D. 65 ¶ 34(i); D. 74 ¶ 34(i).  A student can appeal if he or she "can demonstrate that he or she has been denied a fair hearing of the case due to procedural unfairness or can introduce evidence not previously available that would be likely to change the result of the prior hearing."  D. 65-18 at 8; D. 65-19 at 3; D. 65 ¶ 34(i); D. 74 ¶ 34(i).  The appeal is due "within five business days after notification of the sanctions."  D. 65-18 at 8; D. 65 ¶ 34(i); D. 74 ¶ 34(i).  "The Dean and the Vice President (or their delegated representatives) will review

the case and determine if the new evidence or lack of a fair hearing requires consideration" and if so, "they will refer the appeal to the Appeals Board to be reheard in its entirety or refer it back to the original hearing board for further adjudication."  D. 65-18 at 8; D. 65 ¶ 34(i); D. 74 ¶ 34(i).

### 2. BC's 2012 Disciplinary Proceeding Against Doe

After the alleged October 20, 2012 incident, a BC police officer completed a Sexual Assault Notification Form describing AB's allegations against Doe. D. 65 ¶ 37; D. 74 ¶ 37. After receiving the notification, BC put Doe on summary suspension. D. 65 ¶ 37; D. 74 ¶ 37.

Senior Associate Dean of Students Hughes was put in charge of Doe's university proceeding, D. 65 ¶ 39; D. 74 ¶ 39, the first sexual assault case for which she was in charge. Id. Hughes decided an administrative hearing board should handle the charges against Doe and Associate General Counsel Nora Field confirmed that an administrative hearing board would also be the investigative body. D. 65 ¶¶ 40-41; D. 74 ¶¶ 40-41. Hughes decided that the hearing board would convene within two weeks of report of the October 20, 2012 incident. D. 10 ¶ 62; D. 65 ¶ 42; D. 74 ¶ 42.

Prior to the hearing Hughes met with Doe, his father James and his mother Mary on three occasions. On October 24, 2012, Hughes met with Doe and James, at which point Hughes told Doe that he would be able to tell his account to the hearing board. D. 65 ¶ 42; D. 74 ¶ 42. At this initial meeting, the parties dispute whether Hughes cut Doe off from explaining his version of events, but agree that during this meeting Doe told Hughes he did not commit assault and the charge against him was a case of mistaken identity. D. 65 ¶ 42; D. 74 ¶ 42; D. 71 ¶ 31. There was some discussion in this meeting, initiated by James, an attorney, about whether BC would delay its hearing until the criminal authorities completed their investigation. D. 65 ¶ 43; D. 74 ¶ 43. Later, Hughes met with Doe and Mary on October 26, 2012 and October 30, 2012. D. 65 ¶ 44; D.

71 ¶ 29; D. 74 ¶ 44.  At the October 26, 2012 meeting, Hughes allowed Doe to read AB's statement and also gave Doe the notice of the charges against him, which charged him with sexual assault, and the Conduct Board Procedure documents.  D. 65 ¶ 44; D. 74 ¶ 44.  On October 30, 2012, Doe met with Hughes and reviewed the BC police report as well as his conduct records.  D. 65 ¶ 46; D. 74 ¶ 46.  In these latter two meetings, the parties dispute whether Hughes cut Doe off from explaining his version of the events to her.  D. 65 ¶ 47; D. 74 ¶ 47.

The first day of the hearing took place on November 8, 2012 with a hearing board of Chairperson Rivera, two other administrators, law professor Norah Wylie ("Wylie") and an undergraduate student.  D. 65 ¶¶ 51-52; D. 74 ¶¶ 51-52.  AB, her parents, her lawyer-advisor, Doe, his parents, his lawyer-advisor, and Herlihy attended the hearing.  D. 65 ¶ 54; D. 74 ¶ 54.   The hearing proceeded without recording.  D. 65 ¶ 55; D. 74 ¶ 55.  On the first day of the hearing, the hearing board heard (1) testimony from the complainant, AB; (2) testimony from Doe; and (3) testimony from three of Doe's friends who had been on the *Spirit of Boston* on October 20th.  D. 65 ¶ 55; D. 74 ¶ 55.  AB testified about the alleged assault, Doe denied having committed the assault and produced the *Spirit of Boston*'s surveillance recording of the dance floor on the night in question to the hearing board.  D. 65 ¶ 55; D. 74 ¶ 55.  The hearing board also heard testimony from Doe about what JK had said to him on the dance floor and JK's texts in the aftermath of Doe's arrest and their telephone conversation.  Id.  Each of Doe's three friends testified that "they didn't see [Doe] bend down or do anything unusual."  D. 65 ¶ 55; D. 74 ¶ 55.  The board adjourned so that it could hear additional testimony from Betsy and JK.  D. 65 ¶ 56; D. 74 ¶ 56.

The next day, November 9, 2012, Hughes met with JK and JK's father, explaining that JK was required to attend the second day of the disciplinary hearing but was not being charged with

any violations.  D. 65 ¶ 58; D. 74 ¶ 58.  Hughes also informed Betsy that she would also need to appear at the disciplinary hearing.  D. 65 ¶ 57; D. 74 ¶ 57.

The hearing resumed a week later, on November 16, 2012.  D. 65 ¶ 60; D. 74 ¶ 60.  Betsy testified that she did not see the assault take place and that Doe stood out on the packed dance floor.  D. 65 ¶ 61; D. 74 ¶ 61.  At the hearing, JK denied assaulting AB, being intoxicated and telling Doe "Sorry, dude, my bad."  D. 65 ¶ 62; D. 74 ¶ 62.  Kevin Mullen, Doe's private investigator, was not allowed to testify on either hearing date.  D. 65 ¶ 65; D. 74 ¶ 65.  As to Mullen's proposed testimony, Doe informed the board that Mullen would testify about the October 22nd phone call between Doe and JK and Mullen's subsequent interview of JK.  Id.  After at least consultation with Herlihy by Rivera, the hearing board declined to allow Mullen, who had not be a witness to the alleged incident, to testify.  Id.  During this second day of the hearing, Doe also requested that the board wait to consider allegedly exculpatory forensic evidence, namely the results of the forensic testing that had not yet been received from the criminal authorities. D. 65 ¶ 63; D. 74 ¶ 63.  Doe argued that given the nature of AB's allegations, namely that he had allegedly inserted two fingers in her anus, negative test results would exonerate him.  Id.

After the second day of testimony ended, the board began to deliberate, but did not reach a decision that day.  D. 65 ¶ 67; D. 74 ¶ 67.  Rivera, the chairperson, told Hughes that the board was struggling with the need to see the other evidence.  D. 65 ¶¶ 51, 67; D. 74 ¶¶ 51, 67.  Rivera also told Hughes that the board was struggling with its decision and was contemplating a "no finding" result.  D. 65 ¶ 68; D. 74 ¶ 68.  Hughes relayed to Rivera that Dean of Students Chebator discouraged "no finding" results.  D. 65 ¶ 68; D. 74 ¶ 68.

The board resumed its deliberations the following Monday, November 19, 2012.  D. 65 ¶¶ 67, 69; D. 74 ¶¶ 67, 69.  On November 21, 2012, the board concluded that Doe was "responsible"

for indecent assault and battery on AB.  D. 65 ¶ 69; D. 74 ¶ 69; D. 65-44 at 2; D. 65-49 at 3.  The

board's ruling was based upon the following findings of fact:

> (1) The board "does not doubt that an unwanted touching in a sexual nature occurred to AB on the boat cruise;"

> (2) "[G]iven that this happened in a matter of seconds (the time it took Betsy to look away) and given that AB's reaction was not one sudden pain, it seems less likely than not that the perpetrator achieve penetration;"

> (3) "AB and Betsy testified that they did not see anyone else behind AB other than John;"

> (4) "Betsy was the only witness in the hearing to indicate that she did not drink that evening, and does not drink in general.  So her statement of the scene and not identifying anyone else behind AB was especially noteworthy.  So too was the fact that she did not notice JK, who was dressed in a manner that would attract attention and who was very active and noticeable on the dance floor according to a number of witnesses;"

> (5) "John was certain that JK was the perpetrator, however, no one other than John places JK at the scene of the incident.  John himself said he did not see JK or anyone else touch AB on the buttocks;"

> (6) "John based on his certainty of JK's actions on a supposed statement of guilt made by JK to John.  A statement JK denied ever saying.  The statement itself was vague and did not specify the touching of AB in any way;"

> (7) "John's witnesses could not place anyone else with John during the time frame indicated, nor did they see AB on the dance floor."

D. 65-49 at 4.  As a result, BC suspended Doe until January 6, 2014, barred him from BC housing

continuing until graduation and loss of senior week privileges at any point.  D. 65 ¶ 72; D. 74 ¶

72.

### 3.      Doe's Appeal from the 2012 Disciplinary Proceeding

Doe appealed on two grounds:  denial of due process and the board's refusal to await

submission of his forensic evidence.  D. 65 ¶ 74; D. 74 ¶ 74.  The appeal request was directed to

Chebator and Interim Vice President for Student Affairs Keating.  D. 65 ¶ 75; D. 74 ¶ 75.  Chebator

drafted a response and reviewed the response with Keating.  D. 65 ¶ 78; D. 74 ¶ 78.  Chebator also sent the draft to Rivera and BC General Counsel Herlihy for comments, which both supplied.  D. 65 ¶ 79; D. 74 ¶ 79.  By letter, dated December 7, 2012, Chebator and Keating denied Doe's request for an appeal.  D. 65 ¶ 80; D. 74 ¶ 80.

        **D.**        **The 2014 Post-Suspension Review of Doe's 2012 Proceeding and Appeal**

Doe returned to BC's campus in January 2014 and graduated in May 2014.  D. 65 ¶ 81; D. 74 ¶ 81.  At graduation, James approached the BC President, Father William Leahy ("Leahy"), about the 2012 disciplinary proceeding.  D. 65 ¶ 82; D. 74 ¶ 82.  In September 2014, James and Mary, both BC alumni, wrote letters to Leahy and James stated that the family did not want to file a lawsuit against BC and the individuals involved in the proceeding.  D. 65 ¶¶ 2, 83-84; D. 74 ¶¶ 2, 83-84.  Leahy told James that Vice President for Student Affairs Jones should review the case.  D. 65 ¶ 86; D. 74 ¶ 86.  Thereafter, Jones responded to James that she would conduct a review of the 2012 proceeding.  D. 65 ¶ 88; D. 74 ¶ 88.  Jones viewed her role as assessing whether the procedures were followed and whether there was new evidence.  D. 65 ¶¶ 89-90; D. 74 ¶¶ 89-90.  After the review, Jones sent James and Mary two letters.  The first letter stated that the practices of the hearing board were "consistent with the best practices of higher education," D. 65 ¶ 100, D. 74 ¶ 100, while the second letter explained that the proffered forensic evidence did not justify reconsideration of Doe's discipline.  D. 65 ¶ 102; D. 71 ¶ 259; D. 74 ¶ 102.

## IV.     Procedural History

Doe instituted this action on March 11, 2015.  D. 1.  On March 11, 2016, Doe moved to amend the complaint by adding a new defendant, Herlihy.  D. 51.  Doe subsequently moved for partial summary judgment on Counts I and IV of the complaint.  D. 64.  BC and the Individual Defendants have also moved for summary judgment.  D. 67; D. 69.  The Court heard the parties on the pending summary judgment motions and took these matters under advisement.  D. 84.

## V.      Doe's Motion to Amend Is Denied

Doe moved to amend the complaint to add Herlihy as an individual defendant to the tort-based counts in this case, Counts VIII through XIII.  D. 51.

Once a scheduling order is in place and the litigation has progressed beyond the deadline set for amending the pleadings, motions to amend a complaint are assessed under a heightened "good cause" standard.  Steir, 383 F.3d at 11-12.  "Regardless of the context, the longer a plaintiff delays, the more likely a motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend" especially when motions require a re-opening of discovery or significant postponement to the litigation and trial.  Id. at 12 (citing Acosta-Mestre v. Hilton Int'l of P.R., Inc., 156 F.3d 49, 52-53 (1st Cir. 1998)).

On June 22, 2015, the Court set a schedule for this litigation.  D. 15.  That schedule required that any amended pleadings were due by September 22, 2015, that fact discovery closed on February 12, 2016 and that summary judgment motions were due by March 15, 2016.  D. 15.  The only changes to that schedule were extensions related to discovery and summary judgment.  D. 21; D. 37; D. 48.  There was no change in the deadline for amending the pleadings and Doe filed his motion to amend the complaint after this deadline.  D. 15; D. 51.

Doe fails to show good cause for their delay in moving to amend the complaint to include Herlihy as an individual defendant.  First, Doe does not provide an adequate explanation for the failure to add Herlihy earlier in this litigation.  Doe first argues that they were "not in possession of any information that would have properly supported a claim against Joseph Herlihy" in March 2015 and only became aware of his involvement in January 2016 when Doe received attorney-client privileged documents and Doe took Herlihy's deposition.  D. 53 at 4.  Doe further contends that this information showed that Herlihy was "the principal figure" in the proceedings at the core of this case.  D. 53 at 4-5, 8.  The record reveals, however, that Doe filed their original complaint on March 11, 2015 and included allegations against Herlihy at that time.  D. 1.  For example, in their initial pleading, Doe alleged that (1) Herlihy directed Hughes to interrogate Doe outside of the presence of his lawyer, D. 1 ¶ 122; (2) Herlihy reviewed the appeals letter written by Chebator, D. 1 ¶ 85; (3) Herlihy had spoken with Doe's attorney, D. 1 ¶¶ 66-67; (4) Herlihy assisted JK in obtaining legal representation for the second day of the 2012 disciplinary proceeding, D. 1 ¶ 125; and (5) Herlihy had actual notice of University misconduct related to Doe's disciplinary proceeding, D. 1 ¶ 185.  Despite asserting these allegations, Doe did not name Herlihy as a defendant initially.  See Berwind Prop.  Grp. Inc. v. Envtl. Mgmt. Grp., Inc., 233 F.R.D. 62, 67 (D. Mass. 2005) (rejecting "good cause" argument because the identities and involvement of the proposed defendants were known to the plaintiffs at the time of filing the complaint); Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998) (denying amendment to add new defendant because "the information supporting the proposed amendment to the complaint was available . . . even before she filed suit").

Even if the particular details of Herlihy's role were unknown until discovery, Doe became aware of his involvement in large part through the depositions of Chebator, Jones, Rivera, Hughes

and Keating.  For example, to support their allegations that Herlihy was involved in the pre-hearing and hearing procedures, scheduling issues, obtaining evidence, involving himself in the 2012 disciplinary appeal and participating in the 2014 review, Doe cites these administrators' depositions.  D. 53 at 15.  Doe also cites Keating's deposition as key evidence to explain the allegations against Herlihy as to the 2014 post-suspension review.  D. 53 at 21-22.  Despite these depositions taking place in November of 2015, D. 53-3; D. 53-4; D. 53-16; D. 53-20, Doe did not move to amend to include Herlihy as a defendant until March 11, 2016.  D. 51.  This was well after these depositions and at a time where the parties were on the heels of summary judgment briefing and the close of discovery.  See, e.g., Berwind, 233 F.R.D. at 67 (rejecting Plaintiffs' argument that they did not know of a particular individual's role until her deposition and ultimately denying Plaintiffs' motion to amend because plaintiffs previously had cited documentation of individual's role in a motion to compel).  Thus, Doe has provided no explanation rising to "good cause" for the delayed motion to amend the complaint.

While not the primary focus, the "good cause" analysis also examines possible prejudice to defendants.  O'Connell, 357 F.3d at 155 (citing Johnson, 975 F.2d at 609).  Here, adding Herlihy as a defendant at this late stage may prejudice BC and the Individual Defendants.  Doe contends that there would be no need to re-open discovery and that Herlihy already had his deposition taken.  D. 53 at 9.  Nonetheless, Herlihy's deposition was taken before he was formally named as a defendant in this matter and it is possible that additional information would need to be exchanged or discussed to prepare a proper defense for Herlihy or to alter the strategic defense of other administrators.  See Euro-Pro Operating LLC v. Dyson Inc., No. 14-cv-13720-ADB, 2016 WL 593486, at *5 (D. Mass. Feb. 12, 2016) (denying motion to amend because "allowing an amendment . . . would require the reopening of fact discovery and the taking of additional

depositions in support of a legal theory that Plaintiff did not attempt to advance until far too late in the life of this case"). In addition, as BC and the Individual Defendants contend, adding Herlihy as a defendant could affect the currently pending motions for summary judgment as well as expert disclosures. D. 54 at 10. For these reasons, Doe's motion to amend the complaint and add Herlihy as a defendant is denied.

## VI.    Summary Judgment Discussion

### A.    Count I:  Breach of Contract Claims for 2012 Disciplinary Hearing

Count I alleges that BC breached the terms of its contractual relationship with Doe. D. 1 ¶¶ 94-147. The parties do not dispute that the contractual relationship between BC and Doe arises from the Student Guide and the Conduct Board Procedure, D. 65-17; D. 65-18, D. 65-19; D. 68 at 6-21; D. 65 ¶ 29; D. 74 ¶ 29, even as they disagree about what the express and implicit terms of that contract require. Doe alleges specific breaches of that contract, namely that BC failed to: (1) perform a threshold evaluation of the sexual assault charge; (2) conduct an adequate investigation; (3) set an appropriate hearing date; (4) provide fair and meaningful notice of the charges against Doe; (5) permit Doe the right to effective counsel at the hearing; (6) allow Doe to have his investigator as a witness; (7) provide an unbiased disciplinary process to Doe; (8) provide a trained and competent hearing board; (9) presume Doe to be innocent and improperly shifting the burden of proof to Doe; (10) provide sufficient evidence to support the hearing board's finding; (11) honor an obligation to make a record of the hearing; and (12) provide a meaningful appellate process (Count I). D. 1 ¶¶ 94-147.   Doe also alleges that BC failed to provide a procedurally and substantively fair process that, cumulatively, amounted to a breach of its express contract with Doe and breach of the implied covenant of good faith and fair dealing (Counts I and IV). D. 1 ¶¶ 94-

17

147, 157-60.  Upon a developed factual record after discovery, both Doe and BC seek resolution of these contract-based claims, Counts I and IV, on summary judgment.  D. 64; D. 67.

To establish breach of contract, a plaintiff must demonstrate a valid and binding contract existed, the defendant breached that contract and the plaintiff suffered damages as a result.[4] General Cas. Co. v. Five Star Bldg. Corp., No. 11-cv-30254-DJC, 2013 WL 5297095, at *8 (D. Mass. Sept. 19, 2013) (citing Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999)). Student-college relationships are contractual in nature and the terms of that contractual relationship can be derived from student policy manuals as they are here.  Doe v. Brandeis Univ., No. 15-cv-11557, 2016 WL 1274533, at *25 (D. Mass. Mar. 31, 2016) (citing Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998)).  Under Massachusetts law, courts apply a "reasonable expectation" standard when interpreting contracts between students and their universities.  Bleiler v. Coll. of Holy Cross, No. 11-cv-11541-DJC, 2013 WL 4714340, at *15 (D. Mass. Aug. 26, 2013) (citing Schaer v. Brandeis Univ., 432 Mass. 474, 478 (2000)).  The reasonable expectation standard asks what meaning the party making the manifestation under the contract—the university—should reasonably expect the other party—the student—to give it.  Schaer, 432 Mass. at 478 (quoting Cloud v. Trustees of Boston Univ., 720 F.2d 721, 724 (1st Cir. 1983)).

Under Massachusetts law, all contracts also include an implied covenant of good faith and fair dealing.  Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 385 (2004).  "The covenant of good faith and fair dealing requires that 'neither party shall do anything that will have

---

[4]  The parties primarily focus on whether BC committed a breach.  Doe, however, also argues that he has sustained damages as a result of BC's breaches, including expenses incurred during the suspension, lost earnings as a result of delay in graduation, diminished earning potential, reputational costs and emotional costs.  D. 66 at 19-20.  Defendants do not concede that Doe has suffered any recoverable contract damages and assert that emotional distress and reputational damages are not cognizable under contract law and that the claimed damages are speculative.  D. 73 at 18 n.10.

the effect of destroying or injuring the right of the other party to the fruits of the contract.'" T.W. Nickerson, Inc. v. Fleet Nat. Bank, 456 Mass. 562, 570 (2010) (quoting Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991)).  Good faith and fair dealing, however, cannot "create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Id. (quoting Uno Rests., Inc., 441 Mass. at 385). The "inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain," Brandeis, 2016 WL 1274533, at *41, and by assessing "the party's manner of performance." Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014).  Moreover, "[g]ood faith and fair dealing cannot be separated from context, however—and in evaluating those covenants in the educational milieu, courts must accord a school some measure of deference in matters of discipline." Havlik v. Johnson & Wales Univ., 509 F.3d 25, 35 (1st Cir. 2007).

As part of the analysis of the express and implied terms of the contract between a university and its students, the fact finder must also determine whether the university provided a process conducted with "basic fairness" to the student when analyzing a student's claim for breach of contract.  Brandeis, 2016 WL 1274533, at *25; Cloud, 720 Mass. at 725 (noting that in addition to reviewing the allegations of breach of contract, the court also examines the hearing "to ensure that it was conducted with basic fairness"); Morris v. Brandeis Univ., No. 01-P-1673, 60 Mass. App. Ct. 1119, 2004 WL 369106, at *2 (Feb. 27, 2004).  This inquiry is "uncertain and elastic" with "little case law to serve as guideposts," but essentially requires the Court to assess whether the university provided "some minimum level of fair play" to the student during the disciplinary hearing.  Brandeis, 2016 WL 1274533, at *5, 32; Coveney v. President & Trs. of the Coll. of the

Holy Cross, 388 Mass. 16, 19 (1983) (concluding that a private university did not act arbitrarily or capriciously where the school acted in good faith and on reasonable grounds and noting that "the fact that these [disciplinary] proceedings occurred and were conducted fairly" further indicates that the college's discipline of the student was "neither arbitrary nor capricious").  It does not, however, require "adher[ence] to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts." Schaer, 432 Mass. at 482.  Although Plaintiffs have alleged an array of specific breaches of contract that were addressed in turn by the parties in their respective summary judgment filings, the Court is mindful that it also must assess the cumulative impact of same in assessment of the basic fairness analysis.  The Court addresses both below.

### 1.  BC Had No Contractual Requirement to Perform a "Threshold Evaluation"

Doe contends that the Student Guide requires the Dean to perform a threshold evaluation of the charges against him and BC breached this obligation when Hughes met with Doe on three occasions prior to the hearing, but refused to allow Doe to provide his account of the incident.  D. 66 at 7-8; D. 65 ¶¶ 42, 44, 46.  Doe argues that this breach led to further prejudice to Doe including Hughes' lack of knowledge of JK as a possible perpetrator and an inability to stay the proceeding due to Doe's pending criminal case.  D. 66 at 8.

Section 5 provides that, "[a] student who has had a complaint lodged against him or her will be called by the Dean of Students or designee to discuss the complaint.  At the meeting, the case may be kept open for later resolution, dropped, resolved, or referred to an appropriate hearing board as determined by the Dean or designee." D. 65-18 at 3.

First, there is no express breach based upon the lack of a "threshold evaluation" by Hughes.  None of the contractual language cited contemplates such an evaluation, so Doe had no reasonable

expectation that these meetings would involve any threshold evaluation of the merits of his case. Walker v. President & Fellows of Harvard Coll., 82 F. Supp. 3d 524, 529 (D. Mass. 2014) (explaining that "[if] the meaning [the student] ascribes to the term is unreasonable, the university could not have reasonably expected a student to interpret the term in that way").  Instead, the Student Guide requires only that the Dean of Students or a designee call the accused student to discuss the complaint.

Doe points to deposition testimony by Chebator, in which he stated that, "[a]t some point [Doe] should be given, would have been given an opportunity to tell his side of the story."  D. 65-33 at 4.  This evidence does not support Doe's contention for several reasons.  First, the Court does not assess extrinsic evidence when the terms of a contract are complete without it.  Coffin v. Bowater Inc., 501 F.3d 80, 98 (1st Cir. 2007) (quoting Bidlack v. Wheelabrator Corp., 993 F.2d 603, 608 (7th Cir. 1993)).  Here, the Student Guide language is unambiguous and does not require a threshold evaluation.  Second, as discussed further below, as Chebator testified, Doe was given an opportunity to give his version of events during the process, notably at the hearing.

Moreover, the undisputed facts show that the obligations provided under the contract as an initial notice of the charges to Doe were met.  It is undisputed that Hughes had three different meetings with Doe on October 24, 26 and 30, 2012.  D. 65 ¶¶ 42, 44; D. 74 ¶¶ 42, 44.  It is also undisputed that Doe was provided with a copy of the statement from AB and that Hughes provided Doe with the notice of the charge against him and the Conduct Board Procedure at the meetings on October 26 and October 30.  D. 65 ¶ 44; D. 74 ¶ 44.  Thus, the requirement under Section 5 was fulfilled.  Doe's suggestion that the lack of a threshold evaluation prejudiced Doe where Hughes did not learn of his allegations about a culpable third party, JK, and declined to continue the hearing (which the Court discusses below) is not borne out by the record.  That Doe claimed

that he did not commit the offense charged was raised with Hughes from her first meeting with Doe and, at the adjudicative stage, Doe presented, and the board considered, whether, as Doe alleged, JK was the perpetrator.

Similarly, there is no genuine issue of material fact as to a breach of the implied covenant of good faith and fair dealing. For all of the reasons discussed above, the contract itself did not require a threshold evaluation and so the implied covenant cannot create one. See T.W. Nickerson, Inc., 456 Mass. at 570 (quoting Uno Rests., Inc., 441 Mass. at 385).

2.  *Neither the BC Police Was Required to Conduct the Investigation Nor Was the Hearing Board Required to Have Equivalent Investigatory Training*

Under the terms of the Student Guide, BC "will promptly conduct an investigation of the alleged incident, which will include a review of statements obtained from either party, interviews with the complainant and the accused (if identified), interviews with appropriate witnesses, and a review of other relevant information." D. 65-17 at 16. The parties do not dispute that the hearing board was also the investigating body regarding the charge against Doe. D. 65 ¶ 41; D. 74 ¶ 41.

Doe first contends that BC failed to meet the investigation requirement because the contract requires that the BC Police are involved in the investigation of the alleged sexual assault. D. 66 at 9. To interpret a contract, the Court must give a reasonable meaning to all of the provisions in the contract and "the scope of a party's obligation cannot 'be delineated by isolating words and interpreting them as though they stood alone." Wilton Properties II, Inc. v. 99 W., Inc., No. 2000000586F, 2000 WL 33170832, at *2 (Mass. Super. Nov. 1, 2000) (quoting Starr v. Fordham, 420 Mass. 178, 190 (1995)). Here, the language cited by Doe is listed under the heading "Filing a Criminal Complaint" in the Student Guide. In addition, the first line of this subsection of the policy states, "[if] a student reports a sexual assault to the Boston College Police, the Police will conduct an investigation and assist the victim to file criminal charges against the alleged offender

22

if he or she chooses." D. 65-17 at 17. Another portion of this same section states that "[i]f the incident occurred off campus, the Boston College Police will assist the victim in informing the appropriate municipal police department if he or she so desires." D. 65-17 at 17. This language indicates that BC Police will assist with an investigation to assist with the filing of a criminal complaint. In addition, under the subsection related to filing a complaint with the university, the contract does not mention an investigation by BC Police. It requires only that "the University will promptly conduct an investigation of the alleged incident . . . ." Id. at 16. Therefore, there was no reasonable expectation that the BC Police would conduct the investigation at issue in this case.

Next, Doe maintains that BC violated the terms of the Student Guide by having the hearing board also serve as the investigative body in Doe's case for two reasons. D. 66 at 9. First, Doe argues that the policies "drew a clear line between the investigation and the adjudication" of sexual assault claims. D. 66 at 9-10. The language highlighted by Doe states "[c]omplaints of sexual harassment, misconduct, and assault against a student member of the University community will be investigated and adjudicated" in accordance with Section 5 of the policy. On its face, this language does not imply that the investigative capacities and the adjudicative functions will be partitioned from one another. Assuming the language is vague, the Court can look to contextual clues to discern the meaning of the contractual provision. See Wilton Properties II, 2000 WL 33170832, at *2. Here the provision cited by Doe refers to Section 5. D. 65-17 at 13. Section 5 states "[t]he function of the [Student Conduct System] proceedings is to investigate the facts of the matter and to determine responsibility for alleged violations." D. 65-18 at 2. This language further confirms that the proper interpretation of the contractual provision is that it does not require a separation between the investigative and adjudicative ends of the student disciplinary proceeding, as the language provides no division between these tasks.

Finally, Doe argues that the Board did not conduct a "worthy" investigation.  D. 66 at 10.

The Court, however, will not second guess the thoroughness or accuracy of a university

investigation, so long as the university complied with the terms of its policies.  See Schaer, 432

Mass. at 479 (concluding that the plaintiff failed to state a claim because "[n]othing in this section

requires university officials to obtain an interview from the accused student, to seek evidence from

the accused student, or to grant the accused student an opportunity to provide witnesses at the

investigatory stage in the proceedings"); Tsuruta v. Augustana Univ., No. 15-cv-04150-KES, 2015

WL 5838602, at *6 (D.S.D. Oct. 7, 2015) (concluding that Plaintiff's likelihood of success was

low because "the court cannot agree that the investigation was completed in a less-thorough or

less-impartial manner than is required by the handbook"); Dempsey v. Bucknell Univ., No. 11-cv-

1679, 2012 WL 1569826, at *18 (M.D. Pa. May 3, 2012).  Here, the Student Guide required that

BC "promptly conduct an investigation of the alleged incident, which will include a review of

statements obtained from either party, interviews with the complainant and the accused (if

identified), interviews with appropriate witnesses, and a review of other relevant information."  D.

65-17 at 16.  Without repeating the evidence that the hearing board heard and considered as

discussed above and below, the Court does not conclude that BC failed to conduct a thorough

investigation when it considered and heard testimony from both Doe and AB, evidence proffered

by each, including testimony from and about other witnesses, including JK, that Doe urged it to

consider.

Although the Court rejects Doe's contention that the hearing board was improperly trained

to conduct investigations because they did not have investigative training equivalent to that of BC

police officers, D. 66 at 9, because there was no such requirement under the Student Guide or the

Conduct Board Procedure, D. 66 at 9; D. 81 at 5-6, the Court addresses the overall adequacy of the training of the hearing board below.

> 3. *In Declining to Postpone the Hearing, BC Did Not Breach its Obligation to Allow Doe to Prepare His Defense*

Doe asserts that BC failed to set an appropriate hearing date when it set the hearing within the two weeks of the incident because the Student Guide provides no deadline for a hearing and BC guaranteed an accused student sufficient time to prepare a response to the charges. D. 66 at 10-11. Here, Doe argues that Hughes' refusal to grant a stay until the criminal proceeding was resolved was unreasonable and amounted to Doe having inadequate time to prepare. D. 66 at 11.

In relevant part, the Student Guide provides:

> 1. "The University will make every reasonable effort to resolve the complaint within 60 days." D. 65-17 at 16.

> 2. "When an individual is considered an imminent threat to persons or property, the Dean of Students, the Director of Residential Life, or their designated representatives may invoke an immediate suspension from housing and/or the University, to be followed within a reasonable period of time, under the particular circumstances, by a conduct hearing to resolve the incident." D. 65-18 at 9.

> 3. "If the complainant proceeds with both a disciplinary complaint and a criminal complaint, the University conduct process will normally proceed while the criminal action is in process. However, in such cases, the Office of the Dean of Students may elect to stay the disciplinary process if a student is summarily suspended and the criminal matter remains open." D. 65-17 at 17.

There is no genuine issue of material fact as to whether these three requirements were met. First, BC made efforts to resolve the complaint within 60 days and hold the conduct hearing within a reasonable period of time. D. 65-28 at 2 (showing Hughes writing that she "reviewed our policies and Title 9 (which gives us a little longer time to resolve this) and I think we will do well by the student and be in compliance if we can organize an Administrative Hearing Board sometime in the next two weeks"); D. 65-30 at 2 (providing an email by Hughes that indicates that the Does

"agreed that a quicker hearing would be better since he is on suspension").  Second, although BC did not elect to stay the proceedings, it was under no contractual requirement to do so.  The contract language merely states that the Office of the Dean of Students may elect to stay the disciplinary process.  Cf. Driscoll v. Bd. of Trs. of Milton Acad., 70 Mass. App. Ct. 285, 294 (2007) (concluding that school did not violate its disciplinary process when the headmaster exercised a right to determine disciplinary response herself despite that right generally being used for immediate threats only); see also Tsuruta, 2015 WL 5838602, at *7 (concluding that plaintiff had a low likelihood of success because nothing in the school handbook required the school to delay proceedings until after a criminal trial, there was no student right to delay a proceeding and the school had discretion to delay the proceedings only if they felt it necessary).  Given the early conversation between Hughes and James about the possibility of postponing the hearing in light of the pendency of the criminal case, BC was clearly aware of its discretion to postpone the hearing, but chose not to do so as its contract with its students allows it to do.  Such choice does not amount, in and of itself, to a breach of contract.  Thus, BC did not violate the three contract clauses identified above.

Doe, however, also asserts that by setting the hearing date it did, BC also breached a fourth term of the Student Guide because the timing did not provide him with "adequate time to prepare a response to the charges."  D. 65-17 at 3. It is undisputed that Doe reviewed AB's accusations, received a copy of the notice of the charges against him and received the Conduct Board Procedure prior to the hearing.  D. 65 ¶ 44; D. 74 ¶ 44.  In addition, Doe was able to prepare and deliver testimony of his account of the events to the Board, D. 65 ¶ 6; D. 74 ¶ 6, provide the Board with a portion of the unenhanced video surveillance footage, D. 65 ¶ 55; D. 74 ¶ 55, and have three friends testify on his behalf.  D. 65 ¶ 55; D. 74 ¶ 55.  Forensic evidence specialists had swabbed Doe's

hands and fingernails, D. 65 ¶ 9; D. 74 ¶ 9; D. 65-2 at 3, in the course of the criminal investigation and the results were still pending at the time of his disciplinary hearing and which did not become available until February 2013.  D. 65 ¶ 20; D. 74 ¶ 20; D. 65-13.  Even when these results became available in February 2013, however, they revealed the absence of blood on Doe's hands, but contained no testing results about the presence or absence of DNA, and instead merely noted that the respective swabs were "preserved for the possible recovery of DNA."  D. 65-13 at 3.  That is, even as Doe argued then and now that the forensic testing of his hands would help prove he was not responsible for the charge against him, D. 65 ¶ 55; D. 74 ¶ 55, the limits of this forensic evidence would not have compelled a different decision by the hearing board.

Doe makes a similar argument in regard to an "enhanced" version of the video recording from the *Spirit of Boston* from the evening in question.  The hearing board had the benefit of reviewing the unenhanced video before rendering its ruling, but Doe contends that he was prejudiced by BC's failure to postpone the hearing until the enhanced version was available since video would have exonerated him.  It appears, however, that the enhanced version of the video did not become available until February 2013, D. 78-2 at 58, and there is no suggestion in the record that the hearing board was given any indication of when it would become available for its consideration.  More significantly, although Doe contends that it was the enhanced video was part of the Does' presentation to the Suffolk District Attorney's Office that persuaded the prosecutor to dismiss the criminal charges against Doe, D. 65-11 ¶¶ 6-7, even if that conclusion was admissible here, it does not warrant a different outcome in the administrative proceeding where preponderance of the evidence, and not beyond a reasonable doubt, is the applicable burden of proof or where, in the course of the 2014 review of the manner, BC found the enhanced video to be, at best,  inconclusive.  D. 65-61.

Although there was some indication that the Board was concerned about the dearth of forensic evidence that it had to consider at the time, D. 65-43 at 2; D. 65 ¶ 67; D. 74 ¶ 67; D. 65-43 at 2, and its willingness to have considered if it was available at the time, D. 78-2 at 199, Rivera testified that the board was unsure if that evidence would have been relevant to their decision.  D. 78-2 at 199; see also D. 78-2 at 199-200; D. 65-61 (noting in 2014 review that "[w]e have consulted with the Board concerning this matter and they feel strongly that a negative result of the swab test would not change their finding in this matter").  Even on a developed factual record, the proffered forensic evidence would not have been exculpatory given the nature of the charge or the board's finding of indecent assault and battery.  That is, even assuming *arguendo* that the board's failure to delay the hearing until such forensic evidence was available was a breach, Doe still has to show that he would have been damaged by the breach.  See Guckenberger v. Boston Univ., 957 F. Supp. 306, 316 (D. Mass. 1997); Doe v. Devonshire, No. 16-cv-10458-NMG, 2016 WL 1555682, at *6 (D. Mass. Apr. 15, 2016).  He has not done so here where the DNA recovery and analysis was not done and the absence of blood on Doe's hand would not have been exculpatory and the video, available at least in its unenhanced form to the board, was inconclusive.

### 4.    *BC Provided Doe with Fair and Meaningful Notice of the Charges*

The Student Guide provides that "[i]n the case of disciplinary procedures" each student has "the right to be informed of any charges of misconduct," D. 65-17 at 3, while the Conduct Board Procedure provides that "[t]he accused student will be sent written notification . . . indicating referral to appropriate board, time and location of hearing, the names of all parties charged[,] alleged violations and the name(s) of complainant(s)."  D. 65-19 at 2.

In this case, Doe first argues that the hearing notice provided to Doe was insufficient because the notice of charge did not define the sexual assault charge.  D. 65-48.  It is undisputed

that the notice of charge itself did not define the term "sexual assault."  D. 65 ¶ 45; D. 74 ¶ 45; D. 65-31; D. 65-48.   This notice, however, cannot be divorced from its context, specifically the context provided by the Student Guide.   It explains that BC "prohibits all forms of sexual harassment, sexual assault, and sexual misconduct" and that "[p]rohibited conduct ranges from acts of nonconsensual sexual intercourse and nonconsensual sexual contact, to sexual misconduct including, but not limited to, harassment of a sexual nature, sexual exploitation, stalking, voyeurism, exposure, video or audio taping sexual activity, and sexual activity resulting from emotional coercion."  D. 65-17 at 13.  That is, the term sexual assault is used in the context of a range of prohibited non-consensual, sexual contact.  Significantly, Doe was not only given notice of the charge of sexual assault against him, but was also given notice of AB's statements regarding her specific allegations about the single incident, an alleged sexual assault on the dance floor on October 20, 2012.  D. 65 ¶ 44; D. 74 ¶ 44.   This is not a circumstance in which it could be said that the accused student was not on notice of the specific alleged facts giving rise to the charge against him or to the nature of that charge, even as Doe disputed AB's allegations and denied the charge.

Next, Doe contends that the notice provided to Doe, D. 65-48, was insufficient because it did not list any lesser-included charges, what those charges could be or a definition for "indecent assault and battery."   It is undisputed that the notice did not include any mention of a lesser-included charge or list "indecent assault and battery" as an alleged violation.  D. 65-31; D. 65-48; D. 65 ¶ 70; D. 74 ¶ 70.  The policies, however, state that an accused student can be found "responsible for a lesser inclusive charge."  D. 65-18 at 5.  Given the notice about the possibility of a finding as to a lesser inclusive charge and the broad definition of prohibited conduct under the policies that includes but is not limited to "nonconsensual sexual contact," D. 65-18 at 5; D. 65-

17 at 13, there was no failure by BC to put Doe on notice of the potential charges to which he could be found responsible.

Even assuming *arguendo* that the failure to provide express notice of this lesser inclusive charge amounts to a breach of contract, Doe has not shown that such breach caused him harm. Unlike Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 245-46 (D. Vt. 1994), in which the court held that a student received insufficient notice as to his disciplinary proceeding when he was charged with rape, but was ultimately found responsible for "disrespect of persons," the nature of the noticed charge (sexual assault) and the nature of the charge of which he was found responsible (indecent assault and battery) have, at their core, the same conduct:  nonconsensual, physical contact of a sexual nature.  Doe neither suggests nor does the record show how his defense would have been different if the notice had referenced both sexual assault and indecent assault and battery (or just the latter) even as he disputes that he had adequate time to prepare his defense as to any charge (an issue that the Court addresses separately below).  Id. (concluding that although the court did "not question the ability of the College to discipline students for disrespect of persons . . . the College does have to state the nature of the charges with sufficient particularity to permit the student to defend him[self]")).  As BC points out, Doe's defense to the charge was that he did not have any physical contact with AB and, if anyone did, it was JK.  Although some part of his defense focused on penetration (i.e., presenting the absence of blood on Doe's hands and urging the board to wait for forensic testing results that would allegedly show the absence of DNA to argue that he could not have penetrated as AB alleged), it also focused on his lack of proximity to AB to commit even any unwanted touching (i.e., Doe's testimony, the testimony of his friends and presentation of the unenhanced video and urging the board to wait for an enhanced version of same).  That is, as to the lesser included charge of indecent assault and battery, the record does not

suggest how Doe's defense would have been different, what different evidence he would have proffered or different arguments he would have presented if BC had provided express prior notice of this lesser included charge.

### 5. BC Did Not Breach the Contract With Respect to Doe's Use of Counsel at the Disciplinary Hearing

By the terms of the Student Guide, BC committed no breach in circumscribing Doe's attorney-advisor's role at the disciplinary hearing.  The Student Guide provides that "[a]n attorney may be present and serve as an advisor to either party only in instances where the accused student has been arrested or has had a criminal complaint filed against him or her and the matter has not yet been concluded in court."  D. 65-18 at 6.  Further, the Student Guide limits the role of the advisor at the hearing:  "[h]e or she is not entitled to address the Board or act in any advocacy capacity at the hearing.  The student and his or her advisor can confer at any point during the hearing but the advisor may not formulate specific questions, responses, or statements for the student."  D. 65-18 at 6.

BC met all of these requirements.  As both parties acknowledge, Doe was able to confer with his attorney throughout the hearing, D. 71 ¶¶ 90-95; D. 75 ¶¶ 87-95; see D. 1 ¶ 69 (explaining that Doe's lawyer-advisor was present at the hearing).  Thus, no breach of the express terms of the Student Guide occurred.

To the extent that Doe argues that the limited role prescribed by BC for Doe's attorney-advisor violated the covenant of good faith and fair dealing, D. 75 ¶¶ 87-95, Doe's argument fails for similar reasons as the breach of contract argument.  The language of the contract related to hearing advisors does not create a "reasonable understanding" that the overall spirit of the bargain includes having legal advocates participate in the school disciplinary hearings.  Brandeis, 2016 WL 1274533, at *41.

Nor does Doe's contention that his attorney-advisor's inability to question witnesses, address the hearing board, or otherwise speak throughout the hearing violated BC's contractual "due process" guarantees, D. 65-17 at 3; D. 65-18 at 2-3.  First, due process requirements for private universities are not held to the same standard as criminal defendants and are not constitutionally mandated.  See Schaer, 432 Mass. at 482; Bleiler, 2013 WL 4714340, at *4. Second, it is undisputed that Doe received the due process that BC promised to provide as regards an attorney-advisor even if he objects to the limits that process and procedure placed upon his attorney-advisor.  Cf. Coveney, 388 Mass. at 21 (holding that student had no constitutional right to have an attorney present during a hearing).

> 6.   *BC Did Not Breach the Contract By Prohibiting Doe from Calling His Private Investigator as a Witness*

It is undisputed that the parties agree that one reason that Mullen, Doe's private investigator, was prohibited from being a witness at the hearing was because Mullen did not witness the alleged assault.  D. 65 ¶ 65; D. 71 ¶ 137; D. 74 ¶ 65.  The parties disagree, however, about whether the Student Guide requires that any witness called at the hearing must be a witness who observed the "incident"—here, the alleged assault—as opposed to a witness who may have information otherwise relevant to the proceeding.  Doe had intended to call Mullen to testify about having listened to the phone conversation between Doe and J.K. that Doe alleges suggests J.K.'s culpability and his October 29, 2012 interview with J.K.  D. 66 at 12; D. 65 ¶ 65; D. 74 ¶ 65.

This Court must decide whether the Student Guide circumscribes the use of witnesses to only those witnesses who were witnesses to the alleged event.  To the extent that there is any ambiguity in contract language, such ambiguity is to be construed against the University as the drafter, Brandeis, 2016 WL 1274533, at *26, but the Court must consider "the contract as whole" in resolving any ambiguity.  Id.  The Student Guide states that "[b]oth the complainant and the

accused are entitled to bring witnesses to the hearing . . . . Witnesses should be able to speak to the facts of the incident, which they have witnessed." D. 65-18 at 7. This language makes clear that the witnesses to be called must be able to speak to the facts of the "incident" which the witness himself or herself witnessed. The Student Guide does not often use the term "incident," but does so in reference to the administrative review/adjudication hearing in describing the informal hearing and fact finding to discuss "the report and the related incident." D. 65-18 at 3. In both places, "incident" refers to the incident giving rise to the charge against the student as distinct from the broader references to "the case" or "the matter" in which arguably could encompass more than the incident giving rise to the charge. Id. at 4. The language above must also be read in the context of the further provision in the Student Guide providing that "[w]itnesses . . . will make a presentation concerning those facts that they are witness to, relevant to the complaint, and will then answer questions posed by the board and by the adversarial parties." D. 65-18 at 7. The Student Guide further distinguishes permissible percipient witnesses and (largely) impermissible character witnesses: "[i]n general, character witnesses are not allowed to testify at conduct hearings; written character references may be submitted to the board." D. 65-18 at 7. Reading these provisions in the context of the entirety of the contract, a witness must be a percipient witness to the incident giving rise to the charge against the student and that percipient witness must give evidence relevant to the charge against the student.

BC's application of this contract provision to Doe's case, moreover, did not undermine the basic fairness of the proceedings. Doe's contention that there was a third-party culprit, namely JK, was squarely presented to the hearing board. The board continued its hearing to hear from JK directly and heard testimony from Doe as to JK's text and their telephone call, all aimed at undermining JK's denials of having committed the assault and to suggest that JK, not Doe, was

perpetrator.  See D. 65 ¶¶ 55-56, 62; D. 74 ¶¶ 55-56, 62.   Doe does not appear to dispute that even

as Mullen was not allowed to testify, there was nothing barring him from having Mullen file a

statement about having listened to the Doe-JK call or subsequently interviewing JK, an offer that

the board expressly made to Doe when the case was still pending.  D. 71 ¶ 140, D. 75 ¶¶ 129-147;

D. 78-2 at 184.  That Doe would have preferred to put Mullen's live testimony, rather than a written

statement from the private investigator, before the hearing board does not make BC's choice in

this matter a breach of contract or undermine the basic fairness afforded Doe in the process.  Where

Doe was free to submit a statement from Mullen, as well as pose questions to the Board for it to

ask JK about his prior alleged statements and bearing upon his credibility during the course of the

hearing, the Court cannot conclude that declination to allow Mullen himself to testify denied basic

fairness to Doe.

### 7.     BC Provided Doe with an Unbiased Tribunal

The Student Guide requires that board members "may not hear a case if they are not able

to be impartial in the hearing of the case."  D. 65-18 at 5.  Mills' dual roles as a member on the

hearing board and a staff member in the Dean's office alone does not demonstrate evidence of bias

contrary to Doe's argument, D. 75 ¶¶ 212-13, and Doe points to no other evidence to further his

argument.  See Gorman v. Univ. of Rhode Island, 837 F.2d 7, 15 (1st Cir. 1988) (concluding that

a college administrator's various roles did not prove bias or unfairness); Bleiler, 2013 WL

4714340, at *13 (quoting Ikpeozu v. Univ. of Nebraska, 775 F.2d 250, 254 (8th Cir. 1985))

(explaining that a school's disciplinary body "is entitled to a presumption of honesty and integrity

absent a showing of actual bias such as animosity, prejudice, or personal or financial stake in the

outcome"); cf. Cloud, 720 F.2d at 725-26 (rejecting Plaintiff's claims that hearing examiner's

"statement reflecting respect for the Dean of Student Life demonstrated an inability to make impartial decisions").

Doe fails to show a genuine issue of material fact exists as to whether Rivera was impartial. Doe asserts that Rivera acted as a prosecutor and was hostile toward Doe and that this was evident through her asking cross-examination-like questions to Doe during the hearing while providing "softball" questions to other witnesses. D. 75 ¶ 219. These subjective impressions, without more, are insufficient to show that Rivera was biased or show a genuine issue of material fact regarding same. See Bleiler, 2013 WL 4714340, at *13 (explaining that "alleged prejudice of university hearing bodies must be based upon more than mere speculation and tenuous inferences" and that the board member "persisting in detailed questioning" of the accused did not suggest actual bias); Levitt v. Monroe, 590 F. Supp. 902, 907-08 (W.D. Tex. 1984), aff'd sub nom., 759 F.2d 1224 (5th Cir. 1985) (explaining, in a faculty termination case, that a claim of "prejudice on the part of . . . a university hearing body must be based on more than mere speculation" and finding that the evidence proffered at trial was insufficient for a finding of bias by panel members). This is especially so here, where the chairperson's role was to "manage[] the flow of the hearing," "open[] and close[] the case," "lead[] the questions" and "manage[] the paperwork that comes into the case." D. 78-2 at 177.

As to Wylie, Doe and BC both move for summary judgment as to whether her membership on the Board violated BC's contractual obligations, i.e., whether she failed to "disclose any real or perceived conflict of interest between [herself] and any party and may not hear a case if they are not able to be impartial in the hearing of the case."[5]  D. 65-18 at 5.  It is undisputed that, at the

---

[5]  BC also argues that the Student Guide states that the chair will remove a board member "only if" a student challenges a particular board member's participation and can show actual evidence of a conflict. D. 73 at 13. There is, however, no indication in the language cited by

time of the 2012 hearing, Wylie held a leadership position with Emerge. D. 65 ¶¶ 52-53; D. 74 ¶¶ 52-53; D. 65-37 at 5.   On this undisputed record, however, such a position was not a real or perceived conflict with Doe.   Emerge is focused on "seek[ing] to educate individual men who batter, prevent young people from learning to accept violence in their relationships, improve institutional response to domestic violence, and increase public awareness about the causes and solutions to violence against women."   D. 65-38 at 3.   It is, in effect, an organization with a focus on domestic violence and "helping men with histories of domestic violence to become more responsible parents."   D. 65-38 at 3.   Emerge is also focused on "notions of men taking responsibility for their violence" with a mission is to "eliminate violence toward women."   D.65-38 at 3. Doe was not charged with domestic violence; Emerge had no involvement in this case and neither Emerge nor Wylie in Emerge took any position regarding this matter.   That Wylie is affiliated with Emerge, an organization, that broadly speaking, is involved in education and advocacy about eradicating violence against women and Doe was charged with sexual assault against a woman does not create a real or perceived conflict.   See Gomes v. Univ. of Me. Sys., 365 F. Supp. 2d 6, 29-32 (D. Me. 2005) (concluding that an administrator's volunteer activities with rape response and victim advocate programs did not constitute prejudice and partiality).   Moreover, there has otherwise been no showing that Wylie had actual bias or that she could not be impartial in this matter.   Bleiler, 2013 WL 4714340, at *13 (noting generally that alleged prejudice must be

---

Defendants that a board member will be removed for a conflict of interest "only if" a student raises a challenge and provides evidence.   Instead, this provision provides that a student can do so, but does not necessarily limit BC's ability to remove board members *sua sponte* for conflict of interest. See D. 65-18 at 7 (stating that if the "accused student has evidence as to why a specific person should not be on the Board hearing the case . . . they will be given an opportunity to present this information . . . at the start of the hearing").

grounded in more than tenuous inferences) (quoting <u>Buckholz v. Mass. Inst. Of Tech.</u>, No. 85–2720, 1993 WL 818618, at *3 (Mass. Super. Ct. July 6, 1993)).

> 8.   *The Adequacy of the Training of the Hearing Board Did Not Deny Doe Basic Fairness*

Doe and BC both move for summary judgment as to whether BC breached its duty to provide a trained and competent hearing board.

The Student Guide provides that, "[a]ll members are trained by the Office of the Dean of Students.   Chairpersons for the Administrative Hearing Board are designated by the Dean of Students and receive additional training."   D. 65-18 at 5.   The reasonable expectation a student would accord to this contractual provision is that members of any university hearing board would not only receive training but that training would be adequate to resolve the disputes that came before those members.   Doe's complaint articulates that this alleged breach for an inadequately trained hearing panel is based upon a guarantee in the policies for "fundamental fairness" and "due process."   D.1 ¶ 127; D. 66 at 15.

As a general principle, "the courts must recognize and respect the strong interest of a private university in managing its own affairs," <u>Brandeis</u>, 2016 WL 1274533, at *32, and courts "are chary about interfering with academic and disciplinary decisions made by private colleges and universities." <u>Schaer</u>, 432 Mass. at 482.   It cannot be disputed, on the present record, that the hearing board received some training appropriate to their role.   First, there is undisputed evidence that the board members on Doe's hearing panel received training as to hearing board procedures and additional sexual assault training prior to Doe's hearing.   D. 71 ¶¶ 74-75; D. 75 ¶¶ 71-86; D. 75-2 at 176-77, 180, 209-10, 222-23, 242-43, 256-58.   In addition, Rivera testified that she was also trained in serving as the panel chairperson.   D. 75-2 at 177.   The board members also confirmed that they were familiar with Title IX prior to and at the time of Doe's hearing.   <u>Id.</u> at

181, 222, 243-44, 266.  Moreover, it is undisputed that each of the members of the hearing panel had previous experience handling disciplinary proceedings and some had served as board members on possible sexual assault hearings.  D. 71 ¶¶ 80-86; D. 75 ¶¶ 71-86; D. 75-2 at 175-76, 207-08, 222, 242, 256; see Yu v. Vassar Coll., 97 F. Supp. 3d 448, 477 (S.D.N.Y. 2015) (concluding that "the record indicates that the panelists all received training, which is all the [college's] regulations provide for").

Certainly, that the hearing board members received training (and that BC provided same), however, does not answer the question about the adequacy of this training.  To support his claim for summary judgment, Doe first relies upon the expert report of Brett A. Sokolow. D. 75 at 11; D. 75-10 at 31-32.  Within that report, Sokolow asserts that a professional trainer or expert on campus sexual misconduct should have trained hearing board members for at least two days on a host of different subjects and that there is no evidence to show this occurred at BC.  D. 75-10 at 31-32.  Sokolow, however, cites no authority and does not otherwise explain why these particular subjects or this particular length of time needs to be included for the training to meet the contractual obligation for a trained hearing board and his earlier citations to guidance from the DOE provides no support for the specific demands that Sokolow would have placed on BC.  Id. at 11-12, 31-32.

In addition to Sokolow's report, Doe relies upon an April 23, 2012 report, containing the findings and recommendations of a committee convened from April 2011 to February 2012 to study the prevention of and response to sexual violence at Boston College, which spans over 60 pages and discusses a number of sexual assault-related topics such as enhanced student prevention and education, recommendations to change overall faculty and staff education separate and apart from the disciplinary procedure and the potential of hiring a Sexual Violence Prevention and Response Coordinator.  D. 66 at 15; D. 74-1 at 6, 19-20, 23-27.  Doe highlights one paragraph in

that report which stated, "[a]djudicating sexual violence cases is often difficult for hearing board members.  The Office for the Dean of Student Development currently offers a 3-hour training for board members.  Based on best practices, the training of a hearing board such as ours is insufficient."  D. 65 at ¶ 35; D. 74 ¶ 35; D. 74-1.  This recommendation is derived from a separate study which recommends that hearing boards are trained in understanding rules of evidence related to relevance, credibility and rape shield rules, understanding the analytical approach to deciding whether a policy was violated, understanding rape trauma and incorporating sensitivity training. D. 74-1 at 62.  Such finding, however, is not determinative as it applies to Doe's case, particularly in light of the undisputed record about the training provided and the training the board received, D. 65 ¶ 35; D. 74 ¶ 35; D. 74-2 at 3 (Chebator testifying that in response to the April 2012 report, the school "ramp[ed] up the training for individuals who would be hearing sexual assault cases" by developing "a secondary training for those individuals who would be sitting on administrative hearing boards involving sexual assault matters"); D. 71 ¶¶ 75, 78-79; D. 75 ¶¶ 71-86; D. 78-2 at 178-180, 209, 222-223, 242, 256-57 (board members testifying that they attended annual training specific to sexual assault and sexual violence cases prior to Doe's hearing), and the absence of evidence that the hearing board acted in bad faith, failed to follow BC's policies or procedures or, as concluded below, to provide basic fairness to Doe.

9.      *BC Applied the Correct Burden of Proof in this Matter*

Doe contends that while neither a presumption of innocence nor an assignment of the burden of proof is expressly required by the BC policies, contractual guarantees of "due process" and "fundamental fairness" as well as the implied covenant of good faith and fair dealing dictate a contractual obligation that Doe was presumed innocent and the University had the burden of proof to show otherwise.  D. 1 ¶ 130.

Although Doe argues that the Dean's Office and General Counsel's Office "considered John to be guilty . . . from the first news of his arrest" and that the board was looking for evidence from Doe that would "exonerate" him even though Doe had no obligation to provide such evidence, D. 77 at 12, 16, he points to no specific, admissible facts to show genuine issue as to BC's alleged failure to comply with these standards.  Although Doe dismisses the testimony of all of the board members that they did not place the burden of proof on Doe and that they presumed Doe to be innocent throughout the hearing as post-hoc rationalization, D. 71 ¶¶ 178-79; D. 75 ¶¶ 178-79, such evidence, in the absence of any contrary evidence, alone cannot defeat Defendant's summary judgment motion.  Magarian v. Hawkins, 321 F.3d 235, 239-40 (1st Cir. 2003) (explaining that allegations alone cannot defeat summary judgment).

Moreover, BC's declaration in these proceedings that "[i]t is undisputed that Doe presented no evidence that exonerated him," D. 71 ¶ 112; D. 75 ¶ 112, does not create a genuine issue of material fact on this claim.  Such an assertion, made in the course of litigation, reflects the state of the evidence before the board, not a statement of the burden that BC imposed.  This is particularly true where the Board's decision reflected their weighing and considering the witness testimony including that of Doe's testimony, that of his witnesses and his proffered evidence and its consideration of whether JK was, as Doe contended, the real perpetrator.  D. 65-44 at 3.

10.     *There Was Sufficient Evidence to Support the Hearing Board's Finding*

The Student Guide provides that "[t]he standard used to determine responsibility is the preponderance of the evidence, that is, whether it is 'more likely than not' that the accused has violated the policy" in question.  D. 65-17 at 3; D. 65-18 at 2.

Here, BC moves for summary judgment on the ground that ample evidence existed to support the outcome of the proceeding.  D. 68 at 18.  The Court need only find that there was

enough "evidence, which, if believed, could have supported the board's decision." Schaer, 432 Mass. at 479 n.9. Simply because conflicting evidence exists does not mean that the burden of proof was not met. Id. That this Court or a jury may have come to a different outcome than the hearing board is not the determinative test. See Walker, 82 F. Supp. 3d at 531-32 (stating "[i]t is not the business of lawyers and judges to tell universities what statements they may consider and what statements they must reject") (quoting Schaer, 432 Mass. at 481); Havlik, 509 F.3d at 35; Morris, 2004 WL 369106, at *2 (2004) (stating, when evaluating a breach of contract claim, "[g]reat deference is extended to university decision-making on academic and disciplinary matters"). Instead, the issue is whether there was sufficient evidence to support the board's decision, that it was more likely than not, that Doe committed the indecent assault and battery for which the board found him responsible.

It is fair to say that this was a circumstantial case against Doe. All indications are that the board thought it was a close circumstantial case, particularly as to the initial charge of sexual assault. The fact that the case was a circumstantial one, or even a close circumstantial case, however, does warrant the conclusion that there was insufficient evidence to reach the conclusion that the board reached. Here, after hearing testimony from both AB and Doe and other witnesses, the board, that had the benefit of hearing and considering the testimony about the events in question, credited AB's version that she had been subject to an unwanted touching on the dance floor and that Doe, in close proximity to her, had committed this act. That no one, including AB, saw Doe do so on a packed dance floor, does not mean that there was no rational basis for the board's conclusion or that its decision was arbitrary and capricious. This is particularly true where the board considered not just Doe's denial of the conduct, but his position that JK was in fact responsible for the charge and having heard testimony from Doe and JK himself about this matter.

This Court cannot say, as a matter of law, that this showing did not satisfy the preponderance of evidence standard.

### 11.     BC Did Not Breach Any Obligation to Make a Record of the Hearing

Neither party disputes that BC is not obligated to create a recording—either stenographic or audio—of the hearing.  D. 65 ¶¶ 34(f), 55; D. 74 ¶¶ 34(f), 55.  Section 5 provides that "[n]either party at the hearing will be allowed to use any type of electronic device, including but not limited to laptop computers, tape or digital records, cell phones or PDAs, without the advance written permission of the Dean."  D. 65-18 at 6.  Thus, there is no genuine issue of material fact as to a breach of contract claim due to the University's failure to record Doe's disciplinary hearing because no such a recording was requested in advance.  Moreover, the lack of any recording did not violate the covenant of good faith and fair dealing.  The terms of Section 5 do not provide Doe with a "reasonable understanding of performance obligations as reflected in the overall spirit of the bargain," Brandeis, 2016 WL 1274533, at *41, that include recording the hearing without a request.  Cf. Schaer, 432 Mass. at 480-81 (dismissing plaintiff's claim that the record was made inadequately because the contract did not require a record of a certain length or constituted of any specific content); Bleiler, 2013 WL 4714340, at *16 (concluding there was no basis for a breach of contract claim in part because Plaintiff's desire for a recording of the deliberations was not required by the controlling student handbook).  Instead, the requirement for advanced permission creates the opposite expectation:  that no recording will be made.  Finally, there is no genuine issue of material fact as to contractual due process and fundamental fairness concerns, D. 66 at 15-16, for this same reason.

12.     *There was No Improper Interference with Board Deliberations*

Under the terms of the Student Guide, each hearing board is required to "meet in private to determine whether the accused is responsible or not for the charge(s), based upon a preponderance of the evidence. If the finding is responsible, the board will decide upon appropriate sanctions to recommend to the Dean." D. 65-18 at 7. Accordingly, a student's reasonable expectation is that the hearing board itself will deliberate, apply the correct standard of proof and come to a decision.

That the hearing board, that was convened by the Dean for the investigation and adjudication of the charge against Doe, would have some contact with the Dean and General Counsel does lead to the conclusion Doe urges that its decision was improperly influenced. It is undisputed that Rivera had a telephone conversation with Hughes between the two board deliberation sessions indicating that the board was struggling with its decision and was conserving a "no finding" result. D. 65 ¶ 68; D. 74 ¶ 68. Hughes relayed to Rivera that Chebator discouraged "no finding" results. D. 65 ¶ 68; D. 74 ¶ 68. It is, however, also undisputed that the board members testified that they did not recall hearing that Chebator had discouraged "no finding" results. D. 71 ¶ 167; D. 75 ¶¶ 161-77 (not disputing this fact). Moreover, Rivera's deposition testimony states that the board was considering a "no finding" because the board felt they "had enough information to make a decision just maybe not on what the specific charge was, so [they] did not want to go with no finding," not as a result of Hughes and Chebator. D. 78-2 at 199. On this record, the Court cannot conclude that there was improper influence on the hearing board's decision given the uncontradicted testimony by the members of the board. Moreover, the board did, in essence, come to a no finding ruling about the initial charge of sexual assault, finding instead that Doe was responsible for a lesser included charge of indecent assault and battery.

Similarly, the undisputed record about the board's contact with Herlihy, BC's General Counsel, does not warrant a different outcome.  It remains undisputed that board did not contact Herlihy until after the Board had rendered a decision on the hearing.  D. 65 ¶ 71; D. 74 ¶ 71.  That Herlihy provided language for certain of the board's findings, D. 65 ¶ 71; D. 74 ¶ 71; D. 78-2 at 275-76, does not indicate that he was part of the board's private deliberations.

### 13.  BC Provided the Appellate Process It Promised

Doe contends that (1) the grounds for appeal were "impermissibly limited and flawed" and (2) that Keating's involvement in the internal appellate process was fraught and the entire appellate process was not impartial.  D. 66 at 18-19.

The Student Guide provides if "an accused student can demonstrate that he or she has been denied a fair hearing of the case due to procedural unfairness or can introduce evidence not previously available that would be likely to change the result of the prior hearing, an appeal can be made to the Dean of Students and the Vice President for Student Affairs" and "must be filed in writing by the party . . . within five business days after notification of the sanctions.  The Dean and the Vice President (or their delegated representatives) will review the case and determine if the new evidence or lack of a fair hearing requires consideration."  D. 65-18 at 8.  It continues, "[a] denial of a proper hearing would be a violation of the fairness rights listed in the Statement of Rights and Responsibilities.  New evidence is evidence which was unknown to the party at the time of the original hearing and which could have a significant impact . . . ."  D. 65-18 at 8.

There is no breach of express contract as to this claim.  The contract specifically lists two grounds for appeal:  "procedural unfairness" or "evidence not previously available that would be likely to change the result of the prior hearing."  D. 65-18 at 8.  Moreover, the Student Guide states that the "appeal must be filed . . . within five business days."  D. 65-18 at 8.  Given the language,

there is no reasonable expectation that any other ground would be available for appeal.  Cf. Gomes, 365 F. Supp. 2d at 41 (explaining that the review of the appeal was limited to reviewing that the procedures were followed and the sanction was appropriate and thus "[i]t is reasonable for the University to expect a student reading these provisions would not believe the University was required to review the merits of the case").  Moreover, there is no breach of the implied covenant of good faith and fair dealing on this basis either.  This is because there is no reasonable expectation that party performance of the Student Guide would include an appellate process that encompassed more than these two grounds or more than a five-day window to appeal.

Certainly, the scope and nature of the appellate process bears upon the basic fairness of the process for Doe.  Doe analogizes to Brandeis to state that the inability to appeal on the ground that the Board's decision was not supported by the evidence or otherwise unfairly violated Doe's right to have access to a process through which to resolve deprivation of rights and otherwise violated his right to fairness under the contract.  D. 66 at 18 (citing Brandeis).  Reliance upon Brandeis, however, only goes so far where, in this case, the parties do not dispute that the "procedural unfairness" ground for appeal includes a "demonstrated lack of fairness in the hearing of the case" as part of the ground for appeal.  D. 65-19 at 3; D. 65 ¶ 34(i); D. 74 ¶ 34(i).  In fact, the letter summarizing the appellate process, evidences a consideration of procedural matters, e.g., Doe's objection to the timing of the hearing and the exclusion of Mullen as a witness, as well as substantive matters, e.g., addressing the board's consideration of the video as not precluding its conclusion that Doe, was at one point behind AB as Doe, Betsy and AB testified.  D. 65-55 at 2-3.  In addition, the five-day window alone does not make the appellate process unfair.  Both BC and Doe, who had received sanctions from the hearing board, have an interest in expeditious review.

The Court disagrees with Doe's contention that his appeal was not handled fairly and in accordance with BC's procedures. D. 66 at 18-19. Doe makes several allegations about Keating's lack of training in Title IX and BC's policies and procedures and his limited substantive role in the review. Keating's testimony that he had "general familiarity with Title IX as it applied to the university" and that he knew "generally what [BC's] procedures and policies were, "D. 78-2 at 170, was uncontradicted and neither the terms of the Student Guide nor the Conduct Board Procedure stipulate any specific training. Moreover, that Chebator, rather than Keating, took the lead in the appellate review, does not contravene BC's policies. Chebator's consultation with Rivera, as chair of the hearing board, or with Herlihy on the letter relating to the disposition of the review, D. 65 ¶ 79; D. 74 ¶ 79, also do not amount to a breach of contract. The terms of the policies provide no limitations or explanation for how the appeal request should be reviewed. D. 65-18 at 8; 65-19 at 3. The only language relevant states that "[t]he Dean and the Vice President . . . will review the case," D. 65-18 at 8, and nothing in that language suggests that the reviewers should refrain from contact with those involved in the original hearing. Cf. Havlik, 509 F.3d at 28 (explaining that it was reasonable that the administrator in charge of the appellate review process consulted with another administrator who was involved in the disciplinary process). Moreover, the fact that Chebator had some role in and knew about the original hearing proceeding also creates no genuine issue of material fact as to breach. First, the Student Guide and the Conduct Board Procedure provide no terms restricting an administrator from reviewing the appeal request if they knew of the case previously. D. 65-18 at 8; D. 65-19 at 3; see Cloud, 720 F.2d at 725-26 (rejecting plaintiff's claim that hearing examiner was biased because he had reviewed the university letter suspending plaintiff prior to the hearing); Gorman, 837 F.2d at 15 (concluding that the various roles of the administrator in the disciplinary process did not create unfairness). At base, Doe

requested review of the hearing board's decision within the applicable time period and BC complied with providing same even if Doe was unhappy with the result.  Gomes, 365 F. Supp. 2d at 41 (concluding that "[t]he appeal committee followed the strictures of the Code and evaluated the Hearing Committee decision for procedural errors and the appropriateness of the sanctions" and so "[d]efendants did not breach the contract provision related to appeals" by not reviewing the merits of the case).

### 14.    There Was Basic Fairness in the 2012 Disciplinary Proceeding

Having considered and addressed each of the specific, alleged breaches of contract that Doe alleges against BC, the Court has also considered whether each of these breaches, or some or all of these alleged breaches cumulatively, denied Doe basic fairness in the 2012 disciplinary proceedings. At base, this analysis requires scrutinizing whether the college provided a student with a "minimum level of fair play" in terms of both procedural fairness and substantive fairness. Brandeis, 2016 WL 1274533, at *32; see Kiani v. Trustees of Bos. Univ., No. 04-CV-11838-PBS, 2005 WL 6489754, at *8 (D. Mass. Nov. 10, 2005); Schaer, 432 Mass. at 481-82; Morris, 2004 WL 369106, at *2.  Accordingly, in conducting a basic fairness analysis, the Court examines the conduct of the hearing and the disciplinary process to ensure a student was not sanctioned arbitrarily and capriciously, that the university acted in good faith and the entire process provided basic fairness even as it is not required to follow due process standards guaranteed to criminal defendants or follow the judicial rules of evidence to meet the basic fairness requirement.  Walker, 82 F. Supp. 3d at 532 (citing Schaer, 432 Mass. at 481).

Although Doe's complaint were well presented to this Court (and to BC in 2014), the Court does not conclude that BC denied Doe basic fairness in its disciplinary process.  Its process was in accord with its policies, Doe was given prompt notice of the charge and the factual allegations

against him and Hughes met promptly on several occasions with Doe and his parents on several occasions in the pre-hearing phase to provide notice of same.  BC was aware of Doe's denial of the charge from its first meeting with Doe and promptly convened a hearing board for the investigation and adjudication of the charge.  During the hearing, Doe had the benefit of an attorney-advisor and was able to present his own testimony, the testimony of other witnesses to the incident, the video and was able to present not just his denial of the charge, but got the hearing board to consider a third-party culprit.  He subsequently received review of the board's adverse decision as provided under BC's policies and procedure and, at the request of Mary and James, received a further 2014 review, which considered the additional evidence that were not available at the time of the 2012 hearing, but which, upon review, would not have changed the result of the hearing board's ruling.  For all of these reasons and the reasons discussed above, the Court concludes that BC did not breach its express or implied contractual obligations to Doe or fail to provide him with basic fairness in the process.

### B.      The Court Grants BC Summary Judgment on Count II:  Promissory Estoppel

BC moved for summary judgment on Doe's claim to promissory estoppel.  D. 68 at 21.

Under Massachusetts law, if a written contract exists, a claim of promissory estoppel is not permitted.  Trent Partners & Assocs., Inc. v. Dig. Equip. Corp., 120 F. Supp. 2d 84, 104-05 (D. Mass 1999) (citation omitted) (explaining that "as a matter of law . . . an oral statement made in the face of a written contract was not a 'promise' or 'commitment' for promissory estoppel purposes because the existence of a written contract demonstrated the intention that it would govern their intricate transaction"); see Brandeis, 2016 WL 1274533, at *41; see also Doe v. Brown Univ., No. 15-cv-1445, 2016 WL 715794, at *15 (D.R.I. Feb. 22, 2016).  Here, the parties

do not dispute whether a contract existed.  See D. 1 ¶ 96; D. 68 at 6, 21 n.6.  Accordingly, the Court grants BC's motion for summary judgment on this count.

### C.  No Contract Existed for the 2014 Review of Doe's Disciplinary Proceedings (Count III)

"Under Massachusetts law, the formation of a contract requires a definite offer, acceptance, and consideration."  United States ex rel. Hagerty v. Cyberonics, Inc., No. 13-cv-10214-FDS, 2015 WL 7253675, at *5 (D. Mass. Nov. 17, 2015) (appeal filed Mar. 21, 2016); Northrup v. Brigham, 63 Mass. App. Ct. 362, 367 (2005).  "Contract formation requires a bargain in which there is a manifestation of mutual assent to the exchange."  I & R Mech. Inc. v. Hazelton Mfg. Co., 62 Mass. App. Ct. 452, 454-55 (2004).  "All [] essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their observations ascertained, and their rights determined."  Cygan v. Megathlin, 326 Mass. 732, 733-34 (1951). "[A] contract is not to be held unenforceable if, when applied to the transaction and construed in the light of the attending circumstances, the meaning can be ascertained with reasonable certainty." Simons v. Am. Dry Ginger Ale Co., 335 Mass. 521, 523 (1957) (internal quotation marks omitted) (citations omitted).  All terms of the agreement do not need to be "precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract."  Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000).  For valid consideration, "consideration and the promise bear a reciprocal relation of motive or inducement: the consideration induces the making of the promise and the promise induces the furnishing of the consideration."  Loranger Const. Corp. v. E. F. Hauserman Co., 376 Mass. 757, 763 (1978).  For a contract to have valid consideration, there "must be a bargained-for exchange in which there is

a legal detriment of the promisee or a benefit to the promisor." Hinchey v. NYNEX Corp., 144
F.3d 134, 142 (1st Cir. 1998) (internal quotation marks omitted) (citations omitted).

BC moves for summary judgment on Count III based upon the argument that there was "no
meeting of the minds" regarding the terms of the 2014 review of Doe's disciplinary proceedings
and thus no contract was formed in the correspondence between Leahy and Mary and James.  D.
68 at 21-22.  The factual record fails to show any facts that support a meeting of the minds or the
exchange of definite terms to create a contract.  It is true that Leahy testified that he knew that the
family was prepared to file a lawsuit against the university and that he responded with a suggestion
of independent review by the Vice President of Student Affairs, Barbara Jones.  D. 65-16 at 7.
Still, the terms and conditions of that independent review were left unresolved.  First, Leahy told
Doe's parents that while Jones was "the right person at BC to review the case and make a
recommendation," he did not know "how long it would take [her] to complete re-examining the
facts and make a determination."  D. 72-2 at 15.

In addition, after Doe's parents promised to contact Jones, D. 72-2 at 15, James testified
that when he first met with Jones in September 2014, he only understood that she would do some
sort of "top to bottom assessment of what happened and . . . make a recommendation to the
executive vice president about what she learned" but also that this meeting was primarily to discuss
"how we were going to go forward and what it was that she was going to do."  D. 75-17 at 10-11.
Not only did James indicate that he did not know what the review would entail or how it would be
conducted, other evidence further confirms that definite obligations were not established.  For
example, Jones testified that in her initial meeting with James, she was "trying to understand from
Mr. [Doe] . . . what were his particular concerns and what were the issues that I would need to
exam in particular . . . ."  D. 78-2 at 154-55.  Moreover, Leahy's e-mail to James stated that it was

his "suggestion" that James contact Jones and that "[a]ny review of the decision . . . would have to begin with the Vice President of Student Affairs." D. 72-2 at 15-16. Thus, the record demonstrates that there was no mutual assent to definite obligatory terms and thus an enforceable contract was not formed.

### D.     The   Court   Grants   Summary   Judgment   to   BC   on   Count IV

Doe and BC both moved for summary judgment on Count IV. BC's principal argument rests on the notion that basic fairness is not an independent obligation and thus cannot be asserted as an independent claim apart from the breach of contract claim in Count I. D. 68 at 22; D. 73 at 18-19.

Doe relies upon Brandeis for support that basic fairness is a duty separate and apart from a university's contractual obligations as alleged in Count I. See Brandeis, 2016 WL 1274533, at *40; D. 66 at 20-21; D. 77 at 5. Brandeis provides no such support. In that case, the Court addresses basic fairness as one portion of its breach of contract analysis. Brandeis, 2016 WL 1274533, at *40 (denying defendant's motion to dismiss for breach of contract in part because it was plausible that "the procedures followed did not provide basic fairness, and that therefore Brandeis plausibly could be found liable for breach of contract").

Accordingly, the Court grants BC summary judgment on Count IV, but rests upon its analysis of Doe's claim about basic fairness as to Count I, the breach of contract claim.

### E.     BC is Entitled to Summary Judgment on Count V:   Declaratory Judgment Under                 Title                 IX

In Count V, Doe seeks declaratory judgment related to alleged violations of Title IX regulations and guidance. D. 1 ¶¶ 162-67. Doe alleges that BC's Sexual Assault Policies and Procedures violated Title IX regulation 34 C.F.R. 106.8(b), which requires that universities adopt

grievance procedures which are "prompt and equitable."  D. 1 ¶¶ 47, 162-66.  In addition, Doe seeks declaratory judgment based upon the school's alleged failures to comply with the 2001 O.C.R. "Revised Sexual Harassment Guidance" which mandate that the university provide a series of protective measures for the disciplinary process.  D. 1 ¶¶ 51-53, 162-63; OCR "Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties."  BC moves for summary judgment.  D. 68 at 24-25.

Doe cannot seek declaratory relief because he no longer attends BC and this litigation centers on the 2012-2013 university policies.  D. 65 ¶¶ 29, 81; D. 74 ¶¶ 29, 81; D. 71 ¶ 24.  Declaratory judgment is relief sought in connection with *future* legal rights to assist parties in "conform[ing] their conduct to avoid future litigation."  Wilborn v. Wall, No. 13-cv-11783-GAO, 2015 WL 5662717, at *6 (D. Mass. Sept. 25, 2015) (citing Aldrich v. Young, No. 13-cv-10466-DPW, 2013 WL 3802436, at *9 (D. Mass. July 18, 2013)).  Declaratory judgments are only available where there could be an ongoing legal violation and are not available "simply to proclaim liability for a past act."  Brown v. Rhode Island, 511 F. App'x 4, 6 (1st Cir. 2013) (quoting Ysais v. New Mexico, 373 F. App'x 863, 866 (10th Cir. 2010)) (internal quotation mark omitted).  Declaratory judgments are considered to be "untimely if the questionable conduct has already occurred or damages have already accrued."  Aldrich, 2013 WL 3802436, at *9.  When it becomes clear that the wrongful behavior cannot reasonably be expected to reoccur, there is no case or actual controversy present and the need for declaratory judgment is moot.  Duclerc v. Mass. Dep't of Corr., No. 10-cv-12050-DJC, 2012 WL 6615040, at *5 (D. Mass. Dec. 18, 2012).  Here, Doe graduated from BC, D. 65 ¶ 81; D. 74 ¶ 81, and thus is no longer subject to disciplinary proceedings set by the university.  In addition, the policy central to this litigation is the policies and procedures from the 2012-2013 academic calendar at BC.  D. 65 ¶ 29; D. 74 ¶ 29; D. 71 ¶ 24.  Doe himself

writes that the policies subject to this litigation have changed.  D. 78-2 at 294-95.  Defendants

confirmed this at the summary judgment hearing.  Hr'g Tr. at 10.  Thus, neither Doe nor any other

individual is subject to possible future litigation or an ongoing legal violation in this context,

resulting in a lack of a case or actual controversy present and the need for a declaration moot.

Accordingly, the Court grants summary judgment to BC on this Count.

**F.      The Court Grants BC Summary Judgment on Count VI:  Violation of Title IX
         Erroneous          Outcome          Based          Upon          Gender
         Bias**

Title IX assures that "[n]o person in the United States shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any

education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  To

pursue a claim under Title IX based upon an erroneous outcome theory, a plaintiff must attack the

outcome of the school's disciplinary proceedings by arguing that the plaintiff was wrongfully

found responsible of an offense based upon gender bias by providing facts that cast doubt on the

accuracy of the outcome of the disciplinary hearing and establish circumstances that show that

gender bias motivated the outcome.  Doe v. Univ. of Cincinnati, No. 15-cv-681, 2016 WL

1161935, at *13 (S.D. Ohio Mar. 23, 2016); Brown Univ., 2016 WL 715794, at *5; Salau v.

Denton, 139 F. Supp. 3d 989, 998 (W.D. Mo. 2015), appeal dismissed (Dec. 11, 2015) (citing

Sahm v. Miami Univ., 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015)); Harris v. Saint Joseph's Univ.,

No. 13-cv-3937, 2014 WL 1910242, at *4 (E.D. Pa. May 13, 2014).  The predominant question is

whether the college's actions were motivated by gender bias or if the disciplinary procedures

establish a pattern of decision-making that applies a chauvinistic view of the sexes.  Yu, 97 F.

Supp. 3d at 462 Bleiler, 2013 WL 4714340, at *5 (citing Doe v. Univ. of the S., 687 F. Supp. 2d

744, 756 (E.D. Tenn. 2009)).  This can be shown via "statements by members of the disciplinary

tribunal, statements by pertinent university officials, or patterns of decision-making that … show the influence of gender." Brown Univ., 2016 WL 715794, at *5; Salau, 139 F. Supp. 3d at 998 (quoting Sahm, 110 F. Supp. 3d at 778). Assertions that fail to show a causal link between a plaintiff's protected characteristic and a defendant's conduct are insufficient; a plaintiff must demonstrate particular circumstances that suggest gender bias was the motivating factor. See Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994).

BC first asserts that its policies are gender neutral and thus do not violate Title IX. D. 68 at 23. Doe counters that the university policies evidence gender bias in how the university approaches sexual assault disciplinary proceedings. D. 77 at 9. Doe argues that the policies label accusers as "victims" and "survivors" and accused students as "perpetrator[s]." D. 77 at 9. Doe's argument is without merit. On its face, the language in the 2012-2013 disciplinary policies is gender neutral and makes no mention to men or women. D. 65-17. Second, Doe points to the Sexual Assault Notification Form for support for this claim but this document, D. 65-22, undermines their stance. The Sexual Assault Notification Form asks whether the victim is male or female, leaving checkmark options for both. D. 65-22 at 3-4. Similarly, the form also asks whether the perpetrator is male or female, leaving checkmark options for both. D. 65-22 at 3-4. This exhibits a lack of gender bias.

Doe additionally flags Section 4 of the Student Guide for further support by arguing that the Guide labels accusers as "victims" and "survivors." D. 77 at 9; D. 65-17 at 13. Even assuming these labels were not gender neutral, Section 4 of the Student Guide also provides other labels beyond victim and survivor. For example, the policy lists the accuser as "the complainant" in multiple locations and lists the possible assailant as the "alleged perpetrator" and "the accused." D. 65-17 at 13, 16-17. In addition, even if this language was evident of some bias in the

disciplinary proceedings—which it is not on its face—a Title IX erroneous outcome claim requires that the improper bias is based upon gender.  Showing that a school favors alleged victims of sexual assault claims is not the equivalent of demonstrating bias against male students, even if accused students are generally male.  Univ. of Cincinnati, 2016 WL 1161935, at *14; King v. DePauw Univ., No. 14-cv-70-WTL-DKL, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014); Haley v. Virginia Commonwealth Univ., 948 F. Supp. 573, 579 (E.D. Va. 1996).

This is true even putting aside the evidence shows that, between the period of August 1, 2005 and July 1, 2015, 10 out of 32 male students who were accused of some form of sexual misconduct were found not responsible after participating in the university's disciplinary proceedings,  D. 71 ¶ 210; D. 75 ¶¶ 210-11; D. 78-2 at 63-64; see also Bleiler, 2013 WL 4714340, at *8 (granting summary judgment to defendants after finding that one third of male students were found not responsible in the school's sexual assault disciplinary proceedings), as Doe contends the Court should not consider given his objections to the resolution of his motion to compel as to the underlying documents regarding these other cases.[6]

Doe also asserts that outside pressures with respect to sexual assault on campus instill bias in disciplinary proceedings.  D. 77 at 10-12.  Doe's point that sexual assault on campuses is a subject of increasing public attention and controversy, with external pressures from a variety of sources, is well-taken.  Doe, however, must do more than respond to Defendants' motion for summary judgment with bare assertions.  Magarian, 321 F.3d at 240; see Haley, 948 F. Supp. at 578 (explaining that for Title IX claims at summary judgment, "[a] plaintiff must be able to adduce

---

[6]  The Court is aware that Doe filed a motion to compel BC to produce prior sexual assault complaints or charges brought by non-party students or former students, D. 23, and that Magistrate Judge Bowler denied that motion in part, D. 36.  Having reviewed Doe's objections to that order (and Defendants' reply to those objections), the Court concludes that Magistrate Judge Bowler's order is supported by the factual findings and is not erroneous and this order, therefore, shall stand.

substantial evidence to support his contentions; a mere iota of evidence, followed by conclusory allegations of discriminatory intent, will not suffice"). Here, Doe provides no evidentiary support to show how these outside pressures have influenced the disciplinary proceedings and review to which Doe was subjected.[7]

Finally, Doe provides no evidentiary support for the claim that the "pattern of decision-making" in Doe's case is a result of gender bias. D. 77 at 17-19. Doe points to a series of alleged procedural irregularities, D. 77 at 18-19, to support this contention. However, in so arguing, Doe does not provide "statements by members of the disciplinary tribunal" or "statements by pertinent university officials" that demonstrate the improper influence of gender on the proceedings. Brown Univ., 2016 WL 715794, at *5; Salau, 139 F. Supp. 3d at 998 (quoting Sahm, 110 F. Supp. 3d at 778). Providing no evidence explaining the causal relationship between the alleged procedural irregularities alleged and a pattern of decision-making based upon gender bias, Doe's claim under Count X cannot survive. See Mallory v. Ohio Univ., 76 F. App'x. 634, 640 (6th Cir. 2003) (holding that plaintiff did not demonstrate a genuine issue of material fact because he did not show how alleged procedural irregularities were based upon sex); Univ. of Cincinnati, 2016 WL 1161935, at *14 (concluding that plaintiff "fail[ed] to create a reasonable inference that the disciplinary hearing procedures adopted . . . were motivated by a desire to discriminate against male students"); Salau, 139 F. Supp. 3d at 999 (dismissing claim when plaintiff pointed to his case

---

[7]  Doe contends that Doe v. Columbia, No. 15-1536, 2016 WL 4056034 (2d Cir. July 29, 2016), provides support that Doe's erroneous outcome claim should survive summary judgment. D. 86 at 1-2. The Court disagrees. The Columbia court largely based its decision to allow the plaintiff's claim to survive because "minimal support to a plausible inference of sex discrimination [will] survive a Rule 12(b)(6) motion to dismiss." Id. at *7-9. In this case, however, the parties have reached the summary judgment stage and Doe must demonstrate a genuine issue of material fact, not merely allegations of a plausible inference of gender bias. In his summary judgment record, Doe provides no evidence to support his Title IX erroneous outcome based upon gender bias claim.

only and not a broader pattern of decision-making to show gender bias); <u>Doe v. Case W. Reserve</u> <u>Univ.</u>, No. 14-cv-2044, 2015 WL 5522001, at *5 (N.D. Ohio Sept. 16, 2015) (explaining that the pleadings do not show how sexual bias motivated the procedural flaws).

For these reasons, the Court grants summary judgment to BC on Count VI.

### G.      The Court Grants BC Summary Judgment on Count VII:  Violation of Title IX    –    Deliberate    Indifference

To establish a Title IX "deliberate indifference" claim, a plaintiff must demonstrate that an official with authority to address the alleged discrimination and take corrective measures had actual knowledge of the misconduct and failed to adequately respond to that misconduct. <u>Gebser</u> <u>v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 290 (1998); <u>Bleiler</u>, 2013 WL 4714340, at *5 n.4; <u>Univ. of the S.</u>, 687 F. Supp. 2d at 757. The university's deliberate indifference must also cause the student to face sexual harassment or become vulnerable to such harassment. <u>Univ. of the S.</u>, 687 F. Supp. 2d at 757 (citing <u>Patterson v. Hudson Area Schs.</u>, 551 F.3d 438, 446 (6th Cir. 2009)). Doe has a burden to show that officials' response or inaction was clearly unreasonable given the known circumstances. <u>Brown Univ.</u>, 2016 WL 715794, at *10 (quoting <u>Univ. of the S.</u>, 687 F. Supp. 2d at 757).

Establishing that the university's action was clearly unreasonable is a high bar. <u>Brown</u> <u>Univ.</u>, 2016 WL 715794, at *10; <u>see</u> <u>Porto v. Town of Tewksbury</u>, 488 F.3d 67, 73 (1st Cir. 2007) (explaining that deliberate indifference is "a stringent standard of fault" that requires proof of a "known or obvious consequence" of action or inaction) (quoting <u>Bd. of the Cnty. Comm'rs v.</u> <u>Brown</u>, 520 U.S. 397, 410 (1997)). Moreover, students have no right to officials instituting any one particular set of remedies and courts are cautioned not to second-guess administrative disciplinary decision-making. <u>Univ. of the S.</u>, 687 F. Supp. 2d at 757 (quoting <u>Vance v. Spencer</u> <u>Cnty. Pub. Sch. Dist.</u>, 231 F.3d 253, 260 (6th Cir. 2000)).

BC moves for summary judgment on this count.  BC correctly asserts that "deliberate indifference claims are typically brought in cases where a school has ignored a victim's complaint of sexual harassment or assault."  Brown Univ., 2016 WL 715794, at *10.  Moreover, "[s]ome courts have questioned its application to a case of a disciplined student."  Id. (citing Marshall v. Ohio Univ., No. 15-cv-775, 2015 WL 1179955, at *8 (S.D. Ohio Mar. 13, 2015)).  This alone, however, does not dictate summary judgment in BC's favor.  See Wells v. Xavier Univ., 7 F. Supp. 3d 746, 751-52 (S.D. Ohio 2014) (allowing plaintiff's deliberate indifference claim to survive dismissal);  but see Brown Univ., 2016 WL 715794, at *10 (describing that Wells is "anomalous in its application of deliberate indifference to a challenge of a disciplinary proceeding");  Marshall, 2015 WL 1179955, at *8 (stating that it was unclear how this claim applied because "usually, this claim is asserted by a victim against a school or university official who *failed* to protect him or her from harassment or otherwise address the alleged misconduct—actions that [university] officials undisputedly took, to protect the alleged victim from [the accused]") (emphasis in original).

Still, there is no genuine issue of material fact as to Count XI and summary judgment must be granted to BC.  Doe provides no evidence that the alleged, underlying misconduct taken by various officials in the 2012 disciplinary proceeding or the 2014 review amounted to sexual harassment, i.e. gender discrimination.  See supra IV.F.;  Case W. Reserve Univ., 2015 WL 5522001, at *5 (dismissing claim in part because "the Complaint does not contain factual allegations that plausibly suggest that [procedural] flaws were based upon bias against Plaintiff's gender");  Univ. of the S., 687 F. Supp. 2d at 758 (dismissing complaint because it "fails to allege any facts to support a finding that the University's actions were at all motivated by John Doe's gender or sex or constituted gender harassment");  cf. Marshall, 2015 WL 1179955, at *8.  Instead, Doe largely relies upon alleged irregularities without providing support to demonstrate that these

underlying actions were causally related to gender bias and sexual harassment, which is simply not enough to survive summary judgment.  Magarian, 321 F.3d at 240 (stating that "conclusory allegations" and "unsupported speculation" are insufficient to defeat summary judgment) (quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993)).

For all of these reasons, the Court grants summary judgment to BC on Count VII.

### H.    The Court Grants Defendants Summary Judgment on Counts VIII and IX: Negligence

All Defendants move for summary judgment on negligence Counts VIII and IX.  Under Massachusetts law, Doe v. Emerson Coll., No. 14-cv-14752-FDS, 2015 WL 9455576, at *6 (D. Mass. Dec. 23, 2015), a plaintiff must prove that (1) he or she is owed a legal duty by the defendant; (2) there was a breach of that duty; (3) actual damage or injury occurred; and (4) there is causation between the breach and the damage.  Id. (citing Jorgensen v. Massachusetts Port Auth., 905 F.2d 515, 522 (1st Cir. 1990)).

*1.    Count VIII:  Negligence in the 2012 Disciplinary Proceeding and Appeal*

Here, Doe alleges that BC, Chebator, Hughes, Rivera and Keating owed a duty to Doe and others to conduct the student disciplinary process with due care.  D. 1 ¶ 193.  Defendants move for summary judgment on the ground that Doe's allegation is duplicative of their contract claim and no independent, tort-based duty of care exists.  D. 70 at 6-9.

First, tort obligations "are imposed by law, independent of the promises" of contractual duties.  Treadwell v. John Hancock Mut. Life Ins. Co., 666 F. Supp. 278, 289 (D. Mass. 1987) (citing W. Prosser & W. Keeton, *Torts* § 92, at 655 (5th ed. 1984)).  Thus, "absent an independent duty imposed by law," a plaintiff cannot pursue a tort claim against a defendant.  Id. (explaining that "if the alleged obligation to do or not to do something that was breached could not have existed

but for a manifested intent, then contract law should be the *only* theory upon which liability would be imposed").

In this case, the negligence alleged by Doe is based upon how the student disciplinary process was conducted.  D. 1 ¶ 193.  The Student Guide and the Conduct Board Procedure, however, dictate what the disciplinary process should have entailed and the parties do not dispute that the student manuals in this case created contractual obligations on the part of BC.  Walker, 82 F. Supp. 3d at 528-29; Guckenberger, 957 F. Supp. at 317; Driscoll, 70 Mass. App. Ct. at 293.  Thus, Doe's claim can only survive if an independent duty exists outside of the contract.

The existence of a duty of care is a question of law for the Court.  Jupin v. Kask, 447 Mass. 141, 146 (2006) (citing Andrade v. Baptiste, 411 Mass. 560, 565 (1992)).  When establishing whether a defendant owed a duty of care to the plaintiff, Massachusetts courts look to whether (1) a duty can be derived from "existing social values and customs" and social policy or (2) a duty was voluntarily assumed and thus it must be performed with due care.  Mullins v. Pine Manor Coll., 389 Mass. 47, 50, 52 (1983) (citing Schofield v. Merrill, 386 Mass. 244, 247 (1982) and Black v. New York, N.H., & H.R.R., 193 Mass. 448 (1907)).  In addition, Massachusetts courts assess whether a special relationship existed such that "a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so."  Erickson v. Tsutsumi, No. 199801842B, 2000 WL 1299515, at *3 (Mass. Super. May 17, 2000) (quoting Irwin v. Ware, 392 Mass. 745, 756 (1984)).

First, the Court is unaware of Massachusetts law that imposes a duty of reasonable care upon BC in the circumstances here beyond the obligations, including that to provide basic fairness, that arise from the parties' contractual relationships as discussed in regard to Counts I and IV. Instead, Massachusetts recognizes a duty of care owed to students by schools in a set of

circumstances, none of which are relevant here.  See Mullins, 389 Mass. at 54 (establishing a duty of care for universities to prevent injury to students living on campus from foreseeable criminal acts of third parties); Doe v. Westlake Acad., No. 97-cv-2187, 2000 WL 1724887, at *7 (Mass. Super. Nov. 21, 2000) (concluding that a duty of care exists based upon the special relationship between mentally ill, committed adolescents and adolescent psychiatric facility and academy).

Moreover, ample case law declines to expand the duty of care owed to students by universities.  For example, Driscoll concluded that a student cannot recover in tort for his alleged sexual misconduct on the basis that the school did not adequately monitor its facilities and students, further declined to extend a duty of care onto the private school to advise students to speak to parents or attorneys before being questioned about misconduct and highlighted that schools are allotted "wide discretion" in disciplinary proceedings as part of their educational scheme as rationale for rejecting Plaintiff's negligence claim.  Driscoll, 70 Mass. App. Ct. at 291-92.  Other cases applying Massachusetts law also refrain from expanding the duty of care that universities owe students.  See Emerson, 2015 WL 9455576, at *7 (explaining that Massachusetts imposes no legal duty on universities or administrators to supervisor alcohol or drug consumption by students despite university policies prohibiting such behavior and declining to extend Emerson's duty of care as to Doe's physical safety within the dormitory to a duty of care as to off-campus activity); Erickson, 2000 WL 1299515, at *2 (declining to extend the Mullins duty of care to protect students from third party negligent acts outside of school's boathouse).  In addition, Emerson determined that, as to administrators, "Massachusetts does not . . . impose a common-law or statutory duty on administrators to enforce university policies."  Emerson, 2015 WL 9455576, at *8.

Doe's other arguments, relying upon distinguishable case law, are likewise unavailing. Doe contends that this Court should recognize a duty of care for BC and administrators to conduct

the student disciplinary process with due care.  Doe relies upon <u>Brandeis</u>.  D. 76 at 4.  This case, however, does not provide adequate support for Doe.  In <u>Brandeis</u>, the negligence claim most similar to this case was Plaintiff's claim that Brandeis had a duty of care with respect to conducting proper conflict checks, but the <u>Brandeis</u> court did not address this claim substantively because it concluded that the plaintiff had waived this claim.  <u>Brandeis</u>, 2016 WL 1274533, at *43.  That the the court in <u>Brandeis</u> allowed the plaintiff's claim for negligent hiring, retention and supervision to survive a motion to dismiss where an employer that holds out employees to members of the public in the course of the employer's business and, therefore, owned a duty to the student as a member of the public, <u>id.</u> at *42, does not answer the question of what gives rise to a duty of care here, where no such claim is asserted and where no obligations aside from those arising from the express and implicit provisions of BC's policies and procedures are relied upon by Doe here.  At base, the duty of basic fairness, D. 76 at 8, is a duty resounding in contract law and does not support finding a separate duty of care here.

Whether a plaintiff can pursue a negligence claim against individual employees is a related inquiry.  The first step in this inquiry is determining if a duty of care exists because "[a]bsent a legal duty, there can be no personal liability."  <u>Lyon v. Morphew</u>, 424 Mass. 828, 833 (1997); <u>see Lev v. Beverly Enter.-Massachusetts, Inc.</u>, 457 Mass. 234, 245 (2010) (explaining that violations of policies do not create a duty of care in individual defendants and are only relevant to the negligence inquiry after a duty of care has been established) (citing <u>Goulart v. Canton Hous. Auth.</u>, 57 Mass. App. Ct. 440, 444 (2003)).  As explained above, no such duty exists.

For these reasons, the Court grants summary judgment to BC and the Individual Defendants on Count VIII.

   2.   *Count IX:  Negligence as to the 2014 Post-Suspension Review*

In Count IX, Doe alleges that BC voluntarily assumed the duty of conducting the 2014 review, owed a duty of care to Doe in how that process was conducted and breached that duty.  D. 1 ¶¶ 197-98.  Doe also alleges that Jones and Keating owed this same duty of care and breached that duty.  D. 1 ¶¶ 197-98.  All defendants move for summary judgment on this ground.

The main contention between the parties is whether a duty of care was created when BC, through Leahy, agreed to conduct a post-suspension review of the 2012 disciplinary proceeding and appeal.  No duty of care arose.  Massachusetts law derives a duty of care from voluntarily assumed activities based upon the Restatement (Second) of Torts § 323 (1965).  Cottam v. CVS Pharmacy, 436 Mass. 316, 323-24 (2002); Mullins, 389 Mass. at 52-53.  Under that section, an actor is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care in his performance of his undertaking if (a) his failure to provide due care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."  Mullins, 389 Mass. at 52-53 (quoting Restatement (Second) of Torts § 323 (1965)).  Another formulation of this standard states "[i]f a person voluntarily assumes a duty or undertakes to render services to another that should have been seen as necessary for her protection, that person may be liable for harm caused because of the negligent performance of his undertaking."  Cottam, 436 Mass. at 323-24 (quoting Thorson v. Mandell, 402 Mass. 744, 748 (1988)).

Here, Boston College, Jones and Keating did not undertake to render services necessary for Doe's protection, or assume a duty associated with protecting against physical harm or that could foreseeably increase risk of physical harm.  Cf. Cottam, 436 Mass. at 323-24 (concluding that where "a pharmacy provides a more detailed list of warnings, or . . . promises to provide customers with information, it may thereby undertake a duty to provide complete warnings and information"); Mullins, 389 Mass. at 52-53 (creating duty to protect students from criminal acts

of third parties on campus because "students and their parents rely upon colleges to exercise care to safeguard the well-being of students" and consider "whether the college has undertaken to provide an adequate level of security"); <u>DiPasquale v. Suburban Propane Ltd. P'ship</u>, No. 11-cv-1539-F, 2014 WL 7343976, at *3 (Mass. Super. Dec. 22, 2014) (holding that "Whirlpool and Sears had a duty to warn about the dangers of using a propane dryer because they voluntarily assumed the duty by including some information . . . in the dryer's instruction manual"). In addition, the reasons discussed above further persuade that Defendants owed no duty of care.

Because Defendants BC, Jones and Keating owed no duty the Court grants summary judgment on Count IX.

I.   **The Court Grants Summary Judgment to All Defendants on Counts X and XI: Negligent       Infliction      of      Emotional      Distress**

To state a claim for negligently inflicted emotional distress, a plaintiff must prove 1) negligence; 2) emotional distress; 3) causation; 4) physical harm manifested by objective measures; and 5) that a reasonable person would have suffered emotional distress under the facts alleged. <u>See</u> <u>Sullivan v. Bos. Gas Co.</u>, 414 Mass. 129, 132-33 (1993) (citing <u>Payton v. Abbott Labs</u>, 386 Mass. 540, 557 (1982)). "'A successful negligent infliction of emotional distress claim, in other words, must do more than allege 'mere upset, dismay, humiliation, grief and anger.'" <u>Id.</u> at 137 (quoting <u>Corso v. Merrill</u>, 406 A.2d 300, 304 (N.H. 1979)). To pursue a negligent infliction of emotional distress claim, "[i]t is fundamental that there must be a showing of a duty of care owed to the plaintiff, because 'there can be no negligence where there is no duty.'" <u>Conley v. Romeri</u>, 60 Mass. App. Ct. 799, 801 (2004) (quoting <u>McHerron v. Jiminy Peak, Inc.</u>, 422 Mass. 678, 681 (1996)); <u>Walsh v. Pistorino</u>, No. 03-08, 2007 WL 738437, at *8 (Mass. Super. Oct. 30, 2006).

As established above, the Defendants did not owe a duty of care to Doe, Mary or James separate and apart from its contractual obligations discussed above.  Thus, Doe cannot maintain their negligent infliction of emotional distress claims.  For this reason, the Court grants summary judgment to Defendants on Counts X and XI.

### J.     The Court Grants Summary Judgment to All Defendants on Counts XII and XIII:  Intentional Infliction of Emotional Distress

To make out a claim for intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended, knew, or should have known that its conduct would cause emotional distress; (2) that there was extreme and outrageous conduct; (3) that this conduct caused emotional distress and (4) that this emotional distress was severe.  See Polay v. McMahon, 468 Mass. 379, 385 (2014) (citing Howell v. Enter. Publ. Co., 455 Mass. 641, 672 (2010)).  The bar is set very high to make out a claim for intentional infliction of emotional distress.  Id. (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996)).  A plaintiff who alleges "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" will not meet the burden, nor will a plaintiff who alleges, without more, only "tortious or even criminal" intent.  Id. (quoting Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997)).  To prove the requisite extreme and outrageous conduct, a plaintiff must show that the conduct is "beyond all possible bounds of decency" and is "intolerable in a civilized community."  Id. at 386 (internal quotation marks omitted) (quoting Roman v. Trs. of Tufts Coll., 461 Mass. 707, 718 (2012)).

Here, Doe provides no evidence that shows extreme or outrageous targeted behavior by Defendants.  Much of what Doe relies upon to support these counts are allegations of procedural errors, which do not meet the high bar for intentional infliction of emotional distress.  See Brandeis, 2016 WL 1274533, at *45 (dismissing claim because violations of express or implied contractual obligations and unfair or unreasonable treatment alone do not rise to the targeted and malicious

conduct required for such a claim); <u>Fellheimer</u>, 869 F. Supp. at 247 (granting summary judgment "even where various procedural errors are alleged" against the university's process for handling rape accusation because such errors alone cannot form the basis for intentional infliction of emotional distress); <u>Emerson</u>, 2015 WL 9455576, at *10 (granting judgment on the pleadings to defendants because dissatisfaction with University policies and procedures, perceived insensitivity and dislike for results of investigations did not constitute a valid claim).  These alleged procedural errors, all addressed in the discussion above about Count I, the breach of contract claim, do not support the intentional infliction of emotional distress claim.

For these reasons, the Court grants summary judgment to Defendants on Count XIII.

### K.    The Court Grants BC Summary Judgment on Count XIV:    Unjust Enrichment

Unjust enrichment is "the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  <u>Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.</u>, 534 F. Supp. 340, 347 (D. Mass. 1982) (quoting 66 Am. Jur. 2d <u>Restitution and Implied Contracts</u> § 3).  Where plaintiffs have adequate remedies at law, such as contract law, a claim for unjust enrichment cannot be considered.  <u>Id.</u> (citing <u>Austin v. N. Am. Forest Prods.</u>, 656 F.2d 1076, 1087-88 (5th Cir. 1981)).  A plaintiff is not entitled to recovery on a theory of unjust enrichment when a valid contract defines the obligations of the parties, which as explained in regard to Count I, the parties did have here.  <u>Bos. Med. Ctr. Corp. v. Sec'y of Exec. Office of Health and Human Servs.</u>, 463 Mass. 447, 467 (2012) (citing <u>York v. Zurich Scudder Invs., Inc.</u>, 66 Mass. App. Ct. 610, 620 (2006)).

Accordingly, the Court grants BC summary judgment as to Count XIV.

**VII.    Conclusion**

For the foregoing reasons, Doe's motion to amend, D. 51, is **DENIED**. The Court **DENIES** Doe's partial motion for summary judgment, D. 64.   The Court **ALLOWS** BC's motion for summary judgment, D. 67.   The Court **ALLOWS** Individual Defendant's motion for summary judgment, D. 69.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge