# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-10790-DJC |
| | ) | |
| TRUSTEES OF BOSTON COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM RELATING TO SCOPE-OF-TRIAL ISSUES PURSUANT TO OCTOBER 12, 2018 ORDER

DLA PIPER LLP (US)

Matthew J. Iverson (BBO # 653880)
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000
(617) 406-6100 (fax)
matthew.iverson@dlapiper.com

Charles B. Wayne (*pro hac vice*)
Brian J. Young (*pro hac vice*)
500 8th Street, N.W.
Washington, D.C.  20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.  John Is Entitled to Introduce Sufficient Evidence to Prove the Remanded Breach-of-Contract Claims ............................................................................................................. 2

    A. Improper Handling of the Alternative Culprit Defense ................................................. 2

    B. Interference in the Board's Deliberations .................................................................... 5

II. John Is Entitled to Introduce Sufficient Evidence to Prove the Remanded Basic Fairness Claim ............................................................................................................... 6

    A. The Legal Framework of Basic Fairness .................................................................... 6

    B. The Need for Expert Testimony to Assist the Jury ....................................................... 7

III. John Is Entitled to Prove to the Jury that He Is Deserving  of a Damages Award. ................. 8

    A. Proof of Innocence ................................................................................................. 8

    B. Categories of Damages ........................................................................................... 9

        1.   Emotional Distress ........................................................................................... 9

        2.   Other Elements of Damages ............................................................................ 10

## INTRODUCTION

At the September 20, 2018 status conference, the Court stated that "the First Circuit was clear" that the following breach-of-contract claims were remanded to the Court: (1) the defendant University's improper handling of plaintiff John Doe's "alternative culprit defense"; and (2) the interference by the Dean of Students and the Senior Associate Dean of Students in the deliberations of the Administrative Hearing Board ("Board").  9/20/18 Tr. 21 (Doc. 109); *see Doe v. Trustees of Boston College*, 892 F.3d 67, 86-87 (1st Cir. 2018).  The Court also stated that the remanded "basic fairness" claim has the same factual basis as the "express contractual promises" allegedly breached by the University and remanded by the First Circuit.  9/20/18 Tr. 22; *see* 892 F.3d at 87-88.

All agree that the First Circuit narrowed the legal and factual scope of this case on remand to some extent.  But the claims before the Court on remand, and which a jury will be tasked with deciding, do not fundamentally change what this case is about: whether the University breached its obligations to John, and whether those breaches caused John to be wrongfully convicted and to suffer emotional, reputational, and financial harm that will endure long beyond his time at the University.

The University's characterization of the factual scope of the remanded claims, however, is predictably and improperly narrow.  In the August 2018 joint statement filed by the parties, the University asserted that "all that remains to be tried on liability" is limited to "two communications with the Hearing Board chair – one to the effect that the Board should put J.K. 'at ease' and [one] to the effect that a 'no finding' was permitted but disfavored . . . ."  Doc. 102 at 5.  The University also asserted that "[t]hese are narrow, strictly factual issues, the resolution of which will turn entirely on the testimony of the five [Board] members."  *Id*. at 7.  Similarly, at the status conference, defense counsel argued:

> The only thing that the First Circuit has deemed to be trial-
> worthy is this narrow question of whether these two little pieces of
> alleged extracurricular, extramural ex parte communication with
> the board chair somehow might have influenced the board's
> deliberations, in which case the procedure might have been unfair.
> That is all that any further trial should be about. 9/20/18 Tr. 16.

As discussed below, the University's view of the remanded claims is contrary to the First

Circuit's decision, the law, and common sense.

## ARGUMENT

### I. John Is Entitled to Introduce Sufficient Evidence to Prove the Remanded Breach-of-Contract Claims.

Under the view urged by the University, the only relevant evidence concerns the "at

ease" statement and the "no finding" statement. Acceptance of this view would require plaintiff

to try this case in a vacuum and in a way that would be incomprehensible to the jury. No fair

reading of the First Circuit's decision supports such a result.

### A. Improper Handling of the Alternative Culprit Defense

One of the two remanded breach-of-contract claims is that the University breached John's

"reasonable expectation that B.C. would provide him 'a fair procedure'" by improperly

"handl[ing] Doe's alternative culprit defense," which was "prejudicial" to John because it

prevented the Board from "fairly consider[ing]" his case. 892 F.3d at 87. This claim, if proved,

would be a violation of the Student Guide's guarantee that the University's "disciplinary process

'exists to protect the rights of the Boston College community and assure fundamental fairness to

complainants and to students accused of any breach of the University Code of Student

Conduct."[1] *Id.*

---

[1] This comprehensive promise of fundamental fairness is one of five made in the Sexual Assault
Policies and Procedures, including the right to "due process" and the "right to a fair procedure
which is appropriate to the circumstances." Doc. 66 at 4.

The University's position is that proof at trial on this issue is limited to (1) Senior Associate Dean of Students Carole Hughes' directive to a subordinate to speak to the Board chair, Catherine-Mary Rivera, "about how the [B]oard might also put [the alternative culprit, J.K.] at ease"; and (2) whether this instruction affected the Board's deliberations.  That position, however, ignores the reasoning underlying the First Circuit's ruling, which recognizes that (a) John's "key defense [was] that someone other than [he] committed the alleged sexual assault"; and (b) Hughes' refusal to even consider that J.K. might have committed the assault effectively deprived John of that defense. 892 F.3d at 87.  Hughes' mishandling of the alternative culprit defense – and her corresponding prejudgment of John's guilt – began long before the "at ease" directive, and evidence of that conduct is critical to proving that University breached its contractual duty to guarantee fundamental fairness.

For example:

- The "Sexual Assault Notification Form" provided to Hughes and others on October 21, 2012, the day after the incident, was false and misleading, for it stated that A.B., the victim, saw the alleged perpetrator and watched him assault her, neither of which was true.  Doc. 65 at 15, ¶ 37.

- Immediately prior to meeting with John and his father, Hughes also erroneously believed that, in addition to A.B., "[a]t least one other student, and possibly two, were also able to identify [John]." *Id.* at 16, ¶ 40.

- When Hughes met with John and his father, Hughes refused to let John explain what happened. *Id.* at 17, ¶ 42.  He was able to get out "that he did not do this" and that "this is a case of mistaken identity." *Id.*  In two later meetings with John and his mother, Hughes continued to refuse to hear John's explanation and never asked John to tell her his side of the story. *Id.* at 18, ¶ 47.

- The day before the hearing was to begin, John's attorney-advisor called the University General Counsel, Joseph Herlihy, and told him that another student was the assailant.  *Id.* at 19 ¶ 49.

- After one day of proceedings on November 8, the hearing was adjourned so that the Board could hear J.K.'s testimony at a later date. *Id.* at 21, ¶ 56. Hughes consulted with Herlihy and Dean of Students Paul Chebator on how to treat J.K. The day after the hearing, Hughes met with J.K. and his father, and granted him immunity, being "very clear with [J.K.] that he was coming [to the resumed hearing on November 16] as a witness and was not being charged with anything." *Id.* at 21, ¶ 58.

- Hughes and Herlihy "provided two names of local [criminal] attorneys" to J.K. and his father, and one represented J.K. at the hearing. *Id.* at 21-22, ¶ 59.

As the foregoing shows, Hughes' – and others' – mishandling of John's "key defense" was not a simple matter of telling her subordinate to speak to the Board chair. There is evidence of an extensive pattern of conduct over a period of weeks that must be heard by the jury if John is to have a fair opportunity to prove his claim.

The critical point is that an alternative culprit defense is, if proven, exculpatory and a complete defense. This Court, in *Doe v. Amherst College*, 238 F. Supp. 3d 195 (D. Mass. 2017), recognized this very point. In that case, like this one, the school allegedly refused to consider "significant, existing exculpatory information, and the process employed by the College provided no reasonable opportunity for [the accused student] to remedy that deficit . . . ." *Id.* at 218. Like the *Amherst* plaintiff, John had a reasonable expectation that the school would "conduct its investigation and fact-finding process in such a manner that potentially exculpatory information would be obtained and presented to the Hearing Board in the same manner as inculpatory information . . . ." *Id.* The University's counsel, Mr. Lapp, conceded this very point at the First Circuit oral argument: "[I]f a panel refused to hear exculpatory evidence, that would certainly implicate the fairness analysis." Tr. 30 (Ex. A).

Moreover, in addition to proving all the relevant facts concerning the University's conduct with respect to J.K., there is an additional dimension to the alternative culprit defense:

proving that John did not commit the digital anal rape claimed by A.B. or the "Sexual Assault: Indecent Assault and Battery" found by the Board.  Doc. 65 at 24, ¶ 69.  A defendant who wishes to prove that someone else committed the charged offense may always attempt to prove that he or she did not commit that offense.

In this case, John has every right to take the stand and testify that he did not assault A.B. in any way.  He also has the right to support his denial with all the exculpatory evidence at his disposal, including the unconditional dismissal of his criminal charges and the enhanced, forensically-analyzed video showing that "[a]t the instant of the assault, John is 4-6 feet away from A.B." and that "there are at least 2-3" people between the two of them.  Doc. 65 at 8, ¶ 23. Were John not permitted to prove his innocence with this and other evidence, his argument and proof that the University unfairly deprived him of the alternative culprit defense not only lacks the context required for the jury to understand the claim, but becomes irrelevant as well.

The University, of course, seeks to deny John the opportunity to prove his innocence and for an obvious reason:  the University wants to portray the two breaches of contract as, at most, procedural glitches that had no effect on the Board's decision, which the University will argue was entirely correct.  In other words, the University will seek to prove that it acted in good faith, that John was properly charged, and that the Board properly found him guilty.  If John is not permitted to meet this "harmless error" evidence with proof of his innocence, particularly in light of the less rigorous preponderance-of-the-evidence standard applicable at the campus hearing, the prejudice to him will be overwhelming and will defeat the purpose of the trial on the claims remanded by the First Circuit.

**B.  Interference in the Board's Deliberations**

The second remanded breach-of-contract claim is that the University's agents interfered with the Board's decision-making process in violation of the "require[ment] to ensure the

independence and integrity of the Board's deliberations without outside interference." 892 F.3d at 85. This claim, if proved, would be a violation of three provisions in the Student Guide: (1) the comprehensive guarantee of fundamental fairness; (2) the requirement that the Board deliberate "in private"; and (3) the requirement that "its final decision be impartial." *Id.* at 85-86, 87.

The University breached these contractual provisions when "Hughes transmitted Chebator's discouragement of a 'no finding' result to Rivera during the weekend between the Board's two deliberation sessions." *Id.* at 85. The University, however, would have this Court improperly limit John to proof that the statement was made and the Board members' respective views as to whether their deliberations were affected. Again, and for the reasons stated above, the University's cramped view of the claim would unfairly limit John's ability to present his case to the jury.

## II. John Is Entitled to Introduce Sufficient Evidence to Prove the Remanded Basic Fairness Claim.

As noted above, the Court stated at the status conference that the remanded basic fairness claim has the same factual basis as the "express contractual promises" allegedly breached by the University and remanded by the First Circuit. 9/20/18 Tr. 22; *see* 892 F.3d at 87-88. Despite the shared factual predicate, there are important differences between the breach-of-contract claims and the basic fairness claim. First, the legal framework, including the source of duty, is different for each claim. Second, the basic fairness claim requires expert testimony in order for the jury to understand both (1) the standard of basic fairness in the context of higher education discipline; and (2) whether the University satisfied that standard.

### A. The Legal Framework of Basic Fairness

The First Circuit held that "the implied covenant of good faith and fair dealing imposed on every contract by Massachusetts law, applied in the context of school disciplinary

proceedings, creates an independent duty to provide basic fairness." 892 F.3d at 87. When a school "expressly promises no less than basic fairness." that "express contractual promise" becomes the standard against which basic fairness is measured, not the implied duty of good faith and fair dealing. *Id.* at 87-88. Here, that "express contractual promise" is, as the First Circuit held, the University's comprehensive guarantee of "fundamental fairness" to accused students. *Id.* at 87.

But even with that definitional assistance, the meaning of basic fairness remains "an uncertain and elastic concept" that "must be given some meaning . . . ." *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 601 (D. Mass. 2016). "There is, however, no one-size-fits-all answer to the question of what constitutes the 'basic fairness' that a student is due." *Id.* "[T]he answer may vary depending on the competing interests at stake, includ[ing] such factors as the magnitude of the alleged violation, the likely sanctions and other consequences of a finding of guilt, and the university's experience and aptitude in resolving disputes of that nature." *Id.* (citing *Goss v. Lopez*, 419 U.S. 565, 579 (1975)).

Here, the charge in the campus proceeding was the most serious, one of sexual assault, and the consequences for John were correspondingly serious: a life-altering suspension and a lifelong label of "sexual predator." Whether the University's handling of John's case satisfied the basic fairness standard is at the heart of this case and, as discussed below, the jury will need expert testimony to assist it in understanding the evidence.

### B.  The Need for Expert Testimony to Assist the Jury

"For expert testimony to be admissible under Fed. R. Evid. 702, it must be relevant to the task at hand and helpful to the jury in its deliberations." *United States v. Peña-Santo*, 809 F.3d 686, 694 (1st Cir. 2015) (citations and internal quotation marks omitted). "[C]ustoms and practices of an industry are proper subjects for expert testimony," *Pelletier v. Main St. Textiles,*

*LP*, 470 F.3d 48, 55 (1st Cir. 2006), and, in fact, "[e]xpert testimony on industry standards is common fare in civil litigation." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 79 (1st Cir. 2006) (collecting cases).

The "industry" in this case is higher education discipline, and the standard at issue is basic fairness in campus proceedings, a concept that requires expert testimony if the jury is to understand what basic fairness means and ultimately determine whether the University's conduct satisfied that standard as to John. Plaintiff's expert witness, Brett Sokolow,[2] will testify that (1) the University failed to follow "the custom and practice of the field" in many ways, including (a) the improper handling of the alternative culprit defense (Ex. B at 24, 31-33, 37-38, 45, 48-49, 56, 59) and (b) Hughes and Chebator's interference in the Board's deliberations (*id.* at 21-22, 59); and (2) the University's conduct failed to satisfy the "common law duty of basic fairness" for the same reasons (*id.* at 61-62).

Mr. Sokolow's testimony will be helpful to the jury as contemplated by Rule 702, and he should be permitted to testify.

## III. John Is Entitled to Prove to the Jury that He Is Deserving of a Damages Award.

### A. Proof of Innocence

John's need to prove that he did not assault A.B. relates not only to liability, as discussed above, but also relates to damages. Even if John proves entitlement to damages in each of the categories detailed below, the reality is that the jury will not seriously consider *any* damage award unless John is permitted to provide that he is innocent of any wrongdoing. Again, the University is sure to advance its "harmless error" position, discussed above, to the subject of

---

[2] Mr. Sokolow, who has worked in the higher education discipline field since 1997, has written codes of conduct for more than 100 colleges and universities; has been involved in more than 1,000 school and campus sexual misconduct hearings as an investigator, trainer, consultant, expert, and attorney; is the Executive Director of ATIXA, the Association of Title IX Administrators; and has authored 12 books and more than 100 articles in the field. Ex. B at 1-2.

damages as well.  Even if the jury finds that the University breached the contract or violated the basic fairness standard, they will award no damages unless they believe that John is innocent. Fairness demands that John be given the opportunity to prove his innocence, to place the University's breaches and violations in context, and to fully develop the factual basis of the harm that he has suffered.

## B. Categories of Damages

### 1. Emotional Distress

It has long been the rule in Massachusetts that damages for "psychological injury" may be available for a breach of contract, depending on "the subject matter and background of the contract." *Sullivan v. O'Connor*, 296 N.E.2d 183, 189 (Mass. 1973).  "[W]here a breach 'is of a nature particularly likely to produce emotional distress,'" damages for "mental suffering" may be recovered.  *Bargantine v. Mechanics Coop. Bank*, 2013 WL 6211845, at *6 (D. Mass. 2013) (quoting *St. Charles v. Kender*, 646 N.E.2d 411, 413 (Mass. App. Ct. 1995)).  A breach of contract that foreseeably leads to the improper issuance of a criminal complaint and resulting "depression and post-traumatic stress disorder" qualifies.  *Whitman v. Town of East Longmeadow*, 2017 WL 1240031, at *2 (Mass. App. Ct. 2017).  Moreover, such emotional distress damages are available "primarily in cases involving some direct causal link to physical harm."  *Jennings v. Nathanson*, 404 F. Supp. 2d 380, 396 (D. Mass. 2005) (citation and internal quotations marks omitted).

The University's breaches of contract and basic fairness violations foreseeably caused John to suffer anxiety and depression with "features of post-traumatic stress disorder" among other conditions and attendant physical symptoms.[3]

---

[3] Plaintiff's expert psychiatrist, Michael W. Bain, M.D. will so testify.  John's physical symptoms include loss of appetite, significant weight loss, insomnia, fatigue, sleep disturbance, and episodes of panic.

**2.   Other Elements of Damages**

The measure of damages for a university's breaches of contract and basic fairness violations in a sexual assault case such as this one includes (1) "expenses incurred during the suspension"[4]; (2) "lost earnings as a result of the delay in graduation"[5]; (3) diminished "earning potential"[6]; (4) the "reputational cost" of the suspension[7]; and (5) the "emotional cost" of the suspension.[8]   In general, the damages are designed to put the injured student "in as good a position as he would have been if had the contract been performed."[9]

John has suffered each of these elements of damages and will prove the amounts of each at trial.   In addition to the emotional injury discussed above, he incurred (1) out-of-pocket expenses[10]; (2) lost earnings as a result of the delay in graduation[11]; (3) diminished earning potential[12]; and (4) reputational injury.

---

[4] *Benning v. Corp. of Marlboro Coll.*, 2014 WL 3844217, at *3 (D. Vt. 2014).

[5] *Id.*

[6] *Id.*; *Brandeis*, 177 F. Supp. 3d at 607 (university's unlawful conduct will "permanently scar [student's] career").

[7] *Benning*, 2014 WL 3844217, at *3; *Brandeis*, 177 F. Supp. 3d at 602, 607 ("reputational injury" caused by "stigmatization as a sex offender"; convicted student faces "substantial public condemnation and disgrace").

[8] *Benning*, 2014 WL 3844217, at *3; *Brandeis*, 177 F. Supp. 3d at 602, 607 (convicted student faces "substantial social and personal repercussions" and university's unlawful conduct will "permanently scar [student's] life").

[9] *Benning*, 2014 WL 3844217, at *3 (quoting Restatement (Second) of Contracts § 344 (1979)). Massachusetts courts follow this Restatement provision.   *E.g.*, *Situation Mgt. Sys., Inc. v. Malouf, Inc.*, 724 N.E.2d 699, 704 (Mass. 2000).

[10] Ex. A to Doc. 66.

[11] These lost earnings due to delay are quantified in the supplemental expert report of Steven D. Shedlin (Ex. C) and reduced to present value in the supplemental expert report of Joel N. Morse (Ex. D (without exhibits)).

[12] Shedlin and Morse supplemental reports.

Respectfully submitted,

John Doe

By his attorneys,

DLA PIPER LLP (US)

/s/ Matthew J. Iverson
Matthew J. Iverson (BBO # 653880)
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000
(617) 406-6100 (fax)
matthew.iverson@dlapiper.com


/s/ Charles B. Wayne
Charles B. Wayne (*pro hac vice*)
Brian J. Young (*pro hac vice*)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com

- 11 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2019, a copy of the foregoing was served by electronic mail using the CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/ Charles B. Wayne
Charles B. Wayne