UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,

          Plaintiff

    v.

TRUSTEES OF BOSTON COLLEGE,

          Defendant

Civil Action No. 15-10790-DJC

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT AS A
MATTER OF LAW OR FOR A NEW TRIAL ON LIABILITY**

**RELEVANT PROCEEDINGS**

**A.      The Court Makes a Series of Rulings to Establish the Scope of Trial.**

After the First Circuit largely upheld this Court's summary judgment decision, but

remanded for trial the question whether there was "interference" with the hearing board's

consideration of Doe's case, the Court held a status conference on September 20, 2018. The

Court informed the parties that, consistent with the First Circuit's decision, the scope of trial

would be limited to the question of "interference" as it related to two "ex parte communications"

– the "at ease" and "no finding" communications. The trial would not include issues the First

Circuit had agreed were not triable, including Doe's numerous, other arguments about the

"fairness" of the conduct process that resulted in his suspension. Dkt. 109 at 21-22.

On March 7, 2019, after briefing, the Court held a lengthy hearing on the scope of the

evidence that would be permitted at trial. Doe's counsel argued at length that he should be able

to submit evidence and argue to the jury that Doe was actually innocent, that he did not commit

the assault at issue, claiming this was necessary to rebut BC's argument that the communications

at issue were "harmless error." Dkt. 119 at 4, 26, 27. BC's counsel confirmed that BC would

make no such argument; it was not for the jury to decide whether Doe in fact committed the

assault, but only whether the communications at issue interfered with hearing board's decision. *Id.* at 27, 37. At the conclusion of the hearing, the Court expressed its inclinations, *id.* at 56-59, which the Court formally adopted in its order of March 20, 2019. Dkt. 124. The Court reiterated the scope of trial ruling it made in September 2018, reaffirming that all of the arguments that were "essentially rejected by the 1st Circuit," including "any argument or evidence about whether or not the [hearing board's] decision was correct" and "any evidence that was not before the [board]," would not be properly "before this jury." Dkt. 119 at 56-57. The Court noted, for example, that it would not allow testimony from Doe's supposed expert on video enhancement, because he had not testified before the hearing board. *Id.* at 57-58. The Court emphasized that the evidence and argument at trial would be limited to "what was before the [hearing board] at the time they were considering this matter, their deliberations, and what communications were made to them and what, if any, effect those communications had on their decision." *Id.* at 59.

In addition to ruling on the scope of evidence that would be permitted, the Court also denied Doe's request to submit his claim for emotional distress damages to the jury. Dkt. 124.

On April 4, 2019, the Court held the first of two final pretrial conferences. Doe's counsel again argued that he should be allowed to introduce evidence that was not before the hearing board, but the Court declined to revisit its ruling. Dkt. 152 at 10-14. The Court also heard argument on BC's motion to exclude all evidence of emotional distress and to exclude Doe's experts. *Id.* at 28-53.

On April 8, 2019, the Court granted BC's motion *in limine* to exclude all evidence relating to Doe's emotional distress. The Court ruled that because emotional distress damages were not recoverable, it would be unduly prejudicial for such evidence to be admitted except if truly incidental to a narrative of the sequence of events. Dkt. 151.

After the trial was postponed, the Court held a second final pretrial conference on September 12, 2019. The Court read to counsel a draft, preliminary jury instruction concerning the scope of trial, which emphasized that the claims for the jury to decide concerned only whether the "at ease" communication or "no-findings" communication breached Doe's contractual rights to fair process. Dkt. 197 at 35.

At this second pretrial conference, the Court also heard argument on BC's motion to exclude two witnesses Doe intended to call, neither of whom was at the conduct hearing and neither of whom had any knowledge of the two communications at issue. Dkt. 197 at 13-18. BC's counsel noted his concern that Doe refused to accept this Court's orders on the scope of trial and that Doe's plan to call these two witnesses was "a thinly disguised attempt to do what the plaintiff has been attempting to do from the outset, and what I fear they are going to do throughout this trial, which is invite the jury to … undertake a de novo review of the hearing at BC and undertake their own judgment as to whether or not Doe should have been found responsible. That is not what this trial is about." *Id.* at 15.

On September 13, 2019, the Court allowed BC's motion *in limine*. In doing so, the Court cited "the now well-established scope of this trial" and noted that neither witness participated "in the Hearing Board proceedings nor was [either of them] privy to the Board's deliberations or the communications between the board and BC administration." Dkt. 174.

On the first day of trial, before opening statements, the Court ruled that Doe would not be permitted to introduce evidence or argument concerning the fact that his private investigator, Mr. Mullen, was not permitted to testify before the hearing board in connection with Doe's "alternative culprit" defense. Doe sought to offer this evidence at trial both to prove his actual innocence and to demonstrate the supposed unfairness of the conduct process, even though the

First Circuit, as this Court had done at summary judgment, rejected Doe's claim about the

investigator's exclusion from the hearing. Dkt. 187 at 15-17. The Court admonished Doe's

counsel: "I think I've been pretty clear about what the scope of this trial is[,] led by what I think

is the direction of the 1st Circuit in their remand to me. I don't think the issue as to Mr. Mullen is

properly before this Court for all of the reasons I have previously stated." *Id.* at 16-17.

  **B.**  **Plaintiff Repeatedly Violates the Court's Rulings on the Scope of Trial.**

  Doe's counsel refused to abide by the Court's rulings about the scope of trial. Counsel

was determined to try the case, and proceeded to do so, as if this Court's summary judgment

decision, the First Circuit's decision, and all of this Court's pretrial rulings simply had not

occurred. Throughout the trial, as summarized below, Doe's counsel continuously offered

inadmissible evidence and improper argument – inviting the jury to undertake a de novo

assessment of Doe's responsibility for the assault and inviting the jury to deem BC's process

unfair on the basis of issues that this Court and the First Circuit already had deemed ***not*** to be

unfair as a matter of law. BC's counsel was forced to object repeatedly throughout trial. Most of

the objections were sustained, but the damage was done. The jury heard all of the improper

evidence and argument. Moreover, the jury could only infer from BC's repeated objections that

BC sought to keep important information from the jury and was afraid of its implications, when

in fact just the opposite was true:  BC had ***prevailed*** on these issues prior to trial.

  **1.**  **Opening Statement**

  In his opening statement, Doe's counsel violated the Court's scope-of-trial rulings in

numerous respects, including by arguing Doe's innocence; referencing evidence that never was

before the hearing board; advancing arguments that were rejected at summary judgment and by

the First Circuit; and referencing blatantly inadmissible hearsay evidence. For example, Doe's

counsel told the jury:

- forensic test results came back "negative for blood and DNA – so – and as John predicted, that would show he didn't do it." Dkt. 187 at 44.[1]

- Doe's criminal defense counsel, Hugh Curran, showed a "forensically enhanced" video to the District Attorney's office, which convinced the DA to dismiss the criminal charges against Doe "with no conditions whatsoever." *Id.* at 44-45.

- "So perhaps you're saying to yourself at this point, well, Mr. Wayne, it sounds like the criminal justice system worked. He was innocent and thank God there was evidence that proved that he was innocent and the prosecutor did the right thing, so why are we here?" *Id.* at 45.

- Doe's mother would testify that Dean Hughes treated Doe like a "contemptible criminal" and would not let Doe "tell his side of the story to her, even though he repeatedly tried to do so … ." *Id.* at 48.

- Doe's father told Dean Hughes that she should stay the conduct proceedings until the criminal investigation had concluded because the forensic test results and supposedly enhanced video would demonstrate Doe's innocence. *Id.*

- Dean Hughes refused to delay the school's proceeding because "she was determined to have [the hearing] in two weeks, which is totally contrary to [BC's] own rules." *Id.*

The Court expressed significant concern about the opening statement by Doe's counsel,

noting that it went beyond merely establishing context for the conduct hearing and questioned

the fairness of BC's actions that counsel knew to have been already addressed by the First

Circuit.[2] *Id.* The Court noted that as a result, it would issue an instruction reminding the jury as

---

[1] In addition to involving improper argument about Doe's innocence and evidence that never was before the hearing board, the assertion about DNA evidence was simply false. As the Court noted in its summary judgment opinion, the swab test results were negative for the presence of blood, but there is no evidence of any DNA testing. Dkt. 89 at 5.

[2] Although BC did not object during the opening itself, there can be no doubt that BC repeatedly stated and amply preserved its objections to counsel's conduct, including with respect to issues that were the subject of counsel's opening, starting before and continuing throughout trial. Even if BC had not done so, the misconduct is so egregious as to constitute plain error, prejudicing BC's substantial rights. *See Christopher v. Fla.*, 449 F.3d 1360, 1366-67 (11th Cir. 2006); *see also Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72, 78 (1st Cir. 2010).

to the issues that were and were not for it to decide. *Id.* at 71. The Court delivered that instruction before Doe called his first witness. *Id.* at 73-74.

### 2.      Improper Questioning of Attorney Bletzer

Doe's first witness was Conrad Bletzer, the attorney who represented Doe at the conduct hearing. Despite the Court's repeated rulings and admonitions about the scope of trial, Doe's counsel improperly questioned Bletzer about:  the alleged fact that sexual assault investigations at BC usually are done by the BC Police Department, but that was not done in this case, Dkt. 187 at 78; whether Doe was allowed to tell his side of the story, *id.*; Bletzer's call to BC's General Counsel Joe Herlihy to discuss Doe's defense, objections to which had to be sustained four times, *id.* at 80-83; and the fact that Doe's investigator was not allowed to testify at the hearing, *id.* at 88-89. The Court sustained all of BC's objections to these questions and warned Doe's counsel at sidebar: "Counsel, I've given you some leeway here on context, but … this is an example of what we've been discussing for some time." *Id.* at 82-83.

After the first day of testimony, the Court heard argument on whether Doe would be permitted to call Mr. Bletzer's partner, Hugh Curran, who represented Doe in the criminal case but was not present for the conduct hearing and had no knowledge of the "interference" issues. Dkt. 187 at 111-14. Doe's counsel argued that evidence concerning dismissal of the criminal case should be admitted because he referenced it in his opening. *Id.* at 111-12. The Court questioned how this evidence could possibly be relevant, *id.* at 112, and noted that rather than being a reason to admit it, the fact that Doe's counsel referenced it in his opening, "contrary to what I had said the scope was, was concerning to me … ." *Id.* at 114.

The next morning, before calling in the jury for the second day of trial, the Court made a statement from the bench about the scope of trial. The Court explained that the First Circuit had

resolved in BC's favor Doe's arguments that BC was required to conduct a threshold investigation; that Hughes unfairly failed to listen to Doe's account; and that the timing of the hearing was unfair. Dkt. 188 at 3-4. The Court cautioned counsel: "I get my instructions from the 1st Circuit [and] you get your instructions from me in this court. … [S]ince the time of the remand, the scope of trial, which was very much disputed between the parties, has been well-established for some time." *Id.* at 5. The Court then summarized its prior rulings on the scope of trial and ruled that Mr. Curran's testimony would be excluded. *Id.* at 6-7.

Doe's counsel did not care what the Court had to say. Upon resuming his examination of Mr. Bletzer, Doe's counsel promptly resumed his campaign to obtain testimony beyond the scope of trial, including Bletzer's opinion that the lawyer for J.K. (the supposed "alternative culprit") violated BC's rules during the hearing, but BC permitted that to happen, *id.* at 25-26, and his opinion about BC's stated reasons for not allowing Doe's private investigator to testify, *id.* at 27-28. BC's counsel was forced to make repeated objections, which were sustained, *id.*, but the damage – the unfair prejudice to BC – was done, just as Doe's counsel intended.

### 3.     Improper Questioning of the Board Chair, Ms. Rivera

The Court by this point had ruled repeatedly that evidence and argument challenging BC's decision not to let Doe's investigator testify at the hearing was beyond the scope of trial. Yet, Doe's counsel repeatedly sought to elicit this evidence from the hearing board chair, Catherine-Mary Rivera – openly defying the Court and refusing to move on from this issue. *Id.* at 57-58. The Court had to sustain four objections to this line of questioning. *Id.*

Doe's counsel also sought improperly to read from the victim's medical records, which were not before the hearing board, stating in open court that the documents would "impeach" Ms. Rivera because the information in them was "contrary to the board's finding." *Id.* at 76.

Counsel went on to argue, in front of the jury, that the document was "available and not made available to the board" and was "uncontested." *Id.* at 76-77. BC's counsel objected, as there was no evidence that these records were "available" to the Board, nor could Doe expect to prove that they were, and the issue was plainly beyond the scope of trial. *Id.* The Court sustained BC's objection to this improper line of questioning, but Doe's counsel was undeterred: he immediately asked Ms. Rivera, alluding to the medical records, whether they were something she "would have wanted to see at the hearing?" *Id.* at 77. BC's objection again was sustained, *id.*, but once again, Doe's counsel had made his point – improper though it was – to the jury.

### 4.      Improper Questioning of Dean Hughes

The misconduct by Doe's counsel continued during his examination of Dean Hughes, through whom he sought to introduce evidence about BC's sexual assault notification form, which was not before the board and had nothing to do with the "at ease" or "no finding" communications. The Court, during a lengthy sidebar, sustained BC's objection to admitting or reading from the form. *Id.* at 116-23. Doe's counsel immediately ignored the ruling, telling the jury, in the guise of a "question" to Ms. Hughes, "And that form indicated to you that [the victim] saw her attacker before the attack." *Id.* at 123. The Court again sustained BC's objection, but Doe's counsel had made his point to the jury – effectively testifying to, while also mischaracterizing,[3] this inadmissible document.

Doe's counsel then proceeded to question Dean Hughes improperly about several other issues beyond the scope of trial, including whether she was asked to lift Doe's summary suspension, whether she asked Doe to tell his side of the story in her pre-hearing meetings with

---

[3] The form does not in fact indicate that the victim saw her attacker before the attack. *See* Ex. D1.

him, and whether she recalled a photograph Doe allegedly showed her at one such meeting – all of which drew objections from BC's counsel, which the Court sustained. *Id.* at 127-28.

Doe's counsel then asked Dean Hughes questions about her refusal to delay the hearing to wait for the forensic results. *Id.* at 129-30. The Court sustained all of BC's objections to this line of questioning, but Doe's counsel forged ahead undaunted, asking Dean Hughes whether she was aware of the results of the forensic testing and video surveillance – evidence the Court repeatedly had ruled out of bounds. *Id.* at 129. BC's objections again were sustained. *Id.*

Incredibly, Doe's counsel returned to his argument that the timing of the hearing was unfair, declaring in the guise of a "question" to Dean Hughes, "John's father told you that BC's own procedures allowed you to delay the disciplinary process if there was a criminal proceeding pending and if the student was summarily suspended." *Id.* at 130. BC's counsel objected and asked to be heard. *Id.* The Court instead urged Doe's counsel to move on from this line of questioning, but of course he did not: instead he asked Dean Hughes whether she gave the victim the option to postpone the hearing. *Id.* BC's objection to this improper questioning about the timing of the hearing again was sustained.  *Id.*

Doe's counsel went on to ask Dean Hughes about the requirement that hearing board members must disclose conflicts of interest affecting their impartiality – notwithstanding that the First Circuit had squarely addressed and rejected Doe's claim about supposed bias on the part of the board. *Id.* at 132-33; *Doe v. Trs. of Bos. Coll.*, 892 F.3d at 83 n.7, 84, 92. BC's objection was sustained. *Id.*

Doe's counsel went on to reveal the content of documents not in evidence, *id.* at 155-56, and to ask questions about matters that occurred after the board's deliberations, which were

plainly outside the scope of trial. *Id.* at 161-62, 165. BC's objections were sustained, *id.*, but once again Doe's counsel had brought before the jury all the points he aimed to make.

     **5.**     **Improper Questioning of Mr. Herlihy and a Warning from the Court**

The misconduct by Doe's counsel continued unabated in his examination of BC's General Counsel, Joe Herlihy. Doe's counsel attacked the fairness of not recording the hearing, Dkt. 189 at 41; the timing of the hearing, *id.* at 43; Dean Hughes's request to speak with Doe without his lawyer present,  *id.* at 45, and failing to delay the decision for the forensic evidence, *id.* at 48. BC's objections were sustained, *id*. at 41, 44, 46, 48, but the jury heard all the points that Doe's counsel sought to make.

After Mr. Herlihy testified and the jury left the courtroom, the Court noted that Doe's counsel, though his questioning, was arguing points to the jury that had been considered and rejected by the First Circuit – that he had crossed the line from "providing context" for the "at ease" and "no finding" communications to presenting rejected claims as triable issues. *Id.* at 70-71. The Court noted that given the number of improper questions, it would need to consider an instruction that would clarify this distinction for the jury. *Id.* at 71. The Court warned, "Mr. Wayne, you've certainly made your exceptions to certain of my rulings known, which is appropriate to do, but the attempt, in my view, to avoid the rulings of this Court or to avoid the upshot of the 1st Circuit decision, which I've heard counsel on numerous occasions about, is not something I will permit." *Id.* at 71.

BC's counsel requested that the Court give a curative instruction at this point in the trial. *Id.* at 73-74. He also requested that the Court limit further evidence from Doe and his parents as to what happened at the hearing – as distinct from the "interference" communications, about which these witnesses had no knowledge; BC's counsel noted that further testimony from Doe

and his parents about the hearing would be cumulative and prejudicial, as it would continue to invite the jury to second-guess the Board's decision and to speculate about issues that were not allowed into evidence. *Id.* at 73. The Court declined to rule on BC's request. *Id.* at 75.

### 6. Improper Questioning of Doe, a Curative Instruction, and Continued Disregard of the Court's Rulings

Despite having been admonished multiple times that Doe's actual innocence was not for the jury to consider, the first question Doe's counsel asked Doe was whether he committed the assault. *Id.* at 80. Although BC's counsel immediately objected, Doe was primed to answer without waiting for a ruling on the objection that Doe's counsel knew he would draw. On cue, Doe responded, "Absolutely not." *Id.*

At BC's request, the Court struck the question and answer and gave the jury a curative instruction about the issues for them to decide – whether the "at ease" or "no finding" communications interfered with the Board's deliberations. *Id.* at 80-81. At sidebar, counsel for BC requested that the Court give more detailed instructions. *Id.* at 81-82. The Court agreed and instructed the jury that it was not for the jury to review the Board's decision either as to the finding of responsibility or the sanction; the Court also noted that both sides were aware of the previous ruling in the case as to what the jury would be allowed to consider. *Id.* at 82-83.

Doe's counsel nevertheless went right back to his script of improper questions, inquiring of Doe about the fact that his criminal conviction was dismissed "without conditions," *id.* at 99; that his father asked Dean Hughes to stay the proceeding, *id.* at 103; that Doe asked Dean Hughes to wait until the "DNA evidence … came back and exonerated" him, *id.* at 105; that he felt "humiliated" by the process, *id.* at 118; and that he was "too depressed to get out of bed" after he was suspended, *id.* at 118-19. BC's objections were sustained and Doe's testimony was

struck, *id*. at 99, 103, 105, 118, 119, but the jury nevertheless heard all of this improper evidence through counsel's questions and Doe's testimony.

### 7. Improper Questioning of Mr. and Mrs. Doe

Doe's counsel similarly examined Doe's parents about improper subjects including their impressions of the pre-hearing meetings with Dean Hughes, her refusal to stay the proceedings, and her scheduling of the hearing. Dkt. 190 at 132, 154. Doe's counsel also sought to elicit improper evidence relating to Doe's emotional distress and other matters intended to invoke the jury's sympathy. For example, Mr. Doe was asked about his own "relationship" with Boston College, *id*. at 124-26, and whether "the board's decision had a lasting impact on [his] son's life." *Id*. at 144-45. Mrs. Doe was asked, "Before these events in 2012, what did Boston College mean to you?" *id*. at 149; "What was [cleaning out Doe's room when he was suspended] like for you?" *id*. at 163; and what happened after Doe returned home upon being suspended? *Id*.[4] BC's objections were sustained. *Id*. at 125-126, 144-145, 149, 163.

### 8. Improper Cross-Examination of the Hearing Board Members

The First Circuit affirmed that Doe's claims of bias on the part of the hearing board did not present a triable issue. Nevertheless, Doe's counsel repeatedly inquired of the board members about these issues, testifying through his questions. Dkt. 191 at 43-44, 56, 60. Doe's counsel also questioned the board members improperly about the exclusion of Doe's investigator and the decision not to wait for the supposedly enhanced video that "would exonerate" Doe. *Id*. at 79, 81. BC's objections were sustained, but once again the jury heard what Doe's counsel wanted and once again BC was forced into the posture of keeping evidence from the jury. *Id*.[5]

---

[4] After Doe rested, BC moved for judgment as a matter of law. Dkt. 179. The Court reserved ruling, noting its concern about the "context" evidence "overcoming the evidence that's relevant to what remains" to be decided by the jury. Dkt. 190 at 170-71.

[5] BC renewed its motion for judgment as a matter of law at the close of all the evidence.  Dkt. 191 at 84.

9.      **Closing Arguments and Jury Instructions**

At the charge conference, the Court presented a proposed instruction on the questions that were for the jury to decide. Dkt. 192 at 4. BC requested a more detailed instruction, which would inform the jury that specific issues Doe's counsel had referenced throughout trial were not for the jury to consider because it had been determined in prior proceedings that these issues did not involve any violation of basic fairness. Dkt. 192 at 15-22; Dkt. 181. The Court agreed that the repeated references to these issues by Doe's counsel was problematic – noting that the Court's admonitions were the most pointed things it had said to any attorney about following the Court's orders – but it declined to give BC's requested instruction. *Id*. at 22-23. The Court stated that if Doe's closing argument crossed the line, the Court would reconsider giving it. *Id.* The Court also noted that "if there is a verdict in Mr. Doe's favor, it certainly gives rise to a well-founded motion for new trial, if defense intends to file such motion, based on what they have argued about the impact of these repeated violations of my orders." *Id.* at 23-24.

In his closing, Doe's counsel improperly argued that BC's General Counsel, Mr. Herlihy, interfered with the hearing board's deliberations – an argument which this Court rejected at summary judgment and was not disturbed by the First Circuit. Dkt. 89 at 44.  BC objected and asked for a curative instruction, but the objections were overruled. Dkt. 193 at 44-45, 75, 86-87.

Although the Court had prepared a more detailed instruction on the issues for the jury to decide, the Court gave the instruction it presented at the charge conference. *Id.* at 6-7, 29-30.

ARGUMENT

I.      **BC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

To prevail on its renewed motion for judgment as a matter of law, BC must demonstrate that the evidence points so strongly in its favor that no reasonable jury could have returned a

verdict for Doe. *Veracode, Inc. v. Appthority, Inc.*, 137 F. Supp. 3d 17, 35 (D. Mass., 2015) (quoting *Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 167 (1st Cir. 2005)). In considering the motion, the Court must "view the evidence in the light most favorable to the non-moving party, and may not substitute [its] own view for that of the jury where the evidence in conflict." *Id.* (citing *Osorio v. One Technologies Inc.*, 659 F.3d 81, 84 (1st Cir. 2011)).

No reasonable jury could have returned a verdict for Doe on the question that was properly before them – whether the "at ease" or "no finding" communications interfered with the hearing board's consideration of Doe's case.

With respect to the "at ease" communication, it was undisputed that on November 11, 2012, Dean Hughes sent an email to Assistant Dean Christine Davis and Mr. Herlihy with a "mind dump" of items relating to Doe's upcoming hearing. Trial Ex. 23. In point 7, Dean Hughes stated, "I was very clear with J.K. that he was coming as a witness and was not being charged with anything. I think it might be good to talk to Catherine-Mary [Rivera, the board chair,] about how the Board might also put him at ease." *Id. All* of the evidence at trial was that this "at ease" communication never was made to Ms. Rivera or the other board members. Ms. Rivera was not copied on the email. *Id.* Ms. Davis testified that she made no such communication to Ms. Rivera or other board members. Dkt. 190 at 110. Mr. Herlihy testified that he also did not. Dkt. 189 at 63. Ms. Rivera and the other board members all confirmed that no such communication ever was made to them. Dkt. 188 at 54, 87; Dkt. 191 at 15, 35, 52, 68.

Nor was there any evidence to support Doe's theory about the effect of this communication, assuming arguendo the board received it. Doe's argument is that the suggestion to put J.K. "at ease" was a signal to reject Doe's "alternative culprit" defense. Dkt. 193 at 34-35. But *all* the evidence at trial was that all the board members carefully considered Doe's claim that

it was J.K. who groped A.B. – they just were not persuaded. Dkt. 191 at 15-19, 26-27, 35-36, 52-53, 68, 69-70; Dkt. 188 at 104-105. Doe presented *no* evidence that any of the board members were told, nor that they inferred, that they were to give J.K. any special treatment with respect in their consideration of the case. Dkt. 191 at 18, 36, 53, 69; Dkt. 188 at 90-92.

With respect to the "no finding" communication, there was evidence from which the jury could find that, after the first day of the board's deliberations, Ms. Rivera asked Dean Hughes if a "no finding" was an allowable outcome and Dean Hughes, after conferring with Dean Paul Chebator, told Ms. Rivera that Dean Chebator said "no findings" were permitted but he discouraged them. Dkt. 188 at 160-61. Ms. Rivera testified that she recalled no such exchange with Dean Hughes or anyone else from the Dean's Office, *id.* at 67-68, 101, and that, in any event, she never told the other board members that an outcome of "no finding" was discouraged. *Id.* at 103. The other board members all testified they never were told that a "no finding" was discouraged. Dkt. 191 at 23, 39, 52, 73. Ms. Rivera and the other board members also testified that they all understood from their training at BC that an outcome of "no finding" was always an option. Dkt. 188 at 67-68, 102; Dkt No. 191 at 25, 42. Ms. Rivera and the other board members all testified that they unanimously found Doe "responsible" for inappropriately touching A.B. because a preponderance of the evidence supporting that finding, whereas a preponderance of the evidence supported a finding of "not responsible" for digital penetration. Dkt. 191 at 26, 39, 54-55, 73-74; Dkt. 188 at 99, 103-04. Board members also testified if they had believed a "no finding" was appropriate, they would have voted for that outcome. Dkt. 191 at 42, 75.

Simply put, there was a complete absence of evidence to support a finding that either of the communications at issue interfered with the board's consideration of Doe's case. Indeed, it was for this very reason that Doe's counsel tried a different case entirely – inviting the jury to

conclude that Doe was actually innocent and that BC acted "unfairly," including by not waiting for the "enhanced" video and forensic evidence that "exonerated" Doe and caused the D.A.'s office to dismiss the criminal charges, not allowing Doe's investigator to testify at the hearing, and so on. No reasonable jury could find for Doe on the sole issue that the First Circuit remanded for trial. Accordingly, the Court should enter judgment for BC as a matter of law.

## II.   BC IS ENTITLED IN THE ALTERNATIVE TO A NEW TRIAL ON LIABILITY.

The Court's power to grant a motion for a new trial is "much broader" than its power to grant a motion for judgment as a matter of law. *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009). The Court may grant a new trial if the verdict is against the weight of the evidence.  *Id.* The Court also "has the power ***and duty*** to order a new trial whenever, in its judgment, the action is required in order to prevent injustice." *Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 181 (1st Cir. 1988) (quoting 11 C. Wright, A. Miller & M. Kane, FED. PRACTICE AND PROCEDURE § 2805 (1973)) (emphasis added; internal quotation marks omitted). A new trial only on liability is appropriate where, as in this case, misconduct by counsel improperly influenced the determination of liability but the measure of damages was not influenced. *See Winn v. Lafayette Town House*, 839 F.2d 835, 837 (1st Cir. 1988).

### A.   The Verdict is Against the Weight of the Evidence.

"When deciding whether to grant a new trial, a district court is free to independently weigh the evidence," including the credibility of witnesses. *Jennings*, 587 F.3d at 436 (citing *MacQuarrie v. Howard Johnson Co.*, 877 F.2d 126, 132 (1st Cir. 1989). "[T]he court "may order a new trial 'even where the verdict is supported by substantial evidence.'" *Shea v. Porter*, 56 F. Supp. 3d 65, 79 (D. Mass. 2014) (citations omitted).

The verdict here is not supported by "substantial" evidence, much less the "weight" of the evidence, for the reasons discussed above. A new trial is warranted on this basis alone.

###### B.       The Verdict was Unjustly Influenced by Misconduct.

BC also is entitled to a new trial because the verdict was so influenced by the misconduct of Doe's counsel as to cause a miscarriage of justice. To assess whether counsel's misconduct requires a new trial, the Court must examine "the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself." *Guzman v. Boeing Co.*, 366 F. Supp. 3d 219, 240-41 (D. Mass. 2019) (quoting *Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir. 1988)); *see also Martinez v. Cui*, 608 F.3d 54, 62 (1st Cir. 2010). "(T)he only way that the defendant can be protected against the strong possibility of harm from the improper occurrence at trial for which it was in no way responsible is by having a new trial." *Warner v. Rossignol*, 538 F.2d 910, 913 (1st Cir. 1976) (quoting *Beck v. Wings Field, Inc.*, 122 F.2d 114, 117 (3d Cir. 1941)); *see also Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980) (It is axiomatic that "[c]ounsel should not introduce extraneous matters before a jury or, by questions or remarks, endeavor to bring before it unrelated subjects, and, where there is a reasonable probability that the verdict has been influenced by such conduct, it should be set aside.").

There is more than just a "strong possibility" that the verdict in this case was unjustly influenced by counsel's misconduct. It was the entire strategy of Doe's counsel. Lacking any evidence to support the narrow "interference" issue that the First Circuit remanded for trial, Doe's counsel set out to try a different case entirely, brazenly ignoring the First Circuit's decision and the numerous orders, rulings, and warnings this Court issued in light of that

decision. One need not infer that the verdict was influenced by misconduct. That is precisely what Doe's counsel set out to achieve and the only route he had to get there.

Each of the factors that the First Circuit in *Guzman* identified for consideration supports setting the verdict aside:

**Nature of the misconduct:**  The misconduct by Doe's counsel was willful and egregious. It involved not just isolated failures to abide by a Court order or ruling, but a complete refusal to respect any of the Court's numerous orders and rulings about the scope of trial, admissible evidence, and questions that properly could be put to witnesses.

**Frequency of the misconduct:**  The misconduct occurred throughout the trial beginning with the opening statement, with every single witness, and in the closing argument. To say the misconduct was pervasive is an understatement. It was unrelenting.

**Relevancy to the real issues before the jury:**  The misconduct is entirely relevant to the real issues before the jury. The aim of the misconduct was to divert the jury from question whether the "at ease" or "no finding" communications interfered with the board's decision, and led the jury to focus on whether Doe in fact was innocent and whether the conduct process was unfair in relation to issues this Court and the First Circuit had decided were not triable.

**The manner in which the parties and the Court treated the conduct:**  BC objected to the misconduct throughout the trial, making clear its view that the misconduct was not merely improper but highly prejudicial to BC. Doe's counsel treated the issue with contempt – refusing to modify his behavior in the least. The Court noted its concern about the seriousness and pervasiveness of the misconduct at several points during the trial, as noted above. Although the Court sustained many of BC's objections and gave more than one cautionary instruction, such instructions "are effective only up to a certain point. There must be a line drawn in any trial

where, after repeated exposure of a jury to prejudicial information, … cautionary instructions will have little, if any, effect in eliminating the prejudicial harm." *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 759 (6th Cir. 1980) (quoting *O'Rear v. Fruehauf Corp*., 554 F.2d 1304, 1309 (5th Cir. 1977)). This case proves the point all too well.

**The strength of the case:**  As discussed above, Doe's case on the basis of the admissible evidence was beyond weak – it was non-existent. This fact alone amply demonstrates the miscarriage of justice that must be corrected.

**The verdict:**  The verdict can only be explained as the product of the misconduct – the very outcome that the misconduct was designed to achieve.

### C.     The Court Erroneously Admitted Evidence and Allowed Argument Outside the Scope of Trial.

While the Court sustained the vast majority of BC's objections to the misconduct of Doe's counsel, the Court erred in overruling several objections. This also warrants a new trial.

First, the Court erroneously admitted evidence concerning Dean Hughes's alleged treatment of Doe during her pre-hearing meetings with Doe and his parents. The Court allowed the evidence on the basis that it went to the question whether Ms. Hughes had a "predisposition" or "motivation" for participating in the alleged "interference." Dkt. 189 at 103-04; Dkt. 193 at 15-16. Whether Ms. Hughes had such a "motive" or "predisposition" was irrelevant; the questions for the jury were only whether the communications in fact occurred and whether they interfered with the Board's deliberations. Doe sought to attack Ms. Hughes's alleged treatment of Doe as a "contemptible criminal" not for any proper purpose, but instead as part of his campaign to demonstrate that BC treated Doe "unfairly." This was improper, because the First Circuit ruled that the evidence about Dean Hughes's alleged treatment of Doe failed to overcome

the presumption of impartiality that is granted to university administrators. 892 F.3d at 84. The evidence should have been excluded as irrelevant and unfairly prejudicial to BC.

The Court also erred in overruling BC's objections to the closing argument of Doe's counsel, in which he argued that Mr. Herlihy interfered with the board's deliberations. Dkt. 193 at 44-45, 74-75. The Court rejected this claim at summary judgment, Dkt. 89 at 44, and the First Circuit did not disturb that on appeal. *Doe v. Trs. of Bos. Coll.*, 892 F.3d at 85-86. Moreover, the evidence at trial confirmed that Mr. Herlihy did not communicate with the board members until after it had finished its deliberations. Dkt. 189 at 49. There was no contrary evidence or impeachment. Allowing Doe's counsel to argue that Mr. Herlihy interfered with the board's deliberations, and declining to give a curative instruction as BC requested, signaled to the jury that it could consider the issue of "interference" to involve matters beyond the "at ease" and "no finding" communications. These errors are additional reasons why a new trial is warranted.

CONCLUSION

The Court should allow BC's motion for judgment as a matter of law or in the alternative grant a new trial on the issue of liability.

                                        TRUSTEES OF BOSTON COLLEGE,

                                        /s/ Elizabeth H. Kelly
                                        Daryl J. Lapp (BBO No. 554980)
                                            daryl.lapp@lockelord.com
                                        Elizabeth H. Kelly (BBO No. 672277)
                                            liz.kelly@lockelord.com
                                        LOCKE LORD LLP
                                        111 Huntington Avenue
                                        Boston, MA 02199
June 15, 2020                           617.230.0100

**Certificate of Service**

This document was served electronically upon all counsel of record by filing through the ECF system on June 15, 2020.

/s/ Elizabeth H. Kelly
Elizabeth H. Kelly

82937862v.2