UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-10790-DJC |
| | ) | |
| TRUSTEES OF BOSTON COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR NEW TRIAL ON LIABILITY**

DLA PIPER LLP (US)

Matthew J. Iverson (BBO # 653880)
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000
(617) 406-6100 (fax)
matthew.iverson@dlapiper.com

Charles B. Wayne (*pro hac vice*)
Brian J. Young (*pro hac vice*)
500 8th Street, N.W.
Washington, D.C.  20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................1

I.   Boston College's Motion for Judgment as a Matter of Law Is Without a Legal or
     Factual Basis. ...............................................................................................................1

    A.   The First Circuit Has Already Decided the Issue Presented, and the Law of the
          Case Requires Denial of the Motion. ...............................................................2

        1.   The First Circuit Held that Summary Judgment was Inappropriate Because a
               Reasonable Jury Could Find for John Doe .............................................2

        2.   Boston College's Motion Is Governed by the Identical Legal Standard and
               Must Be Denied Under the Law-of-the-Case Doctrine ...............................3

    B.   The Law of the Case Aside, John Doe Presented Ample Evidence on Which the
          Jury Could Base a Plaintiff's Verdict................................................................5

        1.   "At Ease" Communication .......................................................................6
            a.   Hughes, Davis, and Rivera ...............................................................7
            b.   Evidence of "Many Accommodations" and Their Effect .................8
        2.   "No Finding" Communication ................................................................10

II.  Boston College Is Not Entitled to a New Trial. .........................................................12

    A.   The Jury's Verdict is Supported by Ample Evidence........................................12

    B.   The Court Properly Admitted Evidence and Permitted Argument Relating to
          Hughes' and Herlihy's Conduct. ...................................................................13

        1.   Hughes ...................................................................................................13

        2.   Herlihy ...................................................................................................14

    C.   The Jury's Judgment Was Not Improperly Swayed by the Conduct of Counsel. ..........15

        1.   Opening Statement..................................................................................16

        2.   Closing Argument...................................................................................18

        3.   Examination of Witnesses .......................................................................19

        4.   The Jury's Verdict ..................................................................................19

CONCLUSION......................................................................................................................20

## INTRODUCTION

Boston College's alternative motions suffer from a variety of legal and evidentiary infirmities.  The motion for judgment as a matter of law is, initially, barred by the law-of-the-case doctrine: the First Circuit, using the legal standard applicable to that motion, reversed the summary judgment ruling and, as a result, precluded this Court's consideration of the motion.  Even if the law-of-the-case doctrine is disregarded, the appellate decision still requires that the motion be denied.  The First Circuit ruled that the two breach-of-contract claims were supported by sufficient evidence in the appellate record that required submission to a jury, and this Court's analysis need go no further.  Finally, there was substantial additional evidence presented at trial, the Court properly submitted the case to the jury, and that decision should not be revisited.

As for the new trial motion, none of Boston College's bases are sound.  The jury's verdict is supported by ample evidence, and the Court properly admitted evidence and permitted argument as to the conduct of Dean Hughes and General Counsel Herlihy.  Finally, the jury's judgment was not improperly influenced by the conduct of plaintiff's counsel.  To the extent that there were issues, the Court gave curative instructions that the jury is presumed to have followed.  The verdict revealed that the jury (1) carefully deliberated and weighed the evidence; and (2) awarded damages that were less than one quarter of the requested amount.  Boston College was not deprived of a fair trial.

## ARGUMENT

### I.  Boston College's Motion for Judgment as a Matter of Law Is Without a Legal or Factual Basis.

As a threshold matter, Boston College's motion for judgment as a matter of law suffers from a fatal legal flaw: the law of the case requires that this Court deny the motion.  Apart from the law of the case, there was ample evidence to support the jury's verdict.

**A. The First Circuit Has Already Decided the Issue Presented, and the Law of the Case Requires Denial of the Motion.**

**1. The First Circuit Held that Summary Judgment was Inappropriate Because a Reasonable Jury Could Find for John Doe.**

When this case was on appeal, the First Circuit reviewed the grant of summary judgment *de novo,* using the familiar standard employed by district courts. The Court was required to determine whether there were genuine disputes of material fact that "need[] to be resolved by a trier of fact." *Doe v. Trustees of Boston College*, 892 F.3d 67, 79 (1st Cir. 2018) (citation and internal quotation marks omitted). In the course of its analysis, the Court was to decide whether "the evidence about [a] fact is such that a reasonable jury could resolve the point in favor of the nonmoving party," *i.e.*, John. *Id.* (citations and internal quotation marks omitted). And, as mandated, the Court was to draw "all reasonable inferences in favor of [John,] the non-moving party." *Id.* (citations and internal quotation marks omitted).

The First Circuit ruled that summary judgment should not have been granted to Boston College on two breach-of-contract claims. The first concerned J.K., a fellow student whom John contended had assaulted the complainant A.B., if, in fact, an assault did occur. There was documentary evidence that Senior Associate Dean of Students Carole Hughes instructed her subordinate, Christine Davis, "'to talk to [Administrative Hearing Board Chair Catherine-Mary Rivera] about how the [B]oard might also put [J.K.] at ease'" for his hearing testimony. *Id.* at 87. The First Circuit ruled that "[t]he phrase 'at ease' may encompass many accommodations," may have been "an indication that J.K. received special treatment," and, thus, John's "alternative culprit defense" may not have been "'fairly considered' by the Board." *Id.* As a result, there was "a material fact [in dispute] . . . that should be resolved by the jury," and the court vacated the award of summary judgment on that alleged breach. *Id.*

Second, John claimed that the Dean's Office's communications with Rivera "while deliberations were still ongoing" impermissibly "interfered with the Board's decision on the sexual assault complaint . . . ." *Id.* at 85-86.  There was evidence that Hughes told Rivera that "one of the verdict options favorable to [John] ("no finding") was discouraged by the Dean of Students." *Id.* at 86.  The First Circuit held: "Because a reasonable jury could resolve the dispute in favor of [John], the dispute is genuine and summary judgment inappropriate." *Id.*

In addition, the Court overturned the grant of summary judgment on John's claim that Boston College violated its common-law "independent duty to provide basic fairness," which, under the First Circuit's analysis, was co-extensive with the two viable breach-of-contract claims.  *Id.* at 87-88.

The legal standard employed by the First Circuit in reversing the grants of summary judgment is, as discussed below, precisely the same standard applicable to all three of Boston College's Rule 50 motions for judgment as a matter of law: the one made at the close of plaintiff's case-in-chief,[1] the one made at the close of all the evidence,[2] and the pending motion.

### 2. Boston College's Motion Is Governed by the Identical Legal Standard and Must Be Denied Under the Law-of-the-Case Doctrine.

"The standard for granting a Rule 50 motion is stringent.  Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." *Malone v. Lockheed Martin Corp.*, 610 F.3d 16, 20 (1st Cir. 2010) (citations and internal quotation marks omitted).

---

[1] The Court reserved its ruling.  Dkt. 190 at 170-71.

[2] The Court denied this motion, subject to post-verdict renewal.  Dkt. 191 at 84.

EAST\174976924.3

The Supreme Court made clear more than 30 years ago that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that '*the inquiry under each is the same*.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 503 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)) (emphasis added). Under both a Rule 56 motion and a Rule 50 motion, the district court must (1) "review all of the evidence in the record"; (2) "draw all reasonable inferences in favor of the nonmoving party"; and (3) refrain from "credibility determinations," "weigh[ing] the evidence," and "the drawing of legitimate inferences from the facts," for those "are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150 (citations and internal quotation marks omitted). And "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.

As discussed above, the First Circuit applied these same principles in reversing the grant of summary judgment on two of the breach-of-contract claims and the related basic-fairness claims.  The Court ruled that John's evidence created disputes of material fact that required submission of those claims to a jury.  *See* 892 F.3d at 87 (alternative-culprit-defense claim "should be resolved by the jury"); *id.* at 86 ("a reasonable jury could resolve" interference-in-deliberations claim "in favor of [John]").

Under *Reeves* and *Liberty Lobby*, this Court is required to engage in the identical inquiry in resolving Boston College's post-verdict Rule 50 motion.  The legal standard is the same, and the evidence in the appellate record cited the First Circuit was also before the jury.  As a consequence, the First Circuit's reversal of summary judgment falls squarely within the law-of-the-case doctrine, "a prudential principle that precludes litigation on the legal issues presented in successive stages of a single case once those issues have been decided." *United States v. Vigneau*, 337 F.3d 62, 67 (1st Cir. 2003) (citations and internal quotation marks omitted).  In

- 4 -

cases involving an appeal and remand, like this one, "law of the case" means that "a decision of an appellate tribunal on a particular issue . . . governs the issue during all subsequent stages of the litigation" in the trial court. *United States v. Rivera-Martinez*, 931 F.2d 148, 150 (1st Cir. 1991) (citing *Arizona v California*, 460 U.S. 605, 618 (1983)). This "form of the doctrine, known as the mandate rule, prohibits a trial court from reopening issues decided by an earlier appellate ruling in the same case." *Ms. S. v. Reg'l Sch. Unit 72*, 916 F.3d 41, 47 (1st Cir. 2019).

Because the issue presented by Boston College's Rule 50 motion is identical to that "actually considered and decided by the appellate court"—*i.e.*, whether a reasonable jury could find for plaintiff—the law-of-the-case doctrine bars reopening the issue. *Id.* The Court should deny the motion on that basis.

### B. The Law of the Case Aside, John Doe Presented Ample Evidence on Which the Jury Could Base a Plaintiff's Verdict.

Even if the law-of-the-case doctrine does not preclude the Court's consideration of the motion, the First Circuit's decision still requires that the motion be denied. Based on the evidence in the appellate record, the First Circuit, as discussed above, determined that two breach-of-contract claims (and the corresponding basic-fairness claims) must be submitted to the jury. John introduced that same evidence at trial, and the claims were properly put before the jury. This Court's analysis need go no further. Nevertheless, the evidence admitted at trial in support of each claim is set forth below.

It should also be emphasized that Boston College's narrow view of the evidence is only made possible by ignoring three fundamental evidentiary principles: (1) the "lenient" Fed. R. Evid. 401 relevance standard requires only that evidence "merely alter the probability of the existence of a fact"[3]; (2) the law permits the jury to give the same weight to circumstantial

---

[3] 2 Weinstein's Federal Evidence § 401.04[2][c] (1997).

evidence as it does to direct evidence[4]; and (3) the jury may draw reasonable inferences from facts that "are justified in light of common sense and personal experience."[5]  The court instructed the jury as to the last two principles, Dkt. 193 at 23-25, and there is a "long-standing presumption that jurors follow instructions."[6]  There was ample evidence to support the jury's verdict.

### 1. "At Ease" Communication

In her "a little mind dump" email on November 11, 2012, Hughes told her subordinate, Davis, and General Counsel Joseph Herlihy that "I was very clear with [J.K.] that he was coming as a witness and was not being charged with anything.  I think it might be good to talk to [Rivera] about how the board might also put him at ease."  Ex. 23.  As discussed above, the First Circuit held that "[t]he phrase 'at ease' may encompass many accommodations," may have been "an indication that J.K. received special treatment," and, thus, John's "alternative culprit defense" may not have been "'fairly considered' by the Board."  892 F.3d at 87.

Boston College has argued, since the case was remanded, that the "at ease" communication must be viewed in isolation.  *See, e.g.,* Sept. 20, 2018 Status Conf. Tr. (Dkt. 109) at 16 ("at ease" statement is a "little piece[] of alleged extracurricular, extramural, ex parte communication with the board chair").  Defense counsel made the same argument to the jury in closing, even conceding that the jury had a credibility determination to make.  Dkt. 193 at 54-56.  Boston College continues the same argument in its motion papers, stating: "***All*** of the evidence at trial was that this 'at ease' communication was never made to Ms. Rivera or the other board members."  Mem. at 14 (emphasis in original).

---

[4] 3 Fed. Jury Prac. & Instr. § 101:42 (6th ed. 2020); First Cir. Pattern Crim. Jury Instr. No. 3.05 (1998); Dkt. 193 at 23-24.

[5] First Cir. Pattern Crim. Jury Instr. No. 3.04 (1998); Dkt. 193 at 24-25.

[6] *United States v. Spencer*, 873 F.3d 1, 16 (1st Cir. 2017).

But Boston College's view of the evidence is not a basis for judgment as a matter of law. To the contrary, there is evidence from the three principals alone—Hughes, Davis, and Rivera—sufficient to support a finding that the "at ease" communication was made in those precise words and in substance as well, as the First Circuit's "many accommodations" holding contemplates.

### a. Hughes, Davis, and Rivera

Davis' and Rivera's denials of the "at ease" communication is not the end of the jury's—or this Court's—evidentiary analysis, nor is it even the beginning. First, there is documentary evidence of the communication—Hughes' "mind dump" email, which was sufficient to create a jury issue for the First Circuit. In addition to the "at ease" assignment, Hughes gave Davis two additional tasks in the email: "reach out to [J.K.] on Monday or Tuesday to check in and make sure" J.K. would appear at the hearing; and "let [Rivera] know . . . that I agreed to let [J.K.'s] dad and possibly his attorney attend the hearing with him." Ex. 23. Hughes expected Davis to follow her instructions, particularly because Davis was new to the job, and Hughes had no reason to believe that Davis would not do as instructed. Dkt. 188 at 149-50.

For her part, Davis admitted that she had "communication with [Rivera] during the course of John Doe's conduct case," Dkt. 190 at 110, but denied relaying Hughes' request to tell Rivera to put J.K. "at ease." *Id.* Davis told the jury that she followed Hughes' directive to "reach out" to J.K. because Hughes said in the email that it "*would* be good" to do so. *Id.* at 114 (emphasis added). Davis then told the jury that she felt free to ignore Hughes' directive to speak to Rivera because Hughes' email said that it only "*might* be good" to do so. *Id.* at 116 (emphasis added). The jury was free to ignore Davis's carefully rehearsed answer, particularly in light of her being on the job for only five days when her boss gave her these instructions. *Id.* at 116-17.

Rivera testified that she "[did] not recall" Davis telling her "to put J.K. at ease," but did admit to "being told that he was coming in as a witness and not being charged with anything."

- 7 -

Dkt. 188 at 54.  Rivera also testified that she spoke to Hughes between the two hearing days and that Hughes told her that "even though J.K. was coming to the hearing as a witness, he was going to have his own advisor and possibly a parent for support."  *Id.*  Rivera had never seen that concession before and even asked Hughes if it was permitted.  *Id.*  Rivera testified that Hughes' allowing J.K. to have both an advisor and a parent at the hearing was equivalent to being told that J.K. should be put "at ease":

> Q.    So other than being told by Dean Hughes that J.K. would
>        be permitted to have both an advisor and a parent to
>        support him, did anyone else in the dean's office also tell
>        you to put J.K. at ease?
>
> A.    No.

*Id.*

In short, as plaintiff argued to the jury, there was ample evidence that the "at ease" message got through to Chairperson Rivera loud and clear.  The expected denials of the other Board members is of no moment.  As the documentary evidence and credible testimony showed—and as discussed below—the conduct of the hearing was directly affected.

### b.  Evidence of "Many Accommodations" and Their Effect

As posited by the First Circuit, the phrase "at ease" did, in fact, "encompass many accommodations," 892 F.3d at 87, and evidence of those accommodations was corroborative of the evidence that the "at ease" instruction was conveyed and implemented.  The jury was presented with a mosaic of evidence relating to accommodations.  The evidence began with the November 9 entry in   Hughes' contemporaneous "narrative" of events in which she demonstrated her bias against John with this statement: "I am particularly concerned that [J.K.] is being accused by [John] of being responsible for this assault."  Ex. 32 at 2.  This statement and her equivalent trial testimony, Dkt. 188 at 144-46, is direct evidence that Hughes was actively

opposed to John's assertion of an alternative culprit defense, even though that was his right.  And

Hughes took steps to implement her opposition and convey her views to the Board.

Hughes' first step was to meet with Herlihy to "consult with [him] about what I can tell

[J.K.]."  Ex. 32 at 2.  As a result of that meeting:

- Hughes, with Herlihy's advice and consent, met with J.K. and his father on November 9 and told them that J.K. "was coming [to the hearing] as a witness and was not being charged with anything," Ex. 23, an explicit grant of immunity.

- At the same meeting, Hughes told J.K. that he could be accompanied at the hearing by his father and an attorney.  *Id.*  Although Hughes later told Rivera that this unusual concession—unheard of by Rivera—was "allowed," Dkt. 188 at 54, the school's sexual assault policies and procedures nowhere provided for such an arrangement.  *See* Exs. 1, 2, 3.

- When J.K.'s father "expressed concern about the need for a lawyer," Hughes "consulted with [Herlihy] and [they] provided two names of local attorneys."  Ex. 32 at 3.  One of them was Philip Tracy, a friend of both Boston College and Herlihy.  Tracy had a history of representing Boston College athletes and other students.  Dkt. 188 at 20-21; Dkt. 189 at 47.

- Between the two hearing days, Hughes and Davis spoke to Rivera and told her that (1) J.K. would be coming to the hearing as a witness and "was not being charged with anything"; and (2) he would be permitted to have an advisor and parent with him.  Dkt. 188 at 53-54.

All of these accommodations—implemented by  Hughes and her agents between the two

hearing days—had a direct effect on the conduct of the hearing, to John's detriment.  At the end

of the first hearing day, Rivera and the other Board members all "consider[ed] J.K. to be a

potential culprit in the case."  Dkt. 191 at 16; Dkt. 188 at 55.  But as a result of the intervening

accommodations—including the statement to Rivera that J.K. was a witness only and "was not

being charged with anything"—the Board's "consider[ation of] J.K. to be a potential culprit in

the case" dissipated entirely, and, with it, John's alternative culprit defense.

The jury heard testimony that the Board gave J.K. "special treatment," treated him "very kindly," and "did not challenge" his version of events.   Dkt. 189 at 114; Dkt. 190 at 158; Dkt. 188 at 24.   The Board also saw his lawyer coaching him between each question and answer, and did not stop it.   Dkt. 188 at 26; Dkt. 189 at 114; Dkt. 190 at 158-59.

The few questions that the Board put to J.K. were "softball" in nature.   Dkt. 188 at 24. The Board did not examine him in any meaningful way about the inconsistencies between his testimony and the texts and telephone calls that were in evidence.   Dkt. 188 at 24; Dkt. 190 at 159.   The Board even accepted his facially-ridiculous explanation that being "blacked out" meant "I had a really good time."   *Id.*   Nor did the Board question him about changing his story when he was interviewed by Investigator Mullen, even though John had proffered what Mullen's testimony would be.   Dkt. 187 at 95-96; Dkt. 188 at 24.

Just as the evidence supported the conclusion that the "at ease" communication made it to the Board through Rivera, it also supported the existence of related and corroborative "many accommodations," as the First Circuit suggested the jury might find.

### 2.   "No Finding" Communication

Just as with the "at ease" communication, there was documentary evidence of the origin of the "no finding" communication that interfered with the Board's deliberations: the Friday, November 16 email from Rivera to Hughes in which she said that the Board, after one deliberation session, was "struggling" with the absence of evidence and was considering a "no finding" result, *i.e.*, an insufficiency of evidence.   Ex. 14.   As Hughes testified, she spoke with Rivera by phone over the weekend, and Rivera asked if the "no finding" result was indeed an option.   Dkt. 188 at 159-60.   Hughes checked with Dean of Students Paul Chebator, who told her, "We have had them in the past, but I discourage them."   *Id.* at 160.   Hughes reported

Chebator's view to Rivera prior to resumption of the deliberations on Monday.  *Id.* at 160-61. Rivera, as the Chair, led the deliberations on both days.  *Id.* at 64-65.

It was this evidence—including direct evidence of Hughes' admission that she spoke the offending communication to the Board Chair—that resulted in the First Circuit's ruling: the issue of "inappropriate[] interfere[nce] with the Board's decision" while "deliberations were still ongoing" was one that "a reasonable jury could resolve . . . in favor of [John]."  892 F.3d at 86.

Rivera's purported lack of recollection of the exchange, Dkt. 188 at 67, is of no consequence, for the jury chose to credit Hughes' testimony.  Similarly, the other Board members' predictable denials are irrelevant as well.  The jury either chose not to believe them or believed that Rivera, in her leadership role as Hughes' handpicked chair, "guided the deliberations away from a no finding just as Dean Chebator and Dean Hughes wanted." Dkt. 193 at 44.

Again, there was corroborative evidence of interference in the Board's deliberations that supported the breach of the contractual provision requiring deliberation "in private."  Ex. 2 at 6. Without objection, Herlihy testified that he (1) was present in the deliberation room with the Board; and (2) supplied the critical finding of the Board's decision: "However, given that this happened in a matter of seconds (the time it took [Betsy] to look away) and given that [A.B.'s] reaction was not one of sudden pain, it seems less likely than not that the perpetrator achieved penetration."  Dkt. 189 at 50-51; Ex. 21 at 3.  Herlihy also made other changes to the findings. Dkt. 189 at 51-53.  The Court overruled a post-closing-argument objection to counsel's reference to that evidence, stating that "I overruled it [because] . . . .  I took it to be about . . . whether or not the deliberations were in private, which I think has been properly on the table before this jury."  Dkt. 193 at 87.

Boston College's argument as to the "no finding" communication, like its argument on the "at ease" communication, amounts to little more than disagreement with the jury's view of the evidence.

## II.  Boston College Is Not Entitled to a New Trial.

To set aside the jury's verdict and order a new trial pursuant to Rule 59(a) requires a finding that "the verdict is so seriously mistaken, so clearly against the law or the evidence, as to constitute a miscarriage of justice." *Transamerica Premier Ins. Co. v. Ober*, 107 F.3d 925, 929 (1st Cir. 1997) (citations and internal quotation marks omitted).  Boston College has invoked all of these grounds.  Mem. at 16-20.  None has merit.[7]

### A.  The Jury's Verdict is Supported by Ample Evidence.

For all the reasons discussed above, there was far more evidence than required to support the jury's verdict.  Even on the limited evidence in the appellate record, the First Circuit ruled that there was evidence sufficient to require that the remanded claims be decided by a jury.

Even if this Court were inclined to accept Boston College's invitation to "independently weigh the evidence," Mem. at 16, that exercise is severely circumscribed by law.  The First Circuit has "often emphasized that a district judge cannot displace a jury's verdict because he [or she] disagrees with it or because a contrary verdict may have been equally . . . supportable." *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009) (citation and internal quotation marks omitted).  And the First Circuit has "repeatedly observed [that] trial judges do not sit as thirteenth jurors, empowered to reject any verdict with which they disagree." *Id.*

The evidence plainly supported the jury's verdict.

---

[7] Nor does Boston College's position that if a new trial is granted, it should be on liability only. Mem. at 16.  If, as Boston College claims, "[t]he verdict can only be explained as the product of the misconduct," *id*. at 19, the damages award is inextricably bound up in the purported misconduct.  Boston College is not entitled to a new trial, but if there is a new trial, Boston College should not be permitted to have its cake and eat it, too.

### B. The Court Properly Admitted Evidence and Permitted Argument Relating to Hughes' and Herlihy's Conduct.

In arguing that the Court worked a miscarriage of justice by admitting evidence and permitting argument relating to Hughes' and Herlihy's conduct, Boston College "sings a familiar tune"[8] that the Court has repeatedly heard and rejected.

#### 1. Hughes

As to Hughes, Boston College's complaint is that (1) the Court admitted evidence of her treatment of John and his parents at three meetings prior to the hearing; and (2) admission of this evidence was erroneous because the "First Circuit ruled that the evidence about Dean Hughes's alleged treatment of Doe failed to overcome the presumption of impartiality that is granted to university administrators." Mem. at 19-20 (citing 892 F.3d at 84).

The latter point is simply a misstatement of the First Circuit's ruling. The cited portion of its opinion related to John's argument that Rivera's conduct at the hearing demonstrated bias; it had nothing to do with Hughes. *See* 892 F.3d at 84.

The former point, as discussed above, is the product of Boston College's disregard of (1) the definition of relevance under Fed. R. Civ. P. 401; (2) the probative value of circumstantial evidence; and (3) the jury's right to draw reasonable inferences from the evidence. The Court ruled at sidebar—consistent with these evidentiary principles—that what John and his parents said to Hughes and her reaction were relevant to her "predisposition leading to cause for interference." Dkt. 189 at 103. Given that Hughes was a principal actor in both instances of alleged interference—"at ease" and "no finding"—the ruling was plainly correct and well within the Court's discretion.[9]

---

[8] *Crowe v. Marchand*, 506 F.3d 13, 19 (1st Cir. 2007) (affirming denial of new trial motion).

[9] A district court's evidentiary rulings are subject to an abuse-of-discretion standard. *E.g., Fryar v. Curtis*, 485 F.3d 179, 182 (1st Cir. 2007).

And this ruling was revisited immediately prior to closing arguments as well.  The Court ruled that plaintiff's counsel could, in his closing argument, (1) reference not only the three meetings with Hughes, but also the pre-hearing confrontation between (a) Hughes and (b) the Does and their counsel; and (2) use the word "predisposition" to describe Hughes' state of mind as to John's culpability.  Dkt. 193 at 15-16, 18.

None of the Court's rulings concerning this Hughes evidence and argument was in error.

### 2.  Herlihy

As to Herlihy, Boston College argues only that it was error for the Court to overrule its objections during plaintiff's closing argument to references to Herlihy's post-hearing interactions with the Board.   Mem. at 20.   Boston College does not assert that the admission of the underlying evidence was in error, nor can it.  In his adverse direct examination in plaintiff's case-in-chief, Herlihy testified, without objection by defense counsel, that (1) on Monday, November 19, at the Board's request, he went to the room in Maloney Hall where the Board held its second deliberation session; (2) he supplied the language of the second bullet point in the Board's findings ("less likely than not that the perpetrator achieved penetration"); and (3) he made additional changes to the Board's findings.  Dkt. 189 at 49-53.

Immediately prior to closing argument, plaintiff's counsel inquired of the Court as to whether he could address this evidence in closing argument.   The Court answered in the affirmative, and defense counsel did not object.  Dkt. 193 at 17.  Plaintiff's counsel discussed that evidence in closing, which drew two separate objections from defense counsel, both of which were overruled by the Court.  Dkt. 193 at 44-45, 75.

After the Court gave the final portion of its instructions to the jury, defense counsel once more objected, and requested an instruction to the jury that "there was no actionable interference

by Mr. Herlihy with the board's deliberations." *Id.* at 86-87.  The court's response and ruling, as discussed in part above, was:

> [O]verruled . . . .  I took that to be a reference to deliberations in private.  I certainly see the argument by BC about that not being deliberations in private because there were indications . . . that they had already reached their decision.  I think that is [a] matter of credibility for the jury, which is why I didn't sustain the [objection]. . . .  I don't think there's now a third allegation about interference.  I took it to be about this issue about whether or not the deliberations were in private, which I think has been properly on the table before this jury.

*Id.* at 87.  There was no error.

### C.  The Jury's Judgment Was Not Improperly Swayed by the Conduct of Counsel.

"A new trial may be granted on the ground of prejudicial misconduct of counsel that is not cured by the judge's instructions to the jury.  The overarching inquiry is whether the errors committed by plaintiff's counsel, considered in their totality, injuriously affected the substantial rights of the defendant and deprived [it] of a fair trial."  *Guzman v. Boeing Co.,* 366 F. Supp. 3d 219, 241 (D. Mass. 2019) (citations and internal quotation marks omitted) (collecting cases).  Even where there may be "some prejudicial effect on the jury," the court is not to disturb the verdict unless it can "say with fair assurance . . . that the judgment was [] substantially swayed by the error."  *Ahern v Scholz*, 85 F.3d 774, 791 (1st Cir. 1996) (citations and internal quotation marks omitted).

This case presents no such situation, for even in Boston College's hyperbolic recounting, any potential problems were addressed by the Court's curative instructions, which the jury is presumed to have followed.  *See supra* note 6 and accompanying text.  Boston College complains about the entirety of the trial: opening statement, closing argument, examination of witnesses, and the jury's verdict.  Each is addressed in turn below.

### 1.   Opening Statement

Despite defense counsel's failure to object during plaintiff's 30-minute opening statement or at any time thereafter,[10] Boston College asserts that it was improper for these subjects to be addressed: (1) Hughes' treatment of John in the pre-hearing meetings as a "contemptible criminal" and refusing to let him tell his side of the story; (2) Hughes' refusal to delay the proceedings until the exculpatory forensic test results and enhanced video could be obtained; and (3) the nature and circumstances of the criminal charges and their ultimate resolution.  Mem. at 5.

The first two topics—relating to Hughes' pre-hearing attitude and conduct—were entirely appropriate.  As discussed above, the Court admitted evidence concerning Hughes' pre-hearing conduct and statements because it was relevant to her "predisposition leading to cause for interference."  Dkt. 189 at 103.  Over defense counsel's objections, the Court permitted John, Mary, and James Doe to testify about the content of the three meetings with Hughes, her attitude, her refusal to let John explain, and her refusal to delay the hearing until the exculpatory evidence could be obtained.  Dkt. 189 at 101-02, 105-06; Dkt. 190 at 130-32, 150-54.

As to the criminal charges, it was no surprise to defense counsel that the nature and circumstances of the those charges would be part of the trial.  The agreed exhibits included the criminal complaint (Ex. 9), the state police arrest report (Ex. 10), and a state police investigation report (Ex. 12), all of which were provided to the Board.  *See* Ex. 27.  In addition, plaintiff's timeline chalk (Ex. D3 for identification) contained the date of John's arrest.  Moreover, what John told the Board about his arrest and arraignment could, under the Court's ruling about the scope of evidence, be introduced into evidence at trial, as could his statements concerning the

---

[10] Only after plaintiff's counsel raised an issue relating to Boston College's opening statement did defense counsel share that he "restrained [him]self" from objecting during plaintiff's opening, apparently out of concern about how it might look to the jury.  Dkt. 187 at 69.

forensic test results and the expected enhanced video.  Finally, Boston College asked that the

Court give a preliminary instruction, "before opening statements," that the jury was not being

asked to decide, *inter alia*, (1) whether "the Board should have waited for evidence about the

results of tests conducted on swabs of Doe's hands"; and (2) whether "the Board should have

waited until it had the ability to review an enhanced version of the surveillance video of the

dance floor."  Dkt. 130  at 1, 3.  Defense counsel well knew that the criminal charges and John's

defense to them would be in evidence because they were before the Board, even if it was clear to

all that the jury would not be deciding the propriety of Boston College's actions with respect to

those issues.

The resolution of the criminal case is another matter, and counsel understands that the

Court "was surprised to hear about it in [plaintiff's] opening" because it was not before the

Board.  Dkt. 187 at 114.  But the resolution of the criminal case—both the unconditional

dismissal and its timing—was ultimately admitted into evidence and used by the defense to

argue, perhaps successfully, that John's damages were illusory.  The resolution first became

relevant when the Court, at the very beginning of the proceedings, on day one, Dkt. 187 at 4-5,

denied defendant's motion in limine to exclude the opinions of Mr. Shedlin (and Dr. Morse) that

remained after the Court precluded emotional distress damages both as contract damages[11] and

as affecting John's career path and earning potential.[12]

The remainder of Mr. Shedlin's opinion was that (1) the stigma of Boston College's

finding of responsibility resulted in diminished earning capacity for John over the course of his

working life; and (2) Boston College's actions resulted in a one-year delay in John entering law

school and the legal profession.  Dkt. 190 at 17-19, 35-36.  John testified as to the factual bases

---

[11] Dkt. 124 (electronic order).

[12] Dkt. 151 (electronic order).

for both of these opinions.  On direct examination, the Court overruled the defense's objection and let these questions and answers stand:

> Q. Now, did this arrest and its resolution stigmatize you in any way?
>
> A. No.
>
> Q. Why not?
>
> A. Well, I knew from the outset I was going to be exonerated, which I was, by the D.A.

Dkt. 189 at 99.

On cross-examination, defense counsel revisited the issue of dismissal of the criminal charges and asked a question that included the following: "And just as you got a dismissal of the criminal charges and you can wave that around and say that nobody should take those into account . . . ."  *Id.* at 157.  This and similar questions led to the admission, on redirect examination, of the transcript of the dismissal of the criminal charges, without objection by the defense.  *Id.* at 158-59; Ex. 36.  Likewise, the timing of the dismissal—in May 2014—and its effect on the timing of John's application to law school was the subject of vigorous cross-examination by defense counsel of both John and Mr. Shedlin.  Dkt. 189 at 134-44; Dkt. 190 at 35-46.

In short, the nature and the timing of the dismissal of the criminal charges were central to the damages issues in the case.  To the extent that Boston College suffered any possible prejudice as a result of the reference to that dismissal in plaintiff's opening statement, the Court gave a curative instruction that the jury is presumed to have followed.  Dkt. 187 at 73-74.

### 2.  Closing Argument

At the charge conference, the Court stated that if plaintiff's counsel ran afoul of the Court's evidentiary rulings, the Court would seriously consider a motion for new trial.  Dkt. 192

- 18 -

at 23-24.  On the following day of trial, prior to closing arguments, counsel posed six questions to the Court relating to which subjects could be addressed in closing, including (1) Hughes' pre-hearing conduct and her "predisposition" to believe John was guilty; (2) Herlihy's interaction with the Board in the deliberation room; and (3) Rivera's email (Ex. 14) referencing "struggling with needing to see the other evidence," *i.e.,* the forensic test results and the enhanced video. The Court answered all those questions in the affirmative.  Dkt. 193 at 13-18.  During plaintiff's closing, defense counsel objected twice—both relating to Herlihy's conduct—and the Court overruled both objections, as discussed above.  Dkt. 193 at 44-45, 75.

Finally, the Court, prior to the closings, had prepared an instruction that would be given if the Court thought it "necessary after closing arguments" because of improper argument by plaintiff's counsel.  Dkt. 193 at 6-7.  The Court did not give the instruction, nor did defense counsel ask that it be given.

### 3.   Examination of Witnesses

Boston College's lengthy discussion of plaintiff's counsel's questioning of witnesses boils down to this: questions were asked, objections were made, and some objections were sustained.  A number of objections were overruled.  None of what transpired was out of the ordinary and is certainly not grounds for a new trial.

### 4.   The Jury's Verdict

In order to prevail on a new trial motion, the movant must demonstrate that the jury's "judgment was substantially swayed" by the conduct in issue.  *Ahern*, 85 F.3d at 791.  When it is the plaintiff's counsel's conduct that is examined, the inquiry is often phrased as whether counsel "sought to inflame the jury."  *Osorio v. One World Techs., Inc.*, 659 F.3d 81, 89-90 (1st Cir. 2011) (affirming denial of motion); *see also Guzman*, 366 F. Supp. 3d at 242 (counsel did not "improperly inflame[] the jury").

- 19 -

The timing and the substance of the verdict are the most relevant factors in determining whether the jury was improperly influenced.  "[A] quick verdict may with other circumstances indicate passion or prejudice . . . ."[13]  Here, the jury deliberated for over four hours,[14] an entirely appropriate amount of time given the length of the trial (one full day and five partial days).

Nor does the verdict reflect an excessive amount of damages, for the jury awarded $102,426.50, Dkt. 184, less than one quarter of the amount requested.  Dkt. 193 at 71.  Not only has Boston College failed to argue that the award is excessive, it is willing to accept that amount of damages should there be a plaintiff's liability verdict on retrial.  Mem. at 16.  This concession is "very significant[]," for it weighs heavily against disturbing the verdict.  *Forrestal v. Magendantz*, 848 F.2d 303, 310 (1st Cir. 1988) (affirming verdict where defendant did not argue that damages were excessive).

## CONCLUSION

The Court should deny the motion.

> Respectfully submitted,
>
> John Doe
>
> By his attorneys,
>
> DLA PIPER LLP (US)
>
> /s/ Matthew J. Iverson
> Matthew J. Iverson (BBO # 653880)
> 33 Arch Street, 26th Floor
> Boston, MA 02110
> (617) 406-6000
> (617) 406-6100 (fax)
> matthew.iverson@dlapiper.com

---

[13] *Segars v. Atlantic Coast Line R.R. Co.*, 286 F.2d 767, 771 (4th Cir. 1961) (citation and internal quotation marks omitted) (cited in *Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 182 (1st Cir. 1988)).

[14] Dkt. 193 at 91.

/s/ Charles B. Wayne
Charles B. Wayne (*pro hac vice*)
Brian J. Young (*pro hac vice*)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of July, 2020, a copy of the foregoing was served by electronic mail using the CM/ECF system, which will then send notification of such filing to all counsel of record.


/s/ Charles B. Wayne
Charles B. Wayne